EDWARD PRIGG, PLAINTIFF IN ERROR, v. THE COMMONWEALTH OF PENNSYLVANIA, DEFENDANT IN ERROR.

A writ of error to the Supreme Court of Pennsylvania, brought under the twenty-fifth section of the judiciary act of 1789, to revise the judgment of that Court, on a case involving the construction of the Constitution and laws of the United States.

Edward Prigg, a citizen of the state of Maryland, was indicted, for kidnapping, in the Court of Oyer and Terminer of York county, Pennsylvania, for having forcibly taken and carried away, from that county, to the state of Maryland, a negro woman, named Margaret Morgan, with the design and intention of her being held, sold, and disposed of as a slave for life, contrary to a statute of Pennsylvania, passed on the twenty-sixth day of March, 1826. Edward Prigg pleaded not guilty, and the jury found a special verdict, on which judgment was rendered for the Commonwealth of Pennsylvania. The case was removed to the Supreme Court of the state, and the judgment of the Court of Oyer and Terminer was, pro forma, affirmed: and the case was carried to the Supreme Court of the United States; the constitutionality of the law, under which the indictment was found, being denied by the counsel of the state of Maryland; which state had undertaken the defence for Edward Prigg, and prosecuted the writ of error. The cause was brought to the Supreme Court, with the sanction of both the states of Maryland and Pennsylvania, with a view to have the questions in the case settled. Margaret Morgan was the slave for life, under the laws of Maryland, of Margaret Ashmore, a citizen of that state. In 1832 she escaped and fled from the state, into Pennsylvania. Edward Prigg, having been duly appointed the agent and attorney of Margaret Ashmore, and having obtained a warrant from a justice of the peace of York county, caused Margaret Morgan to be taken, as a fugitive from labour, by a constable of the state of Pennsylvania, before the magistrate, who refused to take cognisance of the case: and thereupon Edward Prigg carried her and her children into Maryland, and delivered them to Margaret Ashmore. The children were born in Pennsylvania; one of them, more than a year after Margaret Morgan had fled and escaped from Maryland.

By the first section of the act of Assembly of Pennsylvania of 25th March, 1826, it is provided, that if any person shall by force and violence take and carry away, or shall by fraud or false pretence attempt to take, carry away, or seduce any negro or mulatto from any part of the commonwealth, with a design or intention of selling and disposing of, or keeping or detaining such negro or mulatto as a slave or servant for life, or for any other term whatsoever, such person, and all persons aiding and abetting him, shall, on conviction thereof, be deemed guilty of a felony, and shall forfeit and pay a sum not less than five hundred nor more than three thousand dollars, and shall be sentenced to undergo a servitude for any term or terms of years, not less than seven years, nor exceeding twenty-one years; and shall be confined and kept at hard labour, &c. Other provisions are contained in the act; and it was passed in 1826, as declared in its title, to aid in carrying into effect the Constitution and laws of the United States, relating to fugitives from labour; and on the application to the legislature, by commissioners from the state of Maryland,

[Prigg *v.* The Commonwealth of Pennsylvania.]

with a view to meet the supposed wishes of the state of Maryland on the subject of fugitive slaves; but it had failed to produce the good effects intended.

By the Court:

It will, probably, be found, when we look to the character of the Constitution of the United States itself, the objects which it seeks to attain, the powers which it confers, the duties which it enjoins, and the rights which it secures ; as well as to the known historical fact that many of its provisions were matters of compromise of opposing interests and opinions ; that no uniform rule of interpretation can be applied, which may not allow, even if it does not positively demand, many modifications in its actual application to particular clauses. Perhaps the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties, and rights, with all the light and aids of contemporary history; and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed.

It is historically well known, that the object of the clause in the Constitution of the United States, relating to persons owing service and labour in one state escaping into other states, was to secure to the citizens of the slaveholding states the complete right and title of ownership in their slaves, as property, in every state in the Union, into which they might escape from the state where they were held in servitude. The full recognition of this right and title, was indispensable to the security of this species of property in all the slaveholding states; and indeed was so vital to the preservation of their domestic interests and institutions, that it cannot be doubted that it constituted a fundamental article, without the adoption of which the Union could not have been formed. Its true design was to guard against the doctrines and principles prevailing in the non-slaveholding states, by preventing them from intermeddling with or obstructing or abolishing the rights of the owners of slaves.

By the general law of nations, no nation is bound to recognise the state of slavery as to foreign slaves within its territorial dominions, when it is opposed to its own policy and institutions, in favour of the subjects of other nations where slavery is recognised. If it does it. it is as a matter of comity, and not as a matter of international right. The state of slavery is deemed to be a mere municipal regulation; founded upon, and limited to the range of the territorial laws.

The clause in the Constitution of the United States, relating to fugitives from labour, manifestly contemplates the existence of a positive, unqualified right, on the part of the owner of the slave, which no state law or regulation can in any way qualify, regulate, control, or restrain. Any state law or regulation, which interrupts, limits, delays, or postpones the rights of the owner to the immediate command of his service or labour, operates, pro tanto, a discharge of the slave therefrom. The question can never be, how much he is discharged from , but whether he is discharged from any, by the natural or necessary operation of the state laws, or state regulations. The question is not one of quantity or degree, but of withholding or controlling the incidents of a positive right.

The owner of a fugitive slave has the same right to seize and take him in a state to which he has escaped or fled, that he had in the state from which he escaped : and it is well known that this right to seizure or recapture is universally acknowledged in all the slaveholding states. The Court have not the slightest hesitation in holding, that under and in virtue of the Constitution, the owner of the slave is clothed with

[Prigg *v.* The Commonwealth of Pennsylvania.]

the authority in every state of the Union, to seize and recapture his slave; wherever he can do it without any breach of the peace, or illegal violence. In this sense, and to this extent, this clause in the Constitution may properly be said to execute itself, and to require no aid from legislation, state or national.

The Constitution does not stop at a mere annunciation of the rights of the owner to seize his absconding or fugitive slave, in the state to which he may have fled. If it had done so, it would have left the owner of the slave, in many cases, utterly without any adequate redress.

The Constitution declares that the fugitive slave shall be delivered up on claim of the party to whom service or labour may be due. It is exceedingly difficult, if not impracticable, to read this language, and not to feel that it contemplated some further remedial redress than that which might be administered at the hand of the owner himself. "A claim" is to be made. .

"A claim," in a just juridical sense, is a demand of some matter as of right, made by one person upon another to do or to forbear to do some act or thing, as a matter of duty.

It cannot well be doubted, that the Constitution requires the delivery of the fugitive on the claim of the master: and the natural inference certainly is, that the national government is clothed with the appropriate authority and functions to enforce it. The fundamental principle applicable to all cases of this sort would seem to be, that where the end is required, the means are given; and where the duty is enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is intrusted.

The clause relating to fugitive slaves is found in the national Constitution, and not in that of any state. It might well be deemed an unconstitutional exercise of the power of interpretation, to insist that the states are bound to provide means to carry into effect the duties of the national government; nowhere delegated or intrusted to them by the Constitution. On the contrary, the natural, if not the necessary conclusion is, that the national government, in the absence of all positive provisions to the contrary, is bound, through its own proper departments, legislative, executive, or judiciary, as the case may require, to carry into effect all the right and duties imposed upon it by the Constitution.

A claim to a fugitive slave is a controversy in a case "arising under the Constitution of the United States," under the express delegation of judicial power given by that instrument. Congress, then, may call that power into activity, for the very purpose of giving effect to the right; and if so, then it may prescribe the mode and extent to which it shall be applied; and how and under what circumstances the proceedings shall afford a complete protection and guaranty of the right.

The provisions of the sections of the act of Congress of 12th February, 1793, on the subject of fugitive slaves, as well as relative to fugitives from justice, cover both the subjects; not because they exhaust the remedies, which may be applied by Congress to enforce the rights, if the provisions shall be found, in practice, not to attain the objects of the Constitution: but because they point out all the modes of attaining those objects which Congress have as yet deemed expedient and proper. If this is so, it would seem upon just principles of construction, that the legislation of Congress, if constitutional, must supersede all state legislation upon the same subject; and by necessary implication prohibit it. For if Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner,

[Prigg v. The Commonwealth of Pennsylvania.]

and in a certain form; it cannot be that the state legislatures have a right to interfere. This doctrine was fully recognised in the case of Houston v. Moore, 5 Wheat. Rep. 1, 21, 22. Where Congress have exclusive power over a subject, it is not competent for state legislation to add to the provisions of Congress on that subject.

Congress have, on various occasions, exercised powers which were necessary and proper, as means to carry into effect rights expressly given, and duties expressly enjoined by the Constitution. The end being required, it has been deemed a just and necessary implication, that the means to accomplish it are given also; or, in other words, that the power flows as a necessary means to accomplish the ends.

The constitutionality of the act of Congress relating to fugitives from labour, has been affirmed by the adjudications of the state tribunals, and by those of the Courts of the United States. If the question of the constitutionality of the law were one of doubtful construction, such long acquiescence in it, such contemporaneous expositions of it; and such extensive and uniform recognitions, would, in the judgment of the Court, entitle the question to be considered at rest. Congress, the executive, and the judiciary, have, upon various occasions, acted upon this as a sound and reasonable doctrine. Cited, Stuart v. Laird, 1 Cranch, 299; Martin v. Hunter, 1 Wheat. 304; Cohens v. The Commonwealth of Virginia, 6 Wheat. 264.

The provisions of the act of 12th February, 1793, relative to fugitive slaves, is clearly constitutional in all its leading provisions; and, indeed, with the exception of that part which confers authority on state magistrates; is free from reasonable doubt or difficulty. As to the authority so conferred on state magistrates, while a difference of opinion exists, and may exist on this point in different states, whether state magistrates are bound to act under it, none is entertained by the Court, that state magistrates, may, if they choose, exercise the authority, unless prohibited by state legislation.

The power of legislation in relation to fugitives from labour, is exclusive in the national legislature. Cited, Sturgis v. Crowninshield, 4 Wheat. 122, 193.

The right to seize and retake fugitive slaves, and the duty to deliver them up, in whatever state of the Union they may be found, is under the Constitution recognised as an absolute positive right and duty, pervading the whole Union with an equal and supreme force, uncontrolled and uncontrollable by state sovereignty, or state legislation.

The right and duty are coextensive and uniform in remedy and operation throughout the whole Union. The owner has the same security, and the same remedial justice, and the same exemption from state regulations and control, through however many states he may pass with the fugitive slave in his possession, in transitu, to his domicile.

The Court are by no means to be understood, in any manner whatever, to doubt or to interfere with the police power belonging to the states, in virtue of their general sovereignty. That police power extends over all subjects within the territorial limits of the states, and has never been conceded to the United States. It is wholly distinguishable from the right and duty secured by the provision of the Constitution relating to fugitive slaves; which is exclusively derived from the Constitution, and obtains its whole efficiency therefrom.

The Court entertain no doubt whatsoever, that the states, in virtue of their general police power, possess full jurisdiction to arrest and restrain run-away slaves, and to remove them from their borders, and otherwise to secure themselves against their depredations,

and evil example, as they certainly may do in cases of idlers, vagabonds, and paupers. The rights of the owners of fugitive slaves, are in no just sense interfered with or regulated by such a course; and in many cases they may be promoted by the exercise of the police power. Such regulations can never be permitted to interfere with or obstruct the just rights of the owner to reclaim his slave derived from the Constitution of the United States, or with the remedies prescribed by Congress to aid and enforce the same.

The act of the legislature of Pennsylvania upon which the indictment against Edward Prigg is founded, is unconstitutional and void. It purports to punish as a public offence against the state, the very act of seizing and removing a slave by his master, which the Constitution of the United States was designed to justify and uphold.

IN error to the Supreme Court of Pennsylvania.

The defendant in error, Edward Prigg, with Nathan S. Bemis, Jacob Forward, and Stephen Lewis, Jr., were indicted by the Grand Jury of York county, Pennsylvania, for that, on the first day of April, 1837, upon a certain negro woman named Margaret Morgan, with force and violence they made an assault, and with force and violence feloniously did take and carry her away from the county of York, within the Commonwealth of Pennsylvania, to the state of Maryland, with a design and intention there to sell and dispose of the said Margaret Morgan, as and for a slave and servant for life.

Edward Prigg, one of the defendants, having been arraigned, pleaded not guilty.

The cause was tried before the Court of Quarter Sessions of York county, on the 22d day of May, 1839; and the jury found the following special verdict:

" That at a session of the General Assembly of the Commonwealth of Pennsylvania, holden at the city of Philadelphia, on the first day of March, 1780, the following law was passed and enacted, to wit: " An act for the gradual abolition of slavery:

1. Sec. III. All persons as well negroes and mulattoes as others, who shall be born within this state, shall not be deemed and considered as servants for life, or slaves; and all servitude for life, or slavery of children in consequence of the slavery of their mothers, in the case of all children born within this state from and after the passing of this act as aforesaid, shall be and hereby is, utterly taken away, extinguished, and forever abolished.

2. Sec. IV. Provided always, that every negro and mulatto

child born within this state after the passing of this act as afore-said, (who would, in case this act had not been made, have been born a servant for years, or life, or a slave,) shall be deemed to be, and shall be, by virtue of this act, the servant of such persons, or her or his assigns, who would in such case have been entitled to like relief in case he or she shall be evilly treated by his or her master or mistress, and to like freedom dues, and other privileges, as servants bound by indenture for four years are or may be entitled.; unless the person to whom the service of any such child shall belong, shall abandon his or her claim to the same; in which case the overseers of the poor of the city, township, or district respectively, where such child shall be so abandoned, shall by indenture bind out every child so abandoned, as an apprentice, for a time not exceeding the age herein before limited for the service of such children.

3. Sec. V. Every person who is or shall be the owner of any negro or mulatto slave or servants for life, or till the age of thirty-one years, now within this state, or his lawful attorney, shall, on or before the first day of November next, deliver or cause to be delivered in writing to the clerk of the peace of the county, or to the clerk of the Court of Sessions of the city of Philadelphia, in which he or she shall respectively inhabit, the name and sur-name and occupation or profession of such owner, and the name of the county and township, district or ward wherein he or she resideth; and also the name and names of any such slave and slaves, and servant and servants for life, or till the age of thirty-one years, within this state, who shall be such on the said first day of November next, from all other persons; which particulars shall by said clerk of the sessions and clerk of the said city court, be entered in books to be provided for that purpose by the said clerks; and no negro or mulatto now within this state shall from and after the said first day of November, be deemed a slave or servant for life, or till the age of thirty-one years, unless his or her name shall be entered as aforesaid on such records, except such negro or mulatto slaves and servants as are hereinafter excepted; the said clerk to be entitled to a fee of two dollars for each slave or servant so entered as aforesaid, from the treasury of the county, to be allowed to him in his accounts.

4. Sec. VI. Provided always, that any person in whom the

ownership or right to the service of any negro or mulatto, shall be vested at the passing of this act, other than such as are hereinbefore excepted, his or her heirs, executors, administrators, and assigns, and all and every of them, severally shall be liable to the overseers of the poor of the city, township, or district to which any such negro or mulatto shall become chargeable, for such necessary expense, with costs of suit thereon, as such overseers may be put to, through the neglect of the owner, master, or mistress of such negro or mulatto, notwithstanding the name and other descriptions of such negro or mulatto shall not be entered and recorded as aforesaid, unless his or her master or owner shall, before such slave or servant obtain his or her twenty-eighth year, execute and record in the proper county, a deed or instrument securing to such slave or servant his or her freedom.

6. Sec. VIII. In all cases wherein sentence of death shall be pronounced against a slave, the jury before whom he or she shall be tried, shall appraise and declare the value of such slave; and in case such sentence be executed, the court shall make an order on the state treasurer, payable to the owner for the same, and for the costs of prosecution; but in case of remission or mitigation, for the costs only.

7. Sec. IX. The reward for taking up runaway and absconding negro and mulatto slaves and servants, and the penalties for enticing away, dealing with, or harbouring, concealing or employing negro and mulatto slaves and servants, shall be the same, and shall be recovered in like manner, as in case of servants bound for four years.

8. Sec. X. No man or woman, of any nation or colour, except the negroes and mulattoes who shall be registered as aforesaid, shall at any time hereafter be deemed adjudged or holden, within the territories of this Commonwealth, as slaves or servants for life, but as free-men and free-women; except the domestic slaves attending upon delegates in Congress from the other American states, foreign ministers and consuls, and persons passing through or sojourning in this state, and not becoming resident therein, and seamen employed in ships not belonging to any inhabitant of this state, nor employed in any ship owned by any such inhabitant; provided, such domestic slaves shall not be alienated or sold to any inhabitant, nor (except in the case of members of Congress,

2 z 2      69

foreign ministers and consuls) retained in this state longer than six months.

9. Sec. XI. (Repealed 25th March, 1826.)

Sec. XII. And whereas attempts may be made to evade this act, by introducing into this state negroes and mulattoes bound by covenant to serve for long and unreasonable terms of years, if the same be not prevented: Therefore,

10. Sec. XIII. No covenant of personal servitude or apprenticeship whatsoever, shall be valid or binding on a negro or mulatto for a longer time than seven years, unless such servant apprentice were, at the commencement of such servitude or apprenticeship, under the age of twenty-one years; in which case such negro or mulatto may be holden as a servant or apprentice, respectively, according to the covenant, as the case shall be, until he or she shall attain the age of twenty-eight years, but no longer.

Sec. XIV. That this act or any thing herein contained shall not give any relief or shelter to any absconding or runaway negro or mulatto slave or servant, who has absconded himself or shall abscond himself from his or her owner, master or mistress, residing in any other state or country; but such owner, master or mistress shall have like right and aid to demand, claim, and take away his slave or servant, as he might have had in case this act had not been made; and that all negro and mulatto slaves now owned and heretofore resident in other states, who have absconded themselves or been clandestinely carried away, or who may be employed abroad as seamen, and have not absconded or been brought back to their owners, masters, or mistresses before the passing of this act, may within five years be registered as effectually as is ordered by this act concerning those who are not within this state, on producing such slave before any two justices of the peace, and satisfying the said justices by due proof of his former residence, absconding, running away, or absence of such slaves as aforesaid, who thereupon shall direct and order the said slaves to be entered on the record as aforesaid."

And the jurors further found, that at a session of the General Assembly of the Commonwealth of Pennsylvania, holden at the city of Philadelphia, on the 29th day of March, 1788, the

following law was passed and enacted, "An act to explain and amend 'An act for the gradual abolition of slavery.'"

"Sec. I. For preventing many evils and abuses arising from ill-disposed persons availing themselves of certain defects in the act for the gradual abolition of slavery, passed on the first day of March, in the year of our Lord one thousand seven hundred and eighty, be it enacted :

Sec. II. The exception contained in the tenth section of the act of the first of March, one thousand seven hundred and eighty, relative to domestic slaves, attending upon persons passing through or sojourning in this state, and not becoming resident therein, shall not be deemed or taken to extend to the slaves of such persons as are inhabitants of or resident in this state, or who shall come here with an intention to settle and reside ; but all and every slave or slaves who shall be brought into this state by persons inhabiting or residing therein, or intending to inhabit or reside therein, shall be immediately considered, deemed, and taken to be free, to all intents and purposes.

Sec. III. No negro or mulatto slave, or servant for term of years, (except as in the last exception of the tenth section of the said act, is excepted,) shall be removed out of this state, with the design and intention that the place of abode or residence of such slave or servant shall be thereby altered or changed, or with the design and intention that such slave or servant, if a female and pregnant, shall be detained and kept out of this state till her delivery of the child of which she is or shall be pregnant, or with the design and intention that such slave or servant shall be brought again into this state, after the expiration of six months from the time of such slave or servant having been first brought into this state, without his or her consent, if of full age, testified upon a private examination, before two justices of the peace of the city or county in which he or she shall reside, or being under the age of twenty-one years without his or her consent, testified in manner aforesaid, and also without the consent of his or her parents, if any such there be, to be testified in like manner aforesaid, whereof the said justices, or one of them, shall make a record, and deliver to the said slave or servant a copy thereof, containing the name, age, condition, and the place of abode of such slave or servant, the reason of such removal, and the place to which he

or she is about to go; and if any person or persons whatsoever shall sell or dispose of any such slave or servant to any person out of this state, or shall send or carry, or cause to be sent or carried, any such slave or servant out of this state, for any of the purposes aforesaid, whereby such slave or servant would lose those benefits and privileges which by the laws of this state are secured to him or her, and shall not have obtained all such consent as by this act is required, testified in the manner before mentioned, every such person and persons, his and their aiders and abettors, shall severally forfeit and pay, for every such offence, the sum of seventy-five pounds, to be recovered in any Court of record, by an action of debt, bill, plaint, or information, at the suit of any person who will sue for the same; one moiety thereof, when recovered, for the use of the plaintiff, the other moiety for the use of the poor of the city, township, or place from which such slave or servant shall be taken and removed.

Sec. IV. All persons who now are, or hereafter shall be, possessed of any child or children, born after the first day of March, one thousand seven hundred and eighty, who would by the said act be liable to serve till the age of twenty-eight years, shall on or before the first day of April, one thousand seven hundred and eighty-nine, or within six months next after the birth of any such child, deliver, or cause to be delivered, in writing to the clerk of the place of the county, or the clerk of the Court of Record of the city of Philadelphia, in which they shall respectively inhabit, the name, sur-name, and occupation or profession of such possessor, and of the county, township, district, or ward in which they reside, and also the age, (to the best of his or her knowledge,) name and sex of every such child, or children, under the pain and penalty of forfeiting and losing all right and title to every such child and children, and of him, her, or them, immediately becoming free, which said return or account in writing shall be verified by the oath or affirmation of the party, which the said clerks are hereby respectively authorized and required to administer, and the said clerks shall make and preserve records thereof, copies and extracts of which shall be good evidence in all Courts of justice, when certified under their hands and seals of office, for which oath or affirmation, and entry on extract, the said clerks shall be respectively entitled to one shilling and six pence, and no more,

to be paid by him or her, who shall so as aforesaid make such entry, or demand the extract aforesaid.

And whereas it has been represented to this house, that vessels have been fitted out and equipped in this port, for the iniquitous purpose of receiving and transporting the natives of Africa to places where they are held in bondage, and it is just and proper to discourage, as far as possible, such proceedings in future :

Sec. V. If any person or persons shall build, fit, equip, man, or otherwise prepare, any such ship or vessel, within any port of this state, or shall cause any ship or other vessel to sail from any port of this state, for the purpose of carrying on a trade or traffic in slaves, to, from, or between Europe, Asia, Africa, or America, or any place or countries whatsoever, or of transporting slaves to or from one port or place to another, in any part or parts of the world, such ship or vessel, her tackle, furniture, apparel, and other appurtenances, shall be forfeited to the commonwealth, and shall be liable to be seized and prosecuted by any officer of the customs, or other person, by information in vene, in the Supreme Court or in the County Court of Common Pleas for the county wherein such seizure shall be made : whereupon such proceedings shall be had, both unto and after judgment, as in and by the impost laws of this commonwealth in case of seizure is directed. And moreover, all and every person and persons so building, fitting out, manning, equipping, or otherwise preparing or sending away any ship or vessel, knowing or intending that the same shall be employed in such trade or business, contrary to the true intent and meaning of this act, or in any wise aiding or abetting therein, shall severally forfeit and pay the sum of one thousand pounds, one moiety thereof to the use of the commonwealth, and the other moiety thereof to the use of him or her who will sue for the same, by action, debt, bill, plaint, or information.

And whereas the practice of separating, which is too often exercised by the masters and mistresses of negro and mulatto slaves, or servants for term of years, in separating husbands and wives, and parents and children, requires to be checked, so far as the same may be done without prejudice to such masters or mistresses :

Sec. VI. If any owner or possessor of any negro, mulatto slave or slaves, or servant or servants for term of years, shall, from and

after the first day of July next, separate or remove, or cause to be separated or removed, a husband from his wife, or wife from her husband, a child from his or her parents, or a parent from a child, or any or either of the descriptions aforesaid, to a greater distance than ten miles, with the design and intention of changing the habitation or place of abode of such husband or wife, parent or child, unless such child shall be above the age of four years, without the consent of such slave or servant for life or years shall have been obtained and testified in the manner hereinbefore described, such person or persons shall severally forfeit and pay the sum of fifty pounds, with costs of suit, for every such offence, to be recovered by action of debt, bill, plaint, or information, in the Supreme Court or in any Court of Common Pleas, at the suit of any person who will sue for the same, one moiety thereof, when recovered, for the use of the plaintiffs, the other moiety for the use of the poor of the city, township, or place, from which said husband or wife, parent or child, shall have been taken and removed."

(Sec. VII. Repealed 27th March, 1820, and 25th March, 1826.)

And the jurors further found, that at a session of the General Assembly of the Commonwealth of Pennsylvania, holden at Harrisburg, on the 25th day of March, 1826, the following law was passed, " An act to give effect to the provisions of the Constitution of the United States relative to fugitives from labour, for the protection of free people of colour, and to prevent kidnapping."

"Sec. I. If any person or persons shall from and after the passing of this act, by force and violence, take and carry away, or cause to be taken or carried away, and shall by fraud or false pretence, seduce, or cause to be seduced, or shall attempt so to take, carry away, or seduce any negro or mulatto from any part or parts of this commonwealth, to any other place or places, whatsoever, out of this commonwealth, with a design and intention of selling and disposing of, or of causing to be sold, or of keeping and detaining, or of causing to be kept and detained, such negro or mulatto, as a slave or servant for life, or for any term whatsoever, every such person, or persons, his or their aiders or abettors, shall on conviction thereof, in any Court of this commonwealth having competent jurisdiction, be deemed guilty of a felony, and shall forfeit and pay at the discretion of the Court

passing the sentence, a sum not less than five hundred, nor more than one thousand dollars, one-half thereof shall be paid to the person or persons who shall prosecute for the same; and the other half to this commonwealth; and moreover shall be sentenced to undergo a servitude for any term or terms not less than seven years, nor exceeding twenty-one years, and shall be confined and kept to hard labour, fed and clothed in the manner as is directed, by the penal laws of this commonwealth, for persons convicted of robbery.

Sec. II. If any person or persons shall hereafter, knowingly sell, transfer, or assign, or shall knowingly purchase, take, or transfer on assignment of any negro or mulatto, for the purpose of- fraudulently removing, exporting, or carrying said negro or mulatto out of this state, with the design or intent by fraud or false pretences of making him or her a slave or servant for life, or for any term whatsoever, every person so offending shall be deemed guilty of a felony, and on conviction thereof, shall forfeit and pay a fine of not less than five hundred dollars, nor more than two thousand dollars, one-half whereof shall be paid to the person or persons who shall prosecute for the same, and the other half to the commonwealth; and moreover shall be sentenced at the discretion of the Court to undergo a servitude for any term or time not less than seven years, nor exceeding twenty-one years, and shall be confined, kept to hard labour, fed and clothed in the same manner as is directed by the penal laws of this commonwealth for persons convicted of robbery.

Sec. III. When a person held to labour or servitude in any of the United States, or in either of the territories thereof, under the laws thereof, shall escape into this commonwealth, the person to whom such labour or service is due, his or her duly authorized agent or attorney, constituted in writing, is hereby authorized to apply to any judge, justice of the peace, or alderman, who on such application, supported by the oath or affirmation of such claimant or authorized agent or attorney, as aforesaid, that the said fugitive hath escaped from his or her service, or from the service of the person for whom he is duly constituted agent or attorney, shall issue his warrant under his hand and seal, and directed to the sheriff, or any constable of the proper city or county, authorizing and empowering said sheriff, or constable, to

arrest and seize the said fugitive, who shall be named in said warrant, and to bring said fugitive before a judge of the proper county, which said warrant shall be in the form or to the following effect:

" STATE OF PENNSYLVANIA, ———— *county, ss.*

The Commonwealth of Pennsylvania to the sheriff or any constable of ———— county, greeting.

Whereas, it appears by the oath, or solemn affirmation of ———— ————, that ———— ————, was held to labour or service to ———— ————, of ———— county, in the state of ————, and the said ———— ———— hath escaped from the labour and service of the said ———— ————, you are therefore commanded to arrest and seize the body of the said ———— ———— if he be found in your county, and bring him forthwith before the person issuing the warrant, if a judge (or if a justice of the peace or alderman) before a judge of the Court of Common Pleas, or of the District Court, as the case may be, of your proper county, or recorder of a city, so that the truth of the matter may be inquired into, and the said ———— ———— be dealt with as the constitution of the United States, and the laws of this Commonwealth direct.

Witness our said judge (or alderman, or justice, as the case may be) at this ———— day of ————, in the year of our Lord one thousand eight hundred and ————.

By virtue of such warrant the person named therein may be arrested by the proper sheriff, or constable to whom the same shall be delivered, within the proper city or county.

Sec. IV. No judge, justice of the peace, or alderman shall issue a warrant on the application of any agent or attorney as provided in the said third section, unless the said agent or attorney shall, in addition to his own oath, or affirmation, produce the affidavit of the claimant of the fugitive, taken before and certified by a justice of the peace or other magistrate authorized to administer oaths in the state or territory in which such claimant shall reside, and accompanied by the certificate of the authority of such justice or other magistrate to administer oaths, signed by the clerk or prothonotary, and authenticated by the seal of a court of record, in such state or territory, which affidavit shall state the

said claimant's title to the service of such fugitive, and also the name, age, and description of the person of such fugitive.

Sec. V. It shall be the duty of any judge, justice of the peace, or alderman, when he grants or issues any warrant under the provisions of the third section of this act, to make a fair record on his docket of the same, in which he shall enter the name and place of residence of the person on whose oath or affirmation the said warrant may be granted; and also if an affidavit shall have been produced under the provisions of the fourth section of this act, the name and place of residence of the person making such affidavit, and the age and description of the person of the alleged fugitive contained in such affidavit, and shall, within ten days thereafter, file a certified copy thereof in the office of the clerk of the Court of General Quarter Sessions of the peace, or Mayor's Court of the proper city or county; and any judge, justice of the peace or alderman, who shall refuse or neglect to comply with the provisions of this section, shall be deemed guilty of a misdemeanor in office, and shall, on conviction thereof, be sentenced to pay, at the discretion of the Court, any sum not exceeding one thousand dollars, one-half to the party prosecuting for the same, and the other half to the commonwealth. And any sheriff or constable, receiving and executing the said warrant, shall without unnecessary delay, carry the person arrested before the judge, according to the exigency of the warrant. And any sheriff or constable who shall refuse or wilfully neglect so to do, shall, on conviction thereof, be sentenced to pay, at the discretion of the Court, any sum not exceeding five hundred dollars, one-half to the party prosecuting for the same, and the other half to the commonwealth, or shall also be sentenced to imprisonment, at hard labour, for a time not exceeding six months, or both.

Sec. VI. The said fugitive from labour or service, when so arrested, shall be brought before a judge as aforesaid, and upon proof to the satisfaction of such judge that the person so seized or arrested, doth under the laws of the state or territory from which she or he fled from service or labour, to the person claiming him or her, it shall be the duty of such judge to give a certificate thereof to such claimant, his or her duly authorized agent or attorney, which shall be sufficient warrant for removing the said fugitive to the state or territory from which she or he fled:

Provided, That the oath of the owner or owners, or other person interested, shall in no case be received in evidence before the judge on the hearing of the case.

Sec. VII. When the fugitive shall be brought before the judge, agreeably to the provisions of this act, and either party allege and prove to the satisfaction of the said judge that he or she is not prepared for trial, and have testimony material to the matter in controversy that can be obtained in a reasonable time, it shall and may be lawful, unless security satisfactory to the said judge be given for the appearance of the said fugitive, on a day certain to commit the said fugitive to the common jail for safe keeping, there to be detained at the expense of the owner. agent, or attorney for such time as the judge shall think reasonable and just, and to a day certain, when the said fugitive shall be brought before him by habeas corpus in the courthouse of the proper county, or in term time at the chamber of the said judge, for final hearing and adjudication: Provided, That if the adjournment of the hearing be requested by the claimant, his agent or attorney, such adjournment shall not be granted unless the said claimant, his agent or attorney, shall give security satisfactory to the judge to appear and prosecute his claim on the day to which the hearing shall be adjourned: Provided, That on the hearing last mentioned, if the judge committing the said fugitive, or taking the security as aforesaid, should be absent, sick, or otherwise unable to attend, it shall be the duty of either of the other judges, on notice given, to attend to the said hearing, and to decide thereon.

Sec. VIII. The officer which may or shall be employed in the execution of the duties of this act shall be allowed the same fees for service of process that sheriffs within this commonwealth are now allowed for serving process in criminal cases. and two dollars and fifty cents per day for each and every day necessarily spent in performing the duties enjoined on them by this act, to be paid by the owner. agent, or attorney, immediately on the performance of the duties aforesaid.

Sec. IX. No alderman or justice of the peace of this commonwealth shall have jurisdiction or take cognisance of the case of any fugitive from labour from any of the United States or territories under a certain act of Congress, passed on the tenth day of February, one thousand seven hundred and ninety-three.

entitled "An act respecting fugitives from justice, and persons escaping from the service of their masters;" nor shall any alderman or justice of the peace of this commonwealth issue or grant any certificate or warrant of removal of any such fugitive from labour as aforesaid, except in the manner and to the effect provided in the third section of this act, upon the application, affidavit, or testimony of any person or persons whatsoever, under the said act of Congress, or under any other law, authority, or act of the Congress of the United States; and if any alderman or justice of the peace of this commonwealth shall, contrary to the provisions of this act, take cognisance or jurisdiction of the case of any such fugitive as aforesaid, except in the manner hereinbefore provided, or shall grant or issue any certificate or warrant of removal as aforesaid. then, and in either case he shall be deemed guilty of a misdemeanor in office, and shall, on conviction thereof, be sentenced to pay at the discretion of the Court any sum not less than five hundred dollars, nor exceeding one thousand dollars, or half thereof, to the party prosecuting for the same, and the other half to the use of the commonwealth.

Sec. X. It shall be the duty of the judge or recorder of any Court of Record in this commonwealth when he grants or issues any certificate or warrant of removal of any negro or mulatto claimed to be a fugitive from labour to the state or territory from which he or she fled, in pursuance of an act of Congress passed the twelfth day of February, one thousand seven hundred and ninety-three, entitled "An act respecting fugitives from justice and persons escaping from the service of their masters," and of this act to make a fair record of the same, in which he shall enter the age, name, sex, and general description of the person of the negro or mulatto for whom he shall grant such certificate or warrant of removal, together with the evidence and the name of the places of residence of the witnesses, and the party claiming such negro or mulatto, and shall within ten days thereafter file a certified copy thereof in the office of the clerk of the Court of General Quarter Sessions of the Peace, or Mayor's Court of the city or county in which he may reside.

Sec. XI. Nothing in this act contained shall be construed as a repeal or alteration of any part of an act of assembly passed the first day of March, one thousand seven hundred and eighty,

[Prigg v. The Commonwealth of Pennsylvania.]

entitled "An act for the gradual abolition of slavery," except the eleventh section of said act, which is hereby repealed and supplied, nor of any part of an act of assembly passed on the twenty-eighth day of March, one thousand seven hundred and eighty-eight, entitled "An act to explain and amend an act for the gradual abolition of slavery," except the seventh section of this last mentioned act, which is hereby supplied and repealed."

And the jurors further found, that the negro woman, Margaret Morgan, in the within indictment mentioned, came into the state of Pennsylvania from the state of Maryland, some time in the year eighteen hundred and thirty-two; that at that time, and for a long period before that time, she was a slave for life, held to labour, and owing service or labour for, under, and according to the laws of the said state of Maryland, one of the United States, to a certain Margaret Ashmore, a citizen of the state of Maryland, residing in Hartford county, and that the said negro woman, Margaret Morgan, escaped and fled from the state of Maryland without the knowledge and consent of the said Margaret Ashmore; that in the month of February, eighteen hundred and thirty-seven, the within named defendant, Edward Prigg, was duly and legally constituted and appointed by the said Margaret Ashmore, her agent or attorney, to seize and arrest the said negro woman, Margaret Morgan, as a fugitive from labour, and to remove, take, and carry her from this state into the state of Maryland, and there deliver her to the said Margaret Ashmore; that as such agent or attorney the said Edward Prigg afterwards, and in the same month of February, eighteen hundred and thirty-seven, before a certain Thomas Henderson, Esquire, then being a justice of the peace in and for the county of York, in this state, made oath that the said negro woman, Margaret Morgan, had fled and escaped from the state of Maryland, owing service or labour for life, under the laws thereof, to the said Margaret Ashmore; that the said Thomas Henderson, so being such justice of the peace as aforesaid, thereupon issued his warrant, directed to one William M'Cleary, then and there being a regularly appointed constable in and for York county, commanding him to take the said negro woman, Margaret Morgan, and her children, and bring them before the said Thomas Henderson, or some other justice of the peace for said county; that the said M'Cleary, in obedience

to said warrant, did accordingly take and apprehend the said negro woman, Margaret Morgan, and her children, in York county aforesaid, and did bring her and them before the said Thomas Henderson; that the said Henderson thereupon refused to take further cognisance of said case, and that the said Prigg afterwards, and without complying with the provisions of the said act of the General Assembly of the Commonwealth of Pennsylvania, passed the 25th of March, 1826, entitled " An act to give effect to the provisions of the Constitution of the United States relative to fugitives from labour, for the protection of free people of colour, and to prevent kidnapping," did take, remove, and carry away the said negro woman, Margaret Morgan, and her children, mentioned in said warrant, out of this state into the state of Maryland, and did there deliver the said woman and children into the custody and possession of the said Margaret Ashmore.

And further say, that one of the said children so taken, removed, and carried away, was born in this state more than one year after the said negro woman, Margaret Morgan, had fled and escaped from the state of Maryland as aforesaid.

But whether or not upon the whole matter aforesaid, by the jurors aforesaid in form aforesaid, found, the said Edward Prigg be guilty in manner and form as he stands indicted the jurors aforesaid are altogether ignorant, and therefore pray the advice of the Court, and if, upon the whole matter aforesaid it shall seem to the said Court that the said Edward Prigg is guilty, then the jurors aforesaid, upon their oaths aforesaid, say that the said Edward Prigg is guilty in manner and form as he stands indicted.

But if upon the whole matter aforesaid, it shall seem to the said Court, that the said Edward Prigg is not guilty, then the jurors aforesaid, upon their oaths aforesaid, say that the said Edward Prigg is not guilty in manner and form as he stands indicted."

This special verdict was, under an agreement between Messrs. Meredith and Nelson, counsel for Edward Prigg, and Mr. Johnson, the attorney-general of Pennsylvania, taken under the provisions of an act of the Assembly of Pennsylvania, passed 22d of May, 1839; and by agreement, the Court gave judg

3 A 2

merit against Edward Prigg, on the finding of the jury and the indictment.

The defendant prosecuted a writ of error to the Supreme Court of Pennsylvania to May term, 1840. On the 23d May, 1840, the following errors were assigned before the Court, by Mr. Meredith, and Mr. Nelson, who represented the state of Maryland, as well as the defendant.

The plaintiff in error suggests to the Supreme Court here, that the judgment rendered in the Court of Oyer and Terminer of York county in this case, should be reversed for the reason following, viz. : That the act of Assembly of the Commonwealth of Pennsylvania, set out in the record in the said cause, is repugnant to the provisions of the Constitution of the United States, and is therefore void.

The Supreme Court affirmed, pro forma, the judgment of the Court of Oyer and Terminer ; and the defendant, Edward Prigg, prosecuted this writ of error.

The case was argued, for the plaintiff in error, by Mr. Meredith and Mr. Nelson, under authority to appear in the case for the state of Maryland; and by Mr. Johnson, the attorney-general of Pennsylvania, and Mr. Hambly, for the Commonwealth of Pennsylvania.

The arguments of all the counsel, with the exception of that of Mr. Nelson, which has not been received, have been by them, respectively, furnished to the reporter.

The counsel for the plaintiff in error contended:

That the law of Pennsylvania, on which the indictment of the defendant founded, was unconstitutional,

1. Because Congress has the exclusive power of legislation upon the subject-matter of the said constitutional provision, which power has been exercised by the act of the 12th February, 1793.

2. That if this power is not exclusive, still the concurrent power of the state legislatures is suspended by the actual exercise of the federal power.

3. That if not suspended, still the statute of Pennsylvania, in all its provisions applicable to this case, is in direct collision with the act of Congress ; and is therefore unconstitutional and void.

Mr. Meredith, for the state of Maryland; interposing in behalf of the plaintiff in error; adverted to the special act of the legislature of Pennsylvania, of the 22d of May, 1839, as the result of a negotiation between that state and Maryland, the object of which was to settle, by the authoritative decision of the Supreme Court of the Union, the power of state legislation, over that provision of the Constitution of the United States, which relates to fugitive slaves. He then briefly stated the facts of the particular case, as found by the special verdict; and referring to the provisions of the act of Congress of the 12th of February, 1793, respecting fugitives from justice, and persons escaping from the service of their masters, and to the several sections of the Pennsylvania law of the 25th of March, 1826, which had given rise to the controversy between the two states, he remarked, that the validity of this law depended entirely upon the constitutionality of the act of Congress. If that act was constitutionally passed, he argued that it was wholly immaterial to inquire whether it was passed in the exercise of an exclusive or of a concurrent power of legislation. Because, in either case, the conclusion would be the same. The Pennsylvania law must be declared inoperative and void, and the judgment of her Courts, which he was about to examine, must necessarily be reversed.

If this should appear to be a proper view of the question presented by the record; if it depended solely upon the constitutionality of the act of Congress; the whole matter, as he believed, would be found to lie within very narrow limits. But, undoubtedly, the cause itself, looking to the consequences of its decision by the tribunal he addressed, was one of deep and pervading interest. It involved matters of high concernment, not only to the two sovereign states, which stood before the Court as the immediate parties to the controversy; but to those other states of the Union, which, with reference to the questions at issue, occupied the same relative position. Indeed, it would perhaps be not too much to say, that the case was one of vital interest to the peace and perpetuity of the Union itself. For he believed that to the interference of state legislation, might justly be ascribed much of that exasperation of public sentiment, which unhappily prevailed upon a subject that seemed every day to assume a more malignant and threatening aspect. It was fit, therefore, that such

a cause should receive not only a careful, but a thorough examination, before it was finally passed upon by the conclusive judgment of the Court.

That he might render what assistance was in his power to this end, he proposed to consider the case, with a view of maintaining the three following propositions:

1. That Congress has the exclusive power of legislation upon the subject-matter of the constitutional provision in question.

2. That if the power is not exclusive, still, from its very nature, the concurrent power of the state legislatures is suspended by the actual exercise of the federal power. And

3. That if the power is not suspended over the whole subject-matter of the provision, still it cannot be constitutionally exercised, so as to conflict with federal legislation; and consequently, that the law of Pennsylvania, so far as it was applied upon the indictment to the case of the plaintiff in error, is void and inoperative; because its provisions are in direct collision with those of the act of Congress.

Before proceeding to discuss these propositions, he observed, that there was a preliminary inquiry on which it would be proper to bestow a brief attention. And that was, whether this constitutional provision required legislation; whether, proprio vigore, it was not sufficient of itself, and by itself, to effectuate the object it contemplated. He did not, it was true, anticipate such a construction from the learned counsel for the state of Pennsylvania: for, if successfully maintained, it would be fatal to their case. Because it was clear beyond all doubt, that if the legislation of Congress is inhibited on the ground that the Constitution neither intends nor requires legislative regulation, the same reason must necessarily exclude the legislation of the states; and therefore, in reference to the present case, if the Constitution effects its own purposes, by its own unassisted strength, the law of Pennsylvania, which professes by its title "to give effect to the provisions of the Constitution of the United States, relative to fugitives from labour," is at best a mere work of legislative supererogation, wholly futile and inoperative. It was not, therefore, he said, in its direct bearing upon the case, that he deemed the inquiry important; but because, elsewhere, in legislative assemblies, as well as in judicial forums, this construction had

been so gravely insisted on as to deserve at least a passing notice.

A very brief examination of the provision in the Constitution, would, he thought, make it manifest that it looks to subsequent legislative enactments. The first clause prohibits the states from passing any law, or adopting any regulation by which fugitives from labour may be discharged from service. If the provision had stopped there, he admitted that legislation would have been unnecessary. Because a state law, in violation of so express a prohibition, would be ipso facto void. And the judicial power, extending to all cases arising under the Constitution, would be unquestionably competent so to declare it. But the next clause of the provision is of a different character. It guarantees a right; and enjoins a duty. It declares that the fugitive shall be delivered up, on claim, to the party to whom his service or labour may be due. Here, then, are two acts to be done. A claim is to be made; but the mode in which it is to be made, and the forms to be observed in making it, are not provided for. Again, a delivery is required; but from whom, and in what manner, and on what condition, the Constitution does not prescribe. Regulations upon these points were indispensable to effectuate the object, and they were left to legislative enactments. And very properly so, because it is the office of a written constitution to establish general principles only, leaving them to be carried out by future legislation.

Mr. Meredith then adverted to the history and origin of the act of Congress, of the 12th of February, 1793, as the strongest illustration of the necessity of such legislation; and for this purpose referred to the first volume of State Papers, title Miscellaneous, page 38 et seq. It appeared from these documents, that in the year 1791, but two years after the organization of the government, the Governor of Pennsylvania, under the analogous provision in the Constitution relative to fugitives from justice, made a demand upon the Governor of Virginia for the surrender and delivery of three persons, who had been indicted in Pennsylvania for kidnapping a negro, and carrying him into Virginia. The Governor of Virginia hesitated upon the course to be pursued, and referred the matter to the attorney-general of that state, who advised that the demand ought not to be complied with. In an elaborate opinion, to which

[Prigg v. The Commonwealth of Pennsylvania.]

the Court was referred, he took several objections; and among them, the one most strenuously insisted on was, that the Constitution had provided no means, and prescribed no method, for carrying the provision into effect. And that Congress had not supplied such means by any law upon the subject. "If," he said, "the delivery and removal in question can be effected, it must be under the authority only of the Constitution of the United States. By that, the delivery is required, and the removal authorized. But the manner in which either shall be effected is not prescribed." And again, "The demand cannot be complied with by the Governor of Virginia, without some additional provision by law, to enable him to do so." The governor adopted this view of the subject, and expressed a hope, in communicating his refusal, that the case would furnish an inducement to Congress to legislate at once upon the constitutional provision. Upon this refusal, the Governor of Pennsylvania addressed a communication to the President of the United States, in which he says, "As the attorney-general of Virginia has suggested another difficulty with respect to the mode of arresting persons as fugitives from justice, I have thought the present a proper occasion to bring the subject into your view; that by the interposition of the federal legislature, to whose consideration you may be pleased to submit it, such regulations may be established, as will in future obviate all doubt and embarrassment upon a constitutional question so delicate and important." The president, it appears, laid these proceedings, with the opinion of the attorney-general of the United States, before Congress; and the result was, that at the same session, the act, as it now stands upon the statute-book, was reported by a committee; and was finally passed without opposition, on the 12th of February, 1793.

The origin then of this act of Congress, so strongly illustrative of the difficulties and embarrassments which would continually have arisen, if the article of the Constitution referred to had been left to execute itself, dispenses with the necessity of all further argument upon this part of the subject. For it is scarcely necessary to remark, that the same difficulties and embarrassments would have arisen in reference to the provision regarding fugitives from labour, but for the enactments of the law of 1793. Indeed, in looking to both provisions, it would be found that the

necessity of legislation is obviously much less, in that which concerns fugitives from justice, than in the one now more immediately under consideration. The act of Congress had never been questioned upon this ground, till the case of Jack *v.* Martin came before the Court of Errors of the state of New York. And even in that case, it was a mere intimation thrown out by the Chancellor, but neither reasoned out, nor relied on. In every other case, it has been taken for granted that legislation was necessary to effectuate the object of the framers of the Constitution. In Wright *v.* Deacon, 5 Serg. & Rawle, 63, Chief Justice Tilghman, after quoting the provision, says, "Here is the principle;—the fugitive is to be delivered on claim of his master. But it required a law to regulate the manner in which this principle should be reduced to practice. It was necessary to establish some mode, in which the claim should be made, and the fugitive be delivered up." So also, in the case of the Commonwealth *v.* Griffith, 2 Pick. Rep. 11. Parker, Chief Justice, says, "The Constitution does not prescribe the mode of reclaiming a slave, but leaves it to be determined by Congress. It is very clear that it was not intended that application should be made to the executive authority of the state."

It being then indisputable, as the counsel thought, that the Constitution looks to, and requires the aid of legislation to accomplish its purpose; he proceeded to argue, that this legislation was intended to be federal, and exclusive of state legislation. Why, he asked, was the provision introduced into the Constitution? The colonial history of the country would show that at one period slavery was recognised as a legal institution in all the provinces; and that in all of them, a customary or conventional law prevailed, which conferred upon the owner of a fugitive slave the right to reclaim him, wherever he might be found. Before the close of the Revolution, however, public opinion in the northern section of the country, had materially changed with regard to the policy and humanity of a system, that had unfortunately been fastened upon the colonies by the power of the mother country, without regard to their interests and in defiance of repeated protests. In 1780, Pennsylvania passed an act for the gradual abolition of slavery. In the same year, Massachusetts, by her Declaration of Rights, emancipated her slaves. And in a short

time afterwards, these examples were followed by all, or nearly all of the New England states.

The institution, however, still continued to exist in the south. The climate of that region, and the products of its soil, peculiarly adapted to this species of labour, has increased the slave population to so great a number, that, at the close of the Revolution, the system had so intertwined itself with the vital interests of private property, and with the maintenance of the public safety, as to render every project, even of gradual abolition, unsafe and impracticable. During the confederation, the southern states had sustained great inconveniences and loss by the change that had been effected by the abolition laws of the northern states. The conventional or customary law was no longer observed. There was no provision upon the subject in the articles of confederation. In many of the northern states no aid whatsoever would be allowed to the owners of fugitive slaves; and sometimes indeed they met with open resistance. 3 Story's Comm. on the Const. 677. "At present," said Mr. Madison, in the Virginia convention, 2 Elliott's Deb. 335, "at present, if any slave elopes to any of those states where slaves are free, he becomes emancipated by their laws. For the laws of the states are uncharitable to one another in this respect." And in the North Carolina convention, Mr. Iredell observed, that, "In some of the northern states they have emancipated their slaves. If any of our slaves go there, they would, by the present laws, be entitled to their freedom, so that their masters could not get them again."

It was during this conflict of law, of opinions, and of interests, between the northern and southern states, that the Constitution embracing the provision in question was adopted. That provision, it is well known, was the result of mutual concessions in reference to the whole subject of slavery. On the one hand the south agreed to confer upon Congress the power to prohibit the importation of slaves after the year 1808. On the other, the north agreed to recognise and protect the existing institutions of the south. And for that very purpose, the clause in question was engrafted upon the Constitution. The history of the times proves that the south regarded, and relied upon it, as an ample security to the owners of slave property. In the Virginia convention, in order to satisfy the minds of the people, that property of this

[Prigg *v.* The Commonwealth of Pennsylvania.]

description was abundantly protected, Governor Randolph held this language: "Were it right to mention what passed in convention on the occasion, I might tell you that the southern states,—even South Carolina herself,—conceived this property to be secured by these words."

Such undoubtedly, was the confidence of the whole south, in the intention of the framers of the Constitution. Such was their intention; and if so, it would seem to follow as a necessary consequence, that they meant to commit all legislative power over the subject exclusively to Congress. The provision was manifestly intended to restore to the south the rights which the customary law had formerly extended to them, in common with the other colonies. Those rights had been disregarded by many of the states. And the apprehension must have forced itself upon every southern mind in the convention, that if the provision were left to be carried out by state legislation, it must prove but a precarious and inadequate protection. The provision, it is true, yielded the right of the owner to reclaim the fugitive, in whatever state he might have sought refuge; but if the power to regulate the mode in which this provision was to be carried into practical effect—if the power of enforcing its execution were left to the states, it could not but have been foreseen that its whole purpose might be defeated. That the states might either legislate or not.—In the one case leaving the owner without legal means to vindicate his rights; in the other, embarrassing the prosecution of them, so as to delay or defeat them. In a word, to borrow the language of Chief Justice Nelson, whose whole argument upon this subject, in the case of Jack *v.* Martin, 12 Wend. Rep. 311, is entitled to the most attentive consideration of the Court, "the idea that the framers of the Constitution intended to leave the legislation of this subject to the states, when the provision itself obviously sprung out of their fears of partial and unjust legislation by the states, in respect to it, cannot be admitted." The confidence of the south could only have reposed itself in Congress, "where the rights and interests of the different sections of the country, liable to be influenced by local and peculiar causes, would be regulated with an independent and impartial regard to all."

If such was the intention of the framers of the Constitution, the next inquiry is, whether it can be effectuated by the express

or implied powers granted in that instrument. Congress has legislated upon the subject. But had it a constitutional authority to do so? Is the power thus exercised directly or impliedly given?

In conducting this inquiry, it is proper, in the first place, to look to the collateral supports on which this act of Congress rests for its validity. It was passed only four years after the adoption of the Constitution. In that Congress were many of the leading and most distinguished men of the convention. The act was not passed hastily; for it was reported in 1791, and finally acted on in 1793. It was not passed without full consideration; for the Virginia case, and the different opinions, looking to federal or state legislation upon a kindred subject, were communicated to Congress in 1791. Here, then, is a contemporaneous exposition of the constitutional provision in the act itself, which has been always regarded by this Court as of very high authority. A practical exposition, which, in the language of a distinguished commentator, approaches nearest to a judicial exposition. 1 Story's Comm. on the Const. 392. It is, indeed, the very case he puts, having all the incidents of such an exposition. For the authority of Congress to pass this law was determined after solemn consideration, pro re nata, upon a doubt raised—upon a lis mota, in the face of the nation—with a view to present action, and in the midst of jealous interests. To this source of collateral interpretation, it has been already said, this Court is in the habit of looking with great respect. Among other cases, those of Martin v. Hunter's lessee, 1 Wheat. Rep. 351, and Cohens v. the State of Virginia, 6 Wheat. Rep. 418, may be referred to; for the purpose of showing that the Court has resorted to contemporary construction—to practical expositions of constitutional powers, in cases of much more doubt and difficulty than the present.

But further, from the period of its enactment, till very recently, this act of Congress has been acquiesced in—practically applied in all the states, and regarded as containing judicious and salutary regulations in reference to both the subjects to which it relates. Ought a construction, time-honoured as this is, to be lightly disturbed? This Court has already answered the question. It has held a practice and acquiescence for a much shorter period, as fixing the construction of the Constitution on a question of at least quite as much doubt. In the case of Stuart v. Laird,

[Prigg *v.* The Commonwealth of Pennsylvania.]

1 Cran. Rep. 309, which involved the constitutionality of the provision in the judiciary act of 1789, giving to the judges of the Supreme Court Circuit Court powers, the Court held this language : "To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course the question is at rest, and ought not now to be disturbed."

But in addition to contemporaneous exposition, and long acquiescence, we have the judicial decisions of the three great non-slaveholding states—Massachusetts, New York, and Pennsylvania; in which the constitutionality of this act of Congress was challenged and sustained. Commonwealth *v.* Griffith, 2 Pick. Rep. 11; Wright *v.* Deacon, 5 Serg. and Rawle's Rep. 63; Jack *v.* Martin, 12 Wend. Rep. 312.

So, too, in every case before the Circuit Court of the United States, the provisions of this act of Congress have been judicially dealt with, without a question as to its constitutionality. It is submitted, therefore, that a very clear case of construction ought to be made out, to shake even the collateral supports on which this law rests.

But if the question can still be considered an open one, there is no difficulty in showing that the power of legislation in reference to this subject is granted by the Constitution to Congress. It would be strange if it were not so; strange, if upon a subject of such intense and general interest, to which the mind of the convention had been so directly called, they had left their work unfinished; their purpose unaccomplished. It has been said, however, and may again be said, that the legislative power of federal government is a limited one; that the Constitution enumerates the cases in which it may be exercised, but that this is not among the number. That besides these enumerated cases, a general power is given to Congress to pass all laws necessary and proper to carry into execution all powers granted by the Constitution to the government, or any of its departments or officers. But that there is no power so granted in reference to

this provision. Is this so? The Constitution declares that slaves escaping from service shall be delivered up, on claim, to the person to whom such service shall be due. What is the meaning of these words "on claim?" They look to a proceeding of a judicial character; to an assertion of the right of property, to be made before a tribunal competent to judge and decide; and to execute that decision, by a delivery of the property, if the claim be established. Is not this, then, a part of the judicial power, which extends to all cases at law and in equity, arising under the Constitution, laws, and treaties of the United States? Is not every such claim a legal claim? and when asserted, is it not a case at law arising under the Constitution?

If then the judicial power extends to cases falling within this provision of the Constitution, Congress had an unquestionable right to vest it. It was a duty to vest it; because this Court has decided that the language of the Constitution in regard to the impartment of the judicial power is imperative upon Congress. Martin v. Hunter, 1 Wheat. Rep. 304, 316.

The judiciary act of 1789 does not cover the whole judicial power under the Constitution. Subsequent legislation has supplied many omissions in that act, of which the act of 1793 is an instance, vesting in the Circuit and District Courts that portion of the judicial power which is embraced by the second and third sections of the fourth article of the Constitution.

It is true that the act does not prescribe a judicial proceeding according to the forms of the common law. But in the same case of Martin v. Hunter, this Court has said, that in vesting the judicial power, Congress may parcel it out in any mode and form in which it is capable of being exercised. The act contemplates a summary proceeding, but still of a judicial character. It provides for the preliminary examination of a fact, for the purpose of authorizing a delivery and removal to the jurisdiction most proper for the final adjudication of that fact; to the state on the laws of which the claim to service depends. But this examination is judicial in its character. The parties,—claimant, and alleged fugitives,—are brought within the jurisdiction; the case is to be heard and decided upon proof; the certificate is not to be granted, unless the judge shall be satisfied upon evidence that the party is a fugitive owing service to the claimant. He acts, therefore, in a judicial character, and exercises judicial functions.

If, then, Congress possesses this legislative power, which has been thus exercised, the nature of that power requires that it should be exclusive. It can only be efficacious and adequate to its object, by being exclusive. And if exclusive, either expressly, or by undeniable implication, the settled principle is, that the states are as absolutely prohibited from legislation as if they were expressly forbidden to legislate. Sturgis *v.* Crowninshield, 4 Wheat. Rep. 122.

What is the nature of the power in this case? What is the object of this constitutional provision? It is to restore to the slaveholding states, substantially, the right which the conventional law of the colonies gave them. It is to confer upon them an authority to reclaim and remove their fugitive slaves, with the least possible inconvenience, expense, and delay. To be effectual to this end, it is obvious that the mode of proceeding ought to be uniform. And in order to its being uniform, the power to prescribe that mode should be exclusively vested in one legislative body. If there be a concurrent power of legislation in the states, with a right to exercise that power, then it follows that the fugitive could only be reclaimed according to the forms of state laws, irrespective of the regulations prescribed by Congress. The constitutional guaranty would thus become a sounding phrase, signifying nothing. State legislation, upon such a subject, would become the sport of prejudice. Different tribunals, forms of proceeding, and modes of proof, would be established in the different states. And the pursuing owner would find it utterly impracticable, ignorant of the particular state into which the fugitive had escaped, to meet the requirements of the local law.

A still further difficulty would be inseparable from the existence of a concurrent power. State laws have no obligatory force beyond state limits. A certificate of removal would carry no authority beyond those limits; and consequently it would be necessary for the owner to make a new claim, offer new proofs, and obtain a new certificate in every state through which he might be compelled to pass to the state of his own residence. The nature of the power, therefore, and the effect of its actual exercise by the states, raise an implication sufficiently strong to render it exclusive.

But admit it to be concurrent; the principle is too firmly esta-

blished to admit of argument, that in a case of this kind, where there is but one subject-matter of legislation, the concurrent power of the states is wholly suspended by the action of the federal power. The doctrine in Houston v. Moore, 5 Wheat. Rep. 1, is this, that where once Congress has exercised its power on a given subject, the state power over the same subject, which has before been concurrent, is by that exercise absolutely prohibited. In other words, wherever Congress exercises a concurrent power, it is made in effect an exclusive power, over the particular subject-matter of the power. There are, it is true, cases of concurrent powers on which both federal and state legislation may act at the same time; and where the latter is not suspended by the action of the former. Thus the exercise of the taxing power by Congress does not suspend the concurrent power of the states. Because, although the same power, it is exercised on different objects, or for different purposes. But where the power acts on the same subject-matter, to accomplish the same end, as in this case, the state power is necessarily suspended.

But if the principle thus adverted to, were not applicable to this case, there is another which would be conclusive; and that is, that in the exercise of concurrent powers, if there be a conflict between federal and state legislation, the latter must yield to the constitutional supremacy of the former. It remains, then, only to show that such a conflict exists in the present case; and a very cursory examination and comparison of the two laws will be abundantly sufficient for the purpose. Thus, the act of Congress authorizes the claimant to arrest the fugitive without a warrant. The Pennsylvania law peremptorily requires one. The act of Congress admits the oath of the owner or his agent, as proof of the claim. The Pennsylvania law excludes both, and requires the testimony of indifferent witnesses. The act of Congress protects the claimant from all unnecessary delay and expense. The Pennsylvania law authorizes delay upon the suggestion of the fugitive; and burdens the claimant with the incidental costs. The act of Congress imposes a penalty for obstructing or hindering the claimant in the prosecution and enforcement of his rights. The Pennsylvania law gives him no redress. In a word, the regulations which the two laws prescribe, are in all essential respects variant from each other. The

object of both may be the same, but the means of attaining it are entirely different.

In conclusion then of the whole matter. The indictment charges the offence of kidnapping under this state law. The special verdict expressly finds, that the fugitive was a slave for life, owing service and labour according to the laws of Maryland. The judgment of the Court was against the party thus indicted. It follows, that in the judgment of the Court, the offence of kidnapping in Pennsylvania, may consist in seizing, and carrying out of that state, an acknowledged slave, if the provisions of the state law for his arrest and removal are not complied with. The special verdict finds that fact, and the judgment of the Court is founded on it.

The offence charged is not that the fugitive was removed from the state of Pennsylvania, without complying with the provisions of the act of Congress. Supposing that to be an offence punishable by state authority; which it clearly is not; it is not an offence provided for by this law; nor according to the tenth section would an exact compliance with the act of Congress have been any protection to the party accused. The special verdict expressly finds that the slave was carried out of the state, without complying with the requirements of this law of Pennsylvania. That is the gravamen of the charge. And, consequently, if the state of Pennsylvania has no constitutional power to legislate at all upon the subject, the power being exclusively in Congress; or, if having originally a concurrent power, it has been suspended by its actual exercise by Congress; or if this state legislation is found to be in conflict with the federal legislation upon the same subject-matter; if either of these propositions has been successfully maintained, this judgment of conviction ought to be reversed.

Mr. Hambly, for the defendant in error.

The final decision of a great constitutional question, should at all times be regarded as a subject for grave consideration and reflection; inasmuch as it may affect the happiness and prosperity, the lives or liberties of a whole nation.

Among the people of this free country, there is nothing which should be guarded with more watchful jealousy, than the charter

of their liberties; which, being the fundamental law of the land, in its judicial construction every one is immediately interested, from the highest dignitary to the meanest subject of the common-wealth. Any irreverential touch given to this ark of public safety should be rebuked, and every violence chastened; its sanc-tity should be no less than that of the domestic altar; its guardians should be Argus-eyed; and as the price of its purchase was blood, its privileges and immunities should be maintained, even if this price must be paid again.

In all the solemn constitutional questions which have been adjudicated before this, the highest tribunal in the land, no one has arisen of more commanding import, of wider scope in its influence, or on which hung mightier results for good or ill to this nation, than that which is now presented to the Court for consideration. An all-absorbing subject is incidentally involved in it—a subject, which is even now heaving the political tides of the country, which has caused enthusiasm to throw her lighted torch into the temples of religion, and the halls of science and learning, whilst the forum of justice, and the village bar-room have equally resounded with the discussion. Its influences have been calculated by political economists; its consequences and determinations by political prophets; until all, from the statesman in the hall of legislation to the farmer at his fireside, are found arrayed on one side or the other of this great question, so that, whilst it has become "sore as a gangrene" in one region, it is the football of the enthusiast in another.

Prigg having been convicted in the State Courts of a crime which the statutes of Pennsylvania designate as "Kidnapping," the state of Maryland, of which he is a citizen, now raises the objection that the laws of our state are unconstitutional and to test this question we are this day here.

On the 25th of March, 1826, the General Assembly of Penn-sylvania passed an act, the first section of which renders it a felony to seduce or carry away any negro or mulatto from the state of Pennsylvania, to make them slaves. Mr. Hambly cited sections 2, 3, 4, 5, 6, 7, 8, 9, and 10 of the act of 1826.

All the provisions of this act of the General Assembly are alleged to be unconstitutional; and the plaintiff in error says are

in contravention of the act of Congress and the Constitution of the United States.

The third paragraph of the second section of article 4th of the Constitution, declares, "That no person held to service or labour in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labour, but shall be delivered up on claim of the party to whom such service or labour may be due."

Under this section, some contend that the owner of a slave has a right, without reference to the municipal regulations of the state or territory where he happens to be, to seize and carry away any alleged slave. That no legislation is necessary either by Congress or the states; that the clause is perfect in itself, and totally independent; and that the word "claim" means demand and surrender, without inquiry or investigation!

That if legislation be necessary, Congress has exclusively that power, has already acted, exercising its power over the whole matter, and therefore all state legislation is invalid.

The act of Congress was passed 12th of February, 1793; and authorizes the arrest of a fugitive from labour, and taking him before a judge of the Circuit or District Courts of the United States, or before any magistrate of a city or town corporate, and upon satisfactory proof, the judge or magistrate shall give a certificate which shall be sufficient warrant for the removal of the fugitive.

The second section fixes a forfeiture of five hundred dollars on any person who shall obstruct, hinder, rescue, or harbour such fugitive, &c.

In the argument of this matter, it is asserted that no legislation is needed; that the constitutional provision is ample; and that under the phrase "shall be surrendered on claim," every thing which legislation can give is already secured; and that under this clause a power is contained, in virtue of which, any one may step into a crowd and seize and carry off an alleged slave, "just as he would a stray horse," or any other article of personal property.

If this conclusion be correct, it is surely a strange deduction from the language used in that clause, and in direct opposition to what would seem to be impliedly its meaning.

If such be the true meaning of "claim," why does that clause

say, that no state by "any law or regulation therein," shall discharge from service? Why speak of "law or regulation," if none be allowed? Why allude to that which is forbidden and unlawful? Why speak of state laws or state regulations, if the states dare not pass any? And why not at once use the language which obviously presented itself, and say, that "escaping into another state," shall not discharge from service or labour, without adding a word about "laws or regulations?" The conclusion is unsound, and altogether unwarranted. The language of the Constitution not only presupposes legislation, but that this legislation not only is to be, or may be, but will be by the states. It was just as much as saying to the states: You may pass laws upon the subject—you may make regulations—you may prescribe the time and manner of seizure, the authorities before whom the parties shall come for adjudication—but you shall not discharge a bonâ fide fugitive from labour from that service which he owes under the laws of the state from whence he fled. Your authorities shall say whether under the laws of that state he owes service, and if he do, you shall hand him over.

This construction is likewise contradicted by the fact, that, not only the states but Congress, legislated upon the subject not long after the formation of the Constitution,—Congress, as early as 1793. It is, therefore, manifestly an argument which raises a strong presumption against the position contended for; that, at that early day, when the framers of that instrument were almost all in full public life; when the debates at its formation and upon its adoption were still fresh in the memory of the whole country; that Congress should have legislated upon this very point. Had the public men of the day forgotten the meaning of this phrase? Could they forget that "claim" meant peremptory surrender—that this was the meaning intended in the use of that word by the framers of the Constitution, and should go to work to legislate, where not only no legislation was necessary, but not at all allowable? Such supposition will not be indulged a moment.

But, again: if they had intended that neither the states nor Congress should legislate upon this subject, is it not altogether certain that they would not have used the term "claim," but would have selected other language better fitted to carry definitely the meaning which they intended to attach? What is the

meaning of "claim?" "A challenge of ownership," says Plowden. A challenge of interest in a thing which another hath in possession, or at least out of the possession of the claimant. "Claim" implies that the right is in dispute or in doubt. "Claim" may be made by two or more at the same time. "Claim" has a technical legal meaning; and those who drew this instrument, being eminent lawyers and well versed in the use of language, may possibly have designed so to point t' e meaning of the phrase, and for that reason used that word.

This impression, too, is greatly strengthened by the recollection that in the preceding clause respecting fugitives from justice, a much stronger word is used. "Shall be delivered up on demand," is the language used in reference to criminals; but fugitives from labour are to be delivered up "on claim." What now is the difference between these two terms? Why, evidently, "demand" is peremptory. It will not admit of delay; it insists upon immediate obedience. "Claim" supposes debate, litigation, the decision of a right. How is it when one seeks satisfaction for an offence? I "demand" satisfaction: I require it immediately. You shall give it me, or I will force it from you. His antagonist sees by his language he is in earnest, and he must reply. But if he should say, I "claim" satisfaction, debate springs up, negotiation ensues, and the offence most likely takes another shape.

This word "demand," in fact, thrust itself upon the attention of the framers of the Constitution. It was used in the preceding paragraph in reference to criminals from justice, and is eminently better fitted to express unconditional surrender than "claim" is.

But beside this, if the framers of this paper had designed such a purpose as that imputed to them, would they not have omitted from this clause the words "in consequence of any law or regulation therein"—and the clause would then have stood in an obvious shape; and every one would have understood that any fugitive from labour, escaping into another state, should not thereby be discharged from service, &c. This puts the matter, it is considered, in a very clear and strong light; and exceedingly adverse to the construction that neither the Union nor the states can legislate upon this subject.

Another reason which might here be noticed is, that no one, either in the debates upon the formation of the Constitution, or

at its adoption by the states, ever asserted that to be the meaning of this clause.

Mr. Hambly here referred to the debates in the Virginia convention.

Another most valid and substantial reason against this construction is, that it would be a violation of the very spirit of the instrument.

If, under this term "claim" the stretch of power is so very great that a man from a neighbouring state can venture into Pennsylvania or Maryland, and upon his simple allegation seize, and without reference to state authorities, carry off any one whom he may choose to single out as his fugitive from labour, it is a most unheard-of violation of the true spirit and meaning of the whole of that instrument.

The same power that can, upon simple allegation, seize and carry off a slave, can, on the allegation of service due, seize and carry off a free man. There is no power, if neither Congress nor the states can legislate, to dispute the question with the seizing party.

In non-slaveholding states the presumption is, that every man is a free man until the contrary be proved. It is like every other legal presumption, in favour of the right. Every man is presumed to be innocent until proved guilty. Every defendant against whom an action of debt is brought, is presumed not to owe until the debt be proved. Now, in a slaveholding state colour always raises a presumption of slavery; which is directly contrary to the presumption in a free or non-slaveholding state; for in the latter, primâ facie, every man is a free man. If, then, under this most monstrous assumption of power, a free man may be seized, where is our boasted freedom? What says the fourth article of the amendments to the Constitution of the United States? "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." Art. 5: "No person shall be deprived of life, liberty, or property, without due process of law."

But here we are met with the remark that "slaves are no parties to the Constitution;" that "we, the people," does not embrace them. This is admitted, but we are not arguing the want of

[Prigg v. The Commonwealth of Pennsylvania.]

power to "claim" and take a slave, but to claim and take a free man! Admit the fact that he is a slave, and you admit away the whole question. Pennsylvania says: Instead of preventing you from taking your slaves, we are anxious that you should have them; they are a population we do not covet, and all our legislation tends toward giving you every facility to get them: but we do claim the right of legislating upon this subject so as to bring you under legal restraint, which will prevent you from taking a free man. If one can arrest and carry away a free man "without due process of law;" if their persons are not inviolate; your Constitution is a waxen tablet, a writing in the sand; and instead of being, as is supposed, the freest country on earth, this is the vilest despotism which can be imagined!

Is it possible this clause can have such a meaning? Can it be, that a power so potent of mischief as this, could find no one of all those who had laid it in the indictment against the king of Great Britain, as one of the very chiefest of his crimes, "that he had transported our citizens beyond seas for trial," whose jealousy would not be aroused—whose fears would not be excited, at a grasp of power so mighty as is claimed for this clause? Think you not that some one of those ardent, untiring, vigilant guardians of liberty, would have raised a warning voice against this danger? And that, too, when only eighteen months after the formation of this charter, although they had already in the body of the instrument carefully guarded the writ of habeas corpus, and provided for the trial of all crimes by jury and in the state where committed, yet, as if their jealousy had been excited to fourfold vigilance, in their amendments provided for the personal security of the subject from "unreasonable seizure," and that no one should be "deprived of liberty without due process of law."

Suppose,—by no means impossible case,—suppose a man to be seized in the streets of Philadelphia simultaneously by a citizen of South Carolina and a citizen of Virginia, each claiming him as their slave: under the construction contended for, each would be entitled to carry him off upon mere allegation! He offers satisfactory evidence to show that he is entirely free; but the state authorities cannot interfere, because the states cannot legislate and give them power; and Congress cannot legisl te, and

if it did, could not give state officers judicial power. Martin v. Hunter's Lessee, 1 Wheat. 304. What is to be done? allow these parties to wrangle it out in the streets, to settle the question with dirk and bowie knife, or execute the judgment of Solomon? No, the answer will be, hand them over to the District Court, and there let them settle the right to property! Yes, but there you meet an unexpected difficulty. The District Court can try the right of property as between the claimants, but not the right of liberty as between them and the arrested free man; therefore it follows that because the party out of possession of the alleged slave cannot prove his right to take him, the party in possession retains him, and carries a free man into slavery. Possession of a slave, in the absence of proof, is sufficient evidence of title. 2 Marsh. Rep. 609.

But in exercising the power of claim, and of excluding the arrested party from testing the question of slave or free, do you not violate the first clause of sec. 2, art. 4? "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

In some states they sell out, for jail fees, the personal services of certain prisoners. Now, suppose such an one, not a negro, to be seized in Pennsylvania, as an alleged fugitive from labour,—and undoubtedly under this clause he may be seized,—but the truth comes out that the party seized is not and never was a prisoner, or sold out to service. Under this construction you cannot try the question; and a free citizen goes promptly and without redress into slavery! Ay, but let that be tried, say the advocates of this doctrine, in the state to which he goes.

There are two answers to this remark: First, it is in direct violation of the spirit of that provision in the Constitution which requires trials to take place in the state where the infraction of law occurred; and secondly, what chance of fair trial would any man under such circumstances have in the state to which he is taken, where all the presumptions are against him, where the whole public opinion is against him, where he is entirely separated from his witnesses, whilst the whole onus probandi is thrown upon him. Better a thousand slaves escape, than that one free man should be thus carried into remediless slavery!

It is true that Chancellor Walworth, in the case of Jack v.

Martin, in 14 Wendel, says that the right of recaption existed at common law, and "is guarantied by the Constitution." Now, with the greatest deference for the opinion of the learned judge, we are not convinced that the right of recaption of persons ever existed here, or if it did exist, it is taken away by the amendments to the Constitution. The open avowed ground is taken, that in a free state every man is primâ facie a free man who is at large. If so, he comes under that class called "people;" and the right of "the people" to be secure in their persons against unreasonable seizures is guarantied by the Constitution. Ay! but he is a slave, say the opponents of this doctrine. But that is not admitted. The very question at issue is, slave or free. Now, so long as he is not proved a slave, he is presumed free; and, therefore, if you seize him, it is a violation of this constitutional privilege.

But, it is said, if this be not the true construction of this clause, and legislation be necessary, that the right appertains alone to Congress; and that the act of 1793 covers the ground, and leaves no room for the action of state legislation.

That no power to legislate upon this subject is expressly granted "in terms" to Congress must be at once conceded. It must likewise be as readily conceded that it is not "prohibited" to the states. Then, if Congress possesses this power, it must be in virtue of a concurrent authority of acting upon the subject-matter; or because this is a faculty which is necessary to the exercise of some power already granted.

That it is not the latter, is manifest; for the most laborious investigation and the most careful search, aided by the most critical powers of mind, can show no single provision of the instrument to the exercise of which this legislative power would be necessary.

There are two kinds of concurrent powers embraced by the Constitution:

1. Those which both bodies may lawfully legislate upon; and,

2. Those which the states may legislate upon until Congress acts; when the latter, being the supreme power, excludes the former.

As an instance of the former, the regulation of the militia may be cited. Congress can "organize, arm, discipline, and govern," whilst to the states is reserved the right of appointing officers and

the authority of training. Art. 1, sec..8, clause 16; Houston v Moore, 5 Wheat. 24.

An illustration of the latter class may be found in the power to establish bankrupt laws; on which, it has been decided by this Court, that the states might legislate until Congress did, when the acts of the former would cease and expire. Sturgis v. Crownin-shield, 4 Wheat. 193.

In order, therefore, to ascertain whether this power of legislation be concurrent or not, we must inquire:

1st. Whether it were possessed by the states previous to the formation of the Constitution, and appertained to sovereignty. 2d. Whether granted in express terms to the Union, or prohibited to the states. 3d. Whether it be an exertion of sovereign power by operating beyond the state territory; or, 4th. As necessarily originating in the Union, so that no exercise of it by the states can take place, without clear, open, and undisguised conflict with the Constitution.

Now let us test this question by these rules. It is manifest that slaves and slavery were the subjects of legislative power by the states, before the Union. After the declaration of independence in 1776, each state, at least before the confederation, was a sovereign, independent body. Each had the right to enact laws which no other power could revise. Each could make war or conclude peace, without reference to the other. Each could raise armies or maintain a navy, without consulting the others; and, in fine, possessed every faculty of sovereign power, as effectually and entirely as either France or England or any of the kingdoms of the Old World, and equally as untrammelled. Then, this being the case, the union was formed, by taking away from the individual states portions of power, and vesting them in one central body, known as "the Union," in the formation of which were admitted maxims: 1st. That it possessed nothing by implication, except what was absolutely necessary to its existence; and, 2d. That powers not delegated to the Union, nor prohibited to the states in express terms, were reserved. Article 9 and 10 of Amendments.

South Carolina, as early as 1695, passed laws upon the subject of slaves and slavery, and so down to the present time. So also Connecticut, in 1711, and Maryland, in 1715. These, then,

are sufficient, as instances of the exercise of this power by the states, long before the Constitution was formed; and this proves the first position,—That it was possessed by the states previous to the formation of the Constitution. And it will not be controverted that the power is not "expressly" granted to the Union, nor prohibited to the states.

Thirdly, The exercise of this power by the states is merely a matter of police and internal regulation; and therefore does not operate beyond the state territory : and,

Lastly, the power does not originate in the Union—that is, the right of legislation does not grow out of the Union; the power itself, the subject matter, is not the birth of the Union; nor is its exercise a "clear, open, undisguised conflict with the Constitution," as the exercise of extra-territorial power would be.

It is inferred, then, from all this, that this power is not a concurrent one; that for want of express reservation of such right, it has not the features which enable it to be exercised at the same time by both parties, as is the case with the militia laws. Nor can the action of Congress absorb it and drive the states from it, as is the case with the bankrupt laws. It is a power which exists, and can only exist in the states. Nor is it any answer to all this, to say, that a variety of laws and regulations will be passed by different states; that the legislation will be incongruous and dissimilar. We must take the Constitution as we find it ! Our duty is to construe, not to legislate ! And we are told by good authority that in the construction of constitutions, the argumentum ab inconvenienti, will not answer; we dare not use it. The ita scripta rule, is enough for us. If the constitutional provision be defective, there is a constitutional mode to amend it : let us then rather apply to that, than violently wrest the instrument by construction.

It is urged, however, that the passage of the act of Congress of 1793 affords a very strong argument in favour of congressional action upon this subject; that the fact of its passage at so early a day evinces the understanding of that clause of the Constitution to have been, amongst the framers of it, that Congress alone had the right to legislate ; and hence, by implication, as it were, they would convince us, that it was one of those concurrent

3 c 2

powers which the action of the highest legislative body absorbs and takes away from the states.

This argument, if it prove any thing, will prove too much.

The act of Congress authorizes the arrest of the fugitive, and requires him to be taken before any judge of the District or Circuit Court, or before any magistrate of a county, city, or town corporate.

Now, it is a principle perfectly settled by judicial decision, that Congress cannot communicate the exercise of judicial power to any person who does not hold the commission of the general government. Martin v. Hunter's Lessee, 1 Wheat. 330: "Congress cannot vest any portion of the judicial power of the United States except in Courts ordained and established by itself." Cons. sec. 3, art. 2: "The President shall commission all officers." Now, if no man can be an officer of this government without bearing the commission of the President, certainly no "magistrate of a county, city, or town corporate" can be a judicial officer of the general government, and so cannot take authority under the act. This principle is necessarily derived from art. 3, sec. 1, which provides "that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as Congress shall from time to time ordain and establish;" and of course the persons holding this power must be commissioned by the power which establishes the Courts. This doctrine has long been held by both the Supreme and State Courts. United States v. Lathrop, 17 Johns. 4; Ely v. Peck, 7 Conn. R. 239. The former was a case in which an action of debt was brought for a penalty under the act of 1813, for selling spirituous liquors, and gave the State Courts jurisdiction. The last case was an action against a deserting mariner, in which the State Court had jurisdiction given it by an act of Congress; but the judges in both cases declined exercising it. 1 Kent's Com. 402, 403.

This, then, being the case, that the act of Congress of 1793 gave to "magistrates of a county" an authority which it could not give, the conclusion is irresistible, that they did not at that day understand in the legislative hall, the construction of the Constitution, as well as we do now, after an interval of half a century; and therefore the argument above cited is of no avail, inasmuch as it explodes itself. Besides which, we might add, that the states

have claimed the power just as openly and avowedly as Congress has done.

It is supposed, however, that the weight of judicial authority from the State Courts, is in favour, very decidedly, of the exercise of this power by the national legislature. Let us therefore examine.

In 5 Serg. and Rawle, 62, is contained the case of Wright v. Deacon. This was a writ de homine replegiando. The case had already been tried on habeas corpus, and adjudicated against the party, and upon that point decided; whilst it was taken for granted that the Constitution and act of Congress gave warrant for his removal. The question was not agitated as to the constitutionality of the law of Congress, or that of Pennsylvania; and the case therefore gives no authority for this construction.

Commonwealth v. Griffith, 2 Pick. 11, was an indictment for an assault and battery upon a negro, and the defence made was that he was a slave, and had fled from servitude. The Court say, " This brings the case to a single point, viz.: whether the statute of the United States is constitutional or not. The Constitution, say they, does not prescribe the mode of reclaiming a slave, but leaves it to be determined by Congress."

Here is taken for granted that which is far from appearing. One leap reaches the conclusion; without showing how Congress attains this power, whether expressly, by implication, or how. In fact, one of the judges dissents, saying that he thought the fugitive should be seized in conformity to state laws. Further, the unconstitutionality of the law was not attacked on the ground that Congress had no right to legislate at all; but merely because in conflict with other parts of the instrument. This case, therefore, it is respectfully conceived, proves nothing for the plaintiff in error.

In 12 Wend. 314, is found the case of Jack v. Martin. This was a writ de homine replegiando; and Judge Nelson in the Court below decided that the legislative power was concurrent, and therefore the action of Congress excluded the states from legislating, and that the object being palpable—i. e., to secure the slaves of the south—it should have a construction that would operate most effectually to attain the end.

We contend that we are giving that construction to this clause most likely to produce the desired end. If excited argument and

an interested withdrawal of the whole subject-matter from the hands of the states could be effected by the south, will it not produce constriction and collapse with the free states? Which is most likely to keep the peace? A tone of confidence and conciliation, or of defiance and the attempted exercise of illegal power? We must negotiate and legislate upon this and every other subject with the calumet of peace, rather than the tomahawk; with the conciliatory spirit of a band of brothers, instead of the animosity of deadly foes.

The case of Jack was taken up before the Court of Errors and Appeals, and the decision below sustained—not the question of constitutionality, but the question of fugitive or not, because Jack had admitted he was a slave by his pleas. But the question of constitutionality was debated, and in my judgment not a single solid reason was given for that construction, but, on the contrary, Chancellor Walworth says, "I have looked in vain among the delegated powers of Congress for authority to legislate upon the subject," and concludes that state legislation is ample for the purpose.

Now, then, upon recapitulating these cases, what have we?

1. We have one case where the constitutionality of the law is taken for granted, by Chief Justice Tilghman.

2. We have the argument of Judge Nelson and Senator Bishop, in favour of it, and the case in Pickering; and—

3. We have the decisive opinion of Chancellor Walworth, and the dissenting judge in the case in Pickering.

For neither in Ex parte Symmons, tried by Judge Washington, and reported in 4 Wash. C. C. Rep. 396, nor in the case of Johnson v. Tompkins, 1 Baldw. Rep., was the question of constitutionality at all mooted or spoken of, but both judges speak in the same breath of state laws and laws of Congress; without once impugning the right of either party to legislate, or for one moment intimating a doubt as to the constitutional right of either party to pass them.

It may, however, be contended that this authority to legislate is given to Congress by the 18th clause of sec. 8, art. 1, of the Constitution: "And to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the govern-

ment of the United States or in any department or officer thereof."

Judge Story says, in his Commentary, sec. 1238 : " The plain import of this clause is, that Congress shall have all the incidental and instrumental powers necessary and proper to carry into execution all the express powers. It neither enlarges any power specifically granted, nor is it a grant of any new power to Congress."

This case, then, is not embraced by the first part of the section, because it is not one of the "foregoing" enumerated powers. Nor is it included under the other term, "all other powers vested," because there is no power vested, for the learned commentator just alluded to, says it means express powers.

Speaking of the Constitution, we are told in Hunter's Lessee *ad.* Martin, 1 Wheat. 326, the government of the United States can claim no powers which are not granted to it by the Constitution, and the powers actually granted, must be such as are expressly given or given by necessary implication. On the other hand, this instrument is to have a reasonable construction, according to the import of its terms. The words are to be taken in their natural and obvious sense; not in a sense unreasonably restricted or enlarged.

Certainly, then, this phrase, "powers vested," means express powers; any other mode of construction would do violence to the whole instrument, and overturn a whole series of decisions. If then it means express power, there is none such in this case; and therefore, under this clause, Congress cannot exercise the authority claimed. 1 Kent's Com. 388, 90. "The correct principle is, that whenever the terms in which the power was granted to Congress, or the nature of the power required that it should be exclusively exercised by Congress, the subject was as completely taken away from the state legislature as if they had been expressly forbidden to act on it." But is that the case here?—the power is not granted in terms at all, and the nature of the power is such, that the states can as easily and usefully exercise it as Congress.

The truth is, the power is one of police and internal regulation, as much as ferries, turnpikes, and health-laws; and in Gibbons *v.* Ogden, 203, we are told that "no direct power is granted over these objects to Congress, and consequently they remain subject

74

to state legislation. If the legislative power of the Union can reach them, it must be for national purposes."

How can legislation respecting slaves become national when only a part of the states hold them? Such legislation cannot assume a national aspect, or attain a "national purpose."

If then this power be not expressly in Congress, nor concurrently, nor necessarily appurtenant to any other power, what is the meaning of this clause?

"No person held to service or labour in any state, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service, but shall be delivered up, on claim of the party to whom such service or labour is due."

It simply means this—nothing more nor less: You may legislate—you may regulate—but this one point alone you shall not touch:—You shall not discharge the fugitive from service, if he were a slave by the law of the state from whence he fled.

The result is, that no power being given to Congress to legislate, it is reserved to the states under the 10th article of the amendments.

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved." Federalist, No. 32. The state governments clearly retain all the rights of sovereignty which they had before the adoption of the Constitution, and which were not by that Constitution exclusively delegated to the Union. 1 Wheat. 325.

Suppose art. 4, sec. 1, is read thus:—"Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state:"—and then stopped. Is it not apparent, that the states could by law regulate the kind and quantum of proof, the manner in which their Courts should receive it; and if it was thought they could not, why in express terms reserve to Congress "the right to prescribe the manner in which they shall be proved, and the effect thereof."

Under art. 1, sec. 4, clause 1, the times, places, and manner of holding elections for senators and representatives shall be prescribed by the state legislatures; but the framers of the Constitution cautiously add, that Congress may make or alter such regulation, except as to place.

Art. 1, sec. 8, clause 5, the power to coin money, one of the highest attributes of sovereign power, is expressly given to Congress; and yet, in section 10, clause 1 of art. 1, the states are cautiously and expressly prohibited from coining money. This has always been the highest mark of sovereign power.

It is, however, supposed by some, that because Congress has legislated on the surrender of criminals, that therefore there is stronger ground for claiming the right of legislating here.

Mr. Hambly cited the Madison Papers and Debates in Convention, that this matter was expected to be left to state legislation; and that the south was not united itself upon the subject. Madison Papers, p. 1447.

As if, however, to remove all doubt upon this subject, we have, in the Constitution itself, an open admission that the whole subject of slaves and slavery was left in the hands of the states. Art. 1, sec. 9: "The migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited by Congress prior to 1808."

Now what is the meaning of this? Why, that Congress shall leave the slave-trade, and all its operations, to state legislation entirely, with the exception that after 1808 they may stop it if they choose; but if they do not choose, it will always remain in the hands of the states, until they do see fit to close it. This, to my mind, without any other consideration, is sufficiently convincing that every body at that day rightly understood this whole matter to be the subject of state legislation.

The use of the terms "legally" and "justly," in the formation of the Constitution, shows that the right was to be ascertained by competent authority, not taken for granted; and that legislative power somewhere was to exercise itself upon the matter, and by none more probably than the same power which then had it in control,—the state legislatures.

It now only remains to examine two arguments urged on behalf of the plaintiff in error.

It is alleged that the judiciary act of 1789 vests in the Courts of the United States the whole judicial power of the government; and that this being judicial power, which is sought to be attached to the general government, it is impliedly embraced by that act.

One word will be a sufficient answer to that argument. The power asked, or rather claimed, is not judicial, but legislative; and therefore can by no possibility be claimed by, through, or under, the judiciary act.

Another argument is, that legislative construction has, with this Court, almost the authority of judicial decision. And because Congress has, in its reports upon slavery, admitted or asserted this right, their claim therefore should be regarded almost as a judicial construction.

It is answered, that if there be any one thing in this country entirely loose, uncertain, and vascillating, it is legislation; and whenever the judicial exposition of our highest Courts becomes so wavering and uncertain as to bear comparison with our legislation, we shall truly be the pity and contempt of all civilized nations.

It has been shown:

1. That "claim" does not mean peremptory demand and unconditional surrender. 2. That legislation is contemplated by the language of the clause; and that both Congress and the states have legislated. 3. That this construction was never asserted by the framers of the Constitution. 4. That it would violate its spirit. 5. That the power of recaption of persons never existed, or if it did, is restrained by the amendments. 6. That this power is neither expressly granted to Congress nor prohibited to the states; nor is it necessary to the exercise of any granted power, nor impliedly reserved. 7. That the states possessed this power before the Constitution was formed. 8. That it is a mere regulation of police, and does not suppose the exercise of national power; and, 9. That the Constitution, in art. 1, sec. 9, gives, or rather leaves the whole subject in the hands of the states, where it originally found it.

Mr. Johnson, attorney-general of Pennsylvania, stated that he appeared before the Court in obedience to the directions of the act of Assembly, passed in 1839, to which reference had been made, to maintain the constitutional authority of Pennsylvania to enact the several laws set out in the paper-book in the hands of the Court; and constituting the groundwork of the indictment and proceedings in the present case. He said he occupied a position of great

[Prigg v. The Commonwealth of Pennsylvania.]

delicacy and embarrassment: He stood before the Court not only as the counsel, but as the official representative of the Commonwealth of Pennsylvania; and was, as such, bound by an oath as solemn as that taken by their honours, to support the Constitution of the United States. It was made his duty to vindicate the right of Pennsylvania to adopt the laws in question against the allegation of the learned gentlemen, who so ably represented the interests of Maryland, that they conflicted with the Constitution and laws of the general government. In performing this duty, he felt the responsibility to be almost as binding as if he were pronouncing a judicial decision, to advance no doctrines that were, in his judgment, incompatible with the true construction of the federal Constitution.

It was gratifying to him to be able to assure the Court, that his official duty and his own conscientious convictions of right, as a citizen of the Union, were in perfect harmony on this subject. He should not hesitate to speak in earnest, for he spoke with sincerity. He desired to place Pennsylvania rectus in curiæ, on her proper footing, before the Court. She came there voluntarily. She was not dragged sullenly to that high bar, denying the jurisdiction of the Court and disclaiming its authority. This proceeding was one of amity, of concord, on the part of Pennsylvania and of Maryland, which were, as the learned counsel had told the Court, the real and substantial parties. They came into that Court to try a great question of constitutional law, to terminate disputes and contentions which were arising, and had for years arisen along the border line between them, on this subject of the escape and delivery up of fugitive slaves. Neither party sought the defeat or humiliation of the other. It was for the triumph of law they presented themselves before the Court. They were engaged under an imperative sense of duty in the work of peace; and he hoped he would be pardoned if he added, of patriotism also

The difficulties which resulted in the present case had been previously felt, and made the subject of negotiation between these states. And it was a curious fact, that this very act of 25th March, 1826, the unconstitutionality of which is alleged in this case, was the joint fruit of such negotiation. It was passed, as he believed, at the instance and with the entire approval of commissioners appointed by the constituted authorities of the state

of Maryland, to wait upon the legislature of Pennsylvania to obtain the passage of some law of the kind. At the time of its passage it was loudly condemned by that portion of the citizens of Pennsylvania who favoured the abolition of slavery. And now, a singular change of places is exhibited—the state of Maryland repudiates what she then sanctioned—and the adversaries of slavery sustain, though not very cordially, what they then condemned. One of these parties thinks this act of 1826 is too indulgent to slaveholders; the other, that it deprives them of their just rights. The considerate and enlightened citizens of Pennsylvania, with few, if any, exceptions, were, he believed, of the opinion that this law was precisely what it should be—alike warranted by the federal Constitution, and careful to protect the rights of all. As such, it would be his duty, as it was his pleasure, to maintain it against every assault upon its constitutionality, let it proceed from whatever source it may.

By the act of 1780, Pennsylvania began the great work of philanthropy in regard to her slaves. She has pursued the policy there indicated, until slavery, with only here and there a time-stricken relic of former policy, has vanished from the soil. She did not trench on the rights of other states. She did not impugn the principles, or the conduct of their citizens; deeply as she abhorred slavery herself. She performed her own duty, and left to others the glory or the shame of performing, or of neglecting theirs. In this act of 1780, there is a saving of the rights of slaveholders in other states. So in the act of 1826. Its very title speaks its object. It is "An act to give effect to the provisions of the Constitution of the United States, relative to fugitives from labour, for the protection of free people of colour, and to prevent kidnapping." Thus is this very unconstitutional act found to be an act to give effect to the Constitution. The history of the legislation of Pennsylvania on this subject will prove, that though she has been ever found in the vanguard of the friends of liberty and humanity, she never has forgotten what is due to her sister states; she never has wavered in her loyalty to the Constitution of the Union; and come what may, she never will depart from this course.

That Pennsylvania had the right then, to enact the law in question, she solemnly avers to have been accorded to her by

[Prigg *v.* The Commonwealth of Pennsylvania.]

the state of Maryland herself. She will not consent to surrender it, until this Court, by its decision, strips her of that valued attribute of sovereignty. None will deny, that the main questions involved in this case are delicate, in some respects intricate, and in any point of view important to all sections of the Union. Substantially they are these:

1. Is the power of prescribing the mode of delivering up fugitives from service or labour, under the 2d section of the 4th article of the Constitution, exclusively vested in the general government?

2. If it is not, is it concurrently vested in the state and general governments, to be exercised on particular terms? or is it solely vested in the state governments?

3. Have the states the right to inflict penalties, as in cases of crimes, upon those who seize and remove fugitive slaves out of their territories, without pursuing the mode prescribed, either by the act of Congress of 1793, or by the acts passed on the same subject, by the states themselves?

The last of these three questions is the most material in the present case: perhaps it is the only real question in this case, upon which the Court is imperatively called upon to pronounce its judgment.

It is to be extremely regretted that we have no judicial guides to aid us in the argument of this cause, which are of higher authority than the mere opinions of individual judges, who have incidently, often hastily expressed them. The cases, such as they are, unfortunately are few, conflicting, and contradictory. They have, it is true, all occurred in states where slavery has been abolished, for such questions must rarely indeed happen, in states where slavery exists. It is obviously the interest of all parties in such states, to determine the question in one way. Without pretending to trouble the Court with a detailed and critical examination of the following cases, he would refer to them as exhibiting a most striking illustration of the "uncertainty of the law." Deacon's Case, 5 Serg. & Rawle, 62; Johnson *v.* Tompkins, 1 Baldwin, 571; Com. *v.* Holloway, 2 Serg. & Rawle, 306; S. C.; 3 Serg. & Rawle, 4; Com. *v.* Griffiths, 2 Pick. 18; Jack *v.* Martin, 12 Wend. 312; S. C., 14 Wend. 510. In the cases in the New York and Massachusetts reports, the Courts were divided in opinion. In

the cases in the Pennsylvania reports, the question did not properly arise, and the Court, without examination, declared its opinion on the constitutionality of the act of Congress of 1793. This subject has been incidentally noticed in a few other instances, but not in such a manner as to be deemed essential.

The questions are thus perfectly open and free from all embarrassment on the score of authority. Decisions of this Court on other provisions of the Constitution will supply us with useful analogies; but we are thrown back on the elementary principles of the Constitution itself for the foundation of the present argument. Let us then recur to these principles, as the source of the power we are in quest of, and trace it up to its fountain-head.

The times call for a full and frank exposition of this subject; and he rejoiced that it had been presented at this juncture, before this tribunal, and in the friendly spirit that actuated the parties now at the bar. He begged leave to make one further preliminary suggestion, before he opened the Constitution. It was this; that the state and national governments were too often viewed as hostile and repugnant to each other in their relations. Powers granted to one, were regarded as if withdrawn from the other; and it seemed to be the effort of some, who were called upon to judge between them, to treat them as if they mutually approached each other as belligerents, with swords drawn. This was not his opinion, nor would it be his course. He thought, with the fathers of the republic, that both were essential to each other; both formed one consistent, harmonious, beautiful system of government—complete when united—imperfect when divided: combined, stronger than links of iron; dissevered, weaker than a rope of sand. It would be his purpose, therefore, to contend for such a construction of the federal Constitution as would place the state and national governments, on this solid and impregnable basis.

1. In regard to the first question he had suggested, he would proceed to read and comment on the second section of the fourth article of the Constitution, which was in these words, "No person held to service or labour in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labour, but shall be delivered up on claim of the party to whom such service or labour may be due." This provision certainly gives no authority

[Prigg v. The Commonwealth of Pennsylvania.]

to the general government in terms; none even by implication. It simply enjoins a duty on the states, and prohibits them from passing laws or regulations liberating fugitive slaves. It recognises the general right to legislate on this subject, for it restricts its exercise in a particular manner. If they could not legislate at all, it was futile and absurd to say they should not pass laws of a particular description. But it enjoins that the fugitives shall be "delivered up" "on claim." This duty is made incumbent on the states, without prescribing the exact mode of its performance. The agency of the general government is in nowise concerned or invoked. The obligation is on the states, and for the states; their power is left perfectly free and untrammeled, with this single restriction—that they cannot discharge the fugitives from the claim of their masters or owners. The authority vested in the states, is in the nature of a negative pregnant; it denies and admits—denies the particular power of liberating fugitives, and admits the general power to prescribe how they shall be delivered up. Should the states transcend their authority by enacting laws impairing the right of the slaveholder, the remedy is by judicial instrumentality. It is here. This Court will pronounce the acts unconstitutional and void. But this power of the general government is preventive—not active. It is solely the right to restrain, not the right to compel. There are various restrictive clauses in the federal Constitution; but no one ever supposed, that a prohibition of legislation upon the states gave the positive right to Congress to legislate; much less can it be pretended, that a prohibition of a particular species of legislation divested the states of all general authority on the subject, and transferred the right to the national government. This construction of the powers of the general government would annihilate the state sovereignties at a blow. See on this subject of the general powers of the federal government, the letters of the Federalist, Nos. 41, 42, and 43; but especially 42. In this letter, the subject of the 4th article of the Constitution is distinctly and elaborately considered. Every line, and every word, is noticed; but this very identical provision, in regard to fugitive slaves, is entirely omitted. Had it at that day been supposed to have conferred any power on the general government, could it thus have been passed silently by? Does the tremendous power arrogated for the national government, in

this case, lurk in this provision, without having been discovered by the keen eyes of Hamilton, Madison, or Jay? These letters of the Federalist, were written before the adoption of the Constitution. They were read by almost every one. The comments were identified with the letter of the Constitution itself. They have been always treated as a contemporary exposition, by the first judicial intellects of the age, sanctioned by popular adoption; and he felt persuaded the Court would pause, before it construed into the Constitution, powers, which these great men never dreamed of ascribing to the general government.

The reason for introducing this provision into the Constitution, is itself the best exponent of its meaning. Prior to the adoption of the Constitution, slavery, absolutely, or in a modified form, existed in all the states except perhaps in Massachusetts. The right of the master to pursue and recapture fugitive slaves then existed by mutual comity. Few, if any, free negroes could be found. The presumption was that all negroes were slaves. No general regulation was necessary; for it was the interest of all the states, to countenance and aid the master in the recapture of his runaway slave. But symptoms of repugnancy to slavery began to be manifested in Pennsylvania and other states; and the southern states were apprehensive that it might at some future day interfere with the recovery of their property. They desired a guarantee from the general government; not that that government should provide for the redelivery of their fugitive slaves, but that the Constitution of the Union should prohibit the states from passing laws declaring them to be free. The provision of the Constitution under consideration furnishes this guarantee; it never was intended for more. See 2 Elliot's Debates, 335, 336; Mr. Madison's and Governor Randolph's speeches in the Virginia convention. Had the southern states demanded more than this simple guarantee; had they required that the right of the states to prescribe the mode of surrendering up fugitive slaves should be yielded to Congress exclusively; we know not but it might have jeoparded the formation of the Union itself. It is well known the word "slave" is not found in the Constitution. That it was excluded on account of the scruples of certain of the northern members of the convention; and had these members been told that they were depriving the states they represented,

[Prigg v. The Commonwealth of Pennsylvania.]

of the power of directing the mode in which fugitive slaves were to be redelivered to their masters, who can doubt that they would have rejected with indignation any instrument of government, containing such a surrender of state sovereignty as this?

The Constitution does not aim at any abridgment of the state sovereignties on this subject, except in the single point of prohibiting them from setting fugitive slaves at liberty. In all other essential particulars, it wisely leaves them to the exercise of their own judgment. Different rules on this subject would naturally be established in different states. Less strictness of proof of the right of the master would be satisfactory in a slave state, than would be so in a free state. Some respect is due to the common feelings, or even prejudices of a community, in the enforcement of claims deemed odious in principle to any considerable number of the people. If even compatible with justice, they should not be pressed in a manner to outrage or wound the sympathies of those on whom the demand is made. To abhor slavery, in principle, is no great offence in a country where liberty is the boast and the birthright of every creature wearing the image of his Maker. The states are the best judges of that mode of delivering up fugitive slaves, which will be most acceptable to their citizens. It is evident that no general law can suit the spirit of the people in all; and the only rational mode of providing for the evil, is that provided by the framers of the Constitution—by committing it to the wisdom and patriotism of the states themselves. The tendency of this course of reasoning is, not only to prove that the general government has not exclusive, but that it has no jurisdiction over this subject whatever. To remove all possibility of difficulty, however, he would proceed to consider the nature of its exclusive powers with some minuteness, but great brevity.

On every principle of rational construction, recognised by common sense and by judicial decisions, exclusive authority on any given subject was vested in the national government in only three cases.

1. When the power is expressly granted.

2. When the power is vested in the general government, and prohibited to the states.

3. When the exercise of a power by the states would be con-

tradictory and repugnant to the exercise of a rightful power by the general government. See the Federalist, No. 32; Sturgis v. Crowninshield, 4 Wheat. 122; Gibbons v. Ogden, 9 Wheat. 1.

Under which of these classes of exclusive powers, can such power be inferred in this case? Not under the first, for, as has been already shown, no such power is given. Not under the second, for no power is vested in the general government, or prohibited to the states, in the section now before the Court, which has been violated. Not under the third, for the general government neither possesses, nor has exercised any power, to which the exercise of the power of enacting the law in question by Pennsylvania, is either contradictory or repugnant. The supposed incompatibility, arising from the nature of the power to be exerted, cannot render it exclusive in the national government; for the very foundation of the argument is wanting, the existence of the power at all.

2. Taking it, then, as established by the argument, that exclusive authority to legislate on this subject is not vested in the general government, is it vested in the respective states, concurrently, and co-operatively with it, or solely, and independently of all control on the part of Congress? Anterior to the adoption of the Constitution, the power of prescribing the mode of surrendering up fugitive slaves, clearly belonged to the states alone. It is not taken away by that instrument; it is not inconsistent with any of the powers vested in Congress or the general government; it is one of the most necessary attributes of sovereignty recognised and sanctioned by every principle of national law. It belongs to them still. No rightful power exists to divest it. The Constitution forbids it; and the Constitution only can strip them of this power. See 4 Wheat. 122; 5 Wheat. 1; 2 Dallas, 294; 3 Dallas, 386; 2 Wheat. 259; 3 Wash. C. C. R. 316, 322. The tenth article of the amendments of the Constitution settles this part of the case beyond all cavil or controversy. There let it rest. Whatever may be the power exercised by Congress, the states at least cannot be deprived of the power that belongs to them under the Constitution.

The act of Congress of the 12th February, 1793, on this subect, is supposed to have been a constitutional exercise of power.

sed so recently after the adoption of the Constitution, and

by men intimately associated with that event, it has hardly ever been subjected to the test of examination, it has been taken for granted, and acted upon without question.   But even great names cannot sanctify wrong; time cannot supply the want of constitutional authority.   We must examine that act of Congress now, as it would have been examined if it had come before this Court the day after it was enacted.   He would not speak irreverently of the Congress of 1793; but he would take occasion to say, the history of this famous law exhibited some curious reminiscences. Its origin in a few words was this.   In the year 1791, the Governor of Pennsylvania made a demand on the Governor of Virginia, for the surrender of three persons charged with kidnapping a free negro.   After taking the advice of the attorney-general of that state, the governor refused to comply, on the ground that although the Constitution made it obligatory on him to surrender up fugitives from justice, yet as there was no act of Congress directing the mode in which it should be done, he could not and would not yield to the demand.   The Governor of Pennsylvania submitted the question to President Washington, who, after consulting the attorney-general of the United States, brought the whole matter to the notice of Congress.   See 1 American State Papers, Miscellaneous, 38, 39.   That body referred the subject to a committee; a bill was reported, substantially the act of 1793.   It lay upon the table for a considerable period, and finally passed and became a law on the 12th February, 1793.   It is to be observed that the only question submitted, was the one touching fugitives from justice, not fugitive slaves.   The two subjects were comprehended by Congress in one bill, and the northern states were constrained to agree to the provision relative to fugitive slaves, for the purpose of procuring the passage of a law providing for the case of fugitives from justice.

The science of legislative log-rolling, which has been deemed of quite modern origin, appears not to have been unknown to the Congress of 1793.   There is no question about the power of Congress to legislate on the subject of fugitives from justice. The demand is to be made by the executive authority, on a " charge made" against a person, of treason, felony, &c., &c., who shall flee, &c.   The first section of the fourth article of the Constitution expressly confers on Congress the power of pre-

scribing the manner in which "records and judicial proceedings' shall be proved, and the effect thereof." The right, therefore, to legislate on this subject is clear. But there is not the remotest connection between this matter and that of fugitive slaves. The one has sole reference to crimes perpetrated against the public peace and public safety; the other to the recapture or reclamation of private property: yet Congress classed them together, and made the provision for one depend on a similar provision for the other.

What are the features of this act of Congress, which, as is contended, was passed in pursuance of the constitutional authority of the general government; and which terminated forever, if such right ever existed, the concurrent power of the states to legislate on the same subject? It empowers state judges, magistrates, &c., &c., to take cognisance of the cases of fugitive slaves, together with judges holding their appointments under the national government. So far as it attempts to vest this or any jurisdiction in state officers, it is unconstitutional and void. The solemn decision of this Court has branded such attempt with condemnation. See Martin v. Hunter's Lessee, 1 Wheat. 304; 3 Story's Commentaries on the Constitution, 114, 115, 386, 603; Sergeant's Constitutional Law, 386, 398.

That act, then, is void, so far as relates to all instrumentality for its execution, but by the judges of the Courts of the United States. The authority of its framers, as constitutional lawyers, is thus exploded; and their boasted work, like all things human, is characterized by frailty and error. If it even be regarded as conformable to the Constitution, its execution is rendered almost impracticable by the want of adequate agents. In a large state like Pennsylvania, with but two district judges residing three hundred miles apart, how is the difficulty of obtaining certificates of removal for fugitive slaves to be obviated? If the state authorities cannot be called upon to furnish aid, what are the limits to the obstacles that environ the masters? A very brief season of trial will make them known. He would suggest to the Court, whether this act of Congress was not operative only in the District of Columbia, the territories, and wherever Congress had exclusive right of legislation. To this extent he did not intend to question its validi y.

It was a fair and reasonable presumption from the provision of the act of Congress itself, authorizing the interposition of state officers, that Congress, aware of its inherent defect of jurisdiction, contemplated the co-operative, or concurrent aid of state legislation, to carry the provisions of this law into effect. If not, why impose on the state magistrates duties which they could not perform? Would a certificate of removal, given under this void authority, authorize the master to remove his slave? Clearly not. Nor would it afford him any protection against the rescue or escape of his slave. To seek the aid of such official authority would be alike dangerous and idle. It would lead to incessant broils and disturbances of the public peace; and to the inevitable escape of the fugitive from his master.

In this state of the case, the legislature of Pennsylvania deeming the act of Congress pursuant to the federal Constitution, steps forth to aid the pursuers of fugitive slaves. The act of Assembly of that state of the 25th March, 1826, was passed in the manner he had already stated, to confer authority on her own magistrates and judges, which the Constitution had denied under the act of Congress.

It, in the first place, describes the offence charged against the defendant in this case, and then proceeds to define the mode in which the state magistrates and judges shall take cognisance of the cases of fugitive slaves. It does not change the mode of making proof on the part of the claimants, nor the mode of granting certificates of removal; it simply deprives subordinate magistrates of the power of granting such certificates, but it directs their interference to procure the arrest of the fugitive, and enjoins on the several judges the duty of hearing the proof and granting the proper certificates for the removal of the fugitive on certain terms therein prescribed. It does not touch the act of Congress. It recognises its authority, and leaves it as it stood before. Proceedings under this act of Assembly are purely voluntary. Claimants may resort to it for aid, or pursue the directions of the act of Congress. If its provisions are onerous, discard them. Take shelter under the national law. But it is an additional remedy provided for the benefit of the slaveholders. It gives them a short cut to justice, and what cause have they to complain, if it leaves the other course equally free for their adop-

tion? In determining which remedy to invoke, the slave owner will be governed by circumstances; distance, place, character of neighbourhood, clearness of his own proof, &c., &c., and will act accordingly to the preponderance of advantages. Not one particle of inconvenience can he suffer under this act of Pennsylvania, while he has the chance of manifold benefits.

The acts of Congress and of Pennsylvania form together a harmonious system, neither jarring nor conflicting in any part of its operation. It is careful of the rights of the slaveholder, and is adapted to the feelings, sympathies, and sovereign power of the states. If the power to pass laws on the subject of delivering up fugitive slaves be concurrent, the states cannot control the acts of Congress; and cannot therefore impair the right of the owners. If the power be solely vested in the states, they cannot impair this right under the federal Constitution. In either case, the slaveholders may bid defiance to hostile state legislation. The mode of recapturing or seizing their property by the southern slaveholders, under the laws, both of Congress and of the legislature of Pennsylvania, is a summary one, in derogation of the common law; and might be confined to a strict and rigid adherence to the boundaries laid down on the subject, in either of them, to the exclusion of the other under the Constitution: but when the free states themselves who might require this construction, choose voluntarily to surrender it, and treat it as a remedial power to be enlarged, by both state and national legislation, for the benefit of the slaveholders, it is an extraordinary spectacle to see those most deeply interested arrayed among the adversaries of this liberal policy. It appeared to him one of the most unaccountable delusions that ever seized the human mind. He would leave to future times, as a matter of wonder, the task of discovering why his learned and zealous friends on the other side, and himself, had not changed places in this argument. Experience will demonstrate who advocates the true interest, not of the north only, but of the south, and of all sections of the Union. He did not for an instant question motives, he spoke of results alone. To these he would appeal, for a judgment that might abide the test of time with all its attendant train of circumstances, fraught with good or ill to our country.

Supposing the power to pass laws on the subject of fugitive

slaves to be concurrent, the learned counsel on the other side contended that it had been exercised by Congress; that the whole ground of legislation was provided for; that the right of the states was thereby superseded, and that the act of Assembly of Pennsylvania was absolutely void. To all these positions he would answer, in addition to what had already been advanced, that Congress had not coverce the whole ground; that it had expressly intended to employ the agency of state magistrates, which could not be done without state legislation; and that the states, if they had a right to authorize the action of their officers, could do so on such terms as they pleased, if they did not contradict the act of Congress. There was no such contradiction or repugnancy in this case, and of course, the argument raised on that presumption totally failed.

He could not on this branch of the case fortify his argument with stronger reason or authority than by quoting the words of Mr. Justice Story, in the case of Houston v. Moore. On this basis he did not fear to let it rest. "The Constitution, containing a grant of powers in many instances similar to those already existing in the state governments, and some of these being of vital importance also to state authority and state legislation, it is not to be admitted that a mere grant of such powers in affirmative terms to Congress, does, per se, transfer an exclusive sovereignty on such subjects to the latter. On the contrary, a reasonable interpretation of that instrument necessarily leads to the conclusion that the powers so granted are never exclusive of similar powers existing in the states, unless where the Constitution has expressly in terms given an exclusive power to Congress, or the exercise of a like power is prohibited to the states, or there is a direct repugnancy or incompatibility in the exercise of it by the states." And also, "In all other cases not falling within the classes already mentioned, it seems unquestionable that the states retain concurrent authority with Congress not only on the letter and spirit of the eleventh amendment of the Constitution, but upon the soundest principles of general reasoning."

3. The vital question in this cause seemed to him to be this: whether the state of Pennsylvania could not punish the forcible removal of a negro, in the manner and for the purposes set forth in this special verdict, as a criminal offence, when such removal,

was made in total disregard of the act of Congress, and of her own act of 1826. He need hardly remind the Court, that the provisions of the federal Constitution under consideration, prescribed that fugitive slaves were to be "delivered up" "on claim." Both the acts of Congress and of the legislature of Pennsylvania directed the mode to be pursued in making claim and delivery. It is obvious that the Constitution contemplated two acts—the claim by the master, and the delivery in pursuance of it, of the state where the fugitive was found. One preceded the other; and neither could be available to restore the slave to his master alone. Under the act of Congress, he might "seize" the slave, but could not remove him without the certificate of the judge or magistrate.

Under the act of 1826, the magistrate may issue his warrant to apprehend the fugitive; but the judge alone can grant the certificate. Under neither can the master remove the slave without this certificate. It is his only legal warrant of removal, and it is a sufficient warrant throughout the whole Union. A forcible removal is nowhere authorized or countenanced; on the contrary, it can only be a removal under the law, and according to the law. The master, under the act of Congress, may "seize" his slave, but only for the purpose of taking him before a judge. He is protected in making such seizure; but the moment he abuses this right, and, in defiance of law, undertakes to remove his slave without a certificate, he forfeits the protection of the law and becomes amenable to such punishment as the states may prescribe.

The act of Congress punishes those who interfere with the rights of the slaveholder; but is silent as to the rights of negroes wrongfully seized, and of the states whose territory is entered by persons, under pretext of right, to violate the laws and carry forcibly away those who are living under their protection. These cases are clearly left to the guardianship of the states themselves. The tenth article of the amendments to the Constitution secures this right; and self-respect, if not self-protection, demands its exercise. It has already been decided, by this Court, that persons who violate or disregard the provisions of an act of Congress may be made amenable to state law. Houston v. Moore, 5 Wheat. 1; 2 Hamilton's Works, 347. This is not on the principle that to violate an act of Congress is a

crime against the state; but that the offence denounced by the laws of the state is not protected by the national authority, and hence may be punished as a crime.

Prigg, the defendant in this case, first sought the aid of the state law to seize his slave, and then, in contempt of both its mandates and those of the act of Congress, removed the fugitive without making claim, obtaining certificate, or doing any thing to procure the warrant of the law  This was a wanton insult to the dignity of the state of Pennsylvania; and tended directly to produce riots, disturbances, and ill-blood between her citizens and those of the state of Maryland.  Would it not be monstrous to hold, that an act which leads to such results, which offends so deeply the honest prejudices of large portions of the citizens of a state, is not, or may not be punished as a crime against her sovereignty and her laws?  If such power do not belong to the states, it is difficult to conceive how any portion of their police arrangements may not at any time be annulled and abrogated by the general government.  A more absolute annihilation of the state sovereignties than this would be, is not within the stretch of human power.

It is a familiar principle to the Court, that on the ground of repugnancy to the Constitution, state laws may be void in part, and valid for the residue.  These questions are extremely delicate; and this Court will declare laws void for this reason, only in a clear case. Fletcher v. Peck, 6 Cranch, 87.  If possible, the Court will reconcile them with the Constitution; and so far as depends on their policy or justice, leave that to the judgment of the people who enact and must obey them.  Dismissing from consideration, for the purposes of this argument, the right of the states to pass laws on the subject of the delivery up of fugitive slaves, in what respect does the act of 1826, so far as relates to the punishment of those who are guilty of kidnapping, conflict with the Constitution of the United States or with any act of Congress?  He thought he might challenge the utmost ingenuity to point out such conflict.  It was clearly the exercise of a reserved power.  It only punished those who set all laws on this subject at naught, and by their examples did more to endanger the rights of the slave-holders in the recovery of their fugitives, than all the state laws ever adopted had done or could do.  Such rash and indiscreet efforts to regain fugitive slaves, as this defendant made, have done

much to foment the spirit of opposition to slavery in the nort and if persisted in, will awaken a feeling not easily subdued of controlled. Did the chivalrous and considerate slave owners of the south come themselves in pursuit of their fugitive slaves these instances of outrage would seldom, if ever, happen; but the agents often employed by them, are of the most debased character, and, being alike ignorant and regardless of law and courtesy, excite, by their conduct, the deepest emotions of indignation and abhorrence. It is against such offenders that the penal enactment in question is chiefly aimed. Can it be possible that this Court will strike down the arm of state authority, thus uplifted to maintain peace, order, and the respectful observance of the law?

The fact that the negro thus forcibly and illegally removed is a slave, is wholly immaterial. It is admitted by the other side, that legislation under the Constitution is necessary to carry the provision on this subject of fugitive slaves into effect. If so, the right of removal cannot exist independent of such legislation. Although the slave may be so in fact, yet he must be identified and certified by the law to be such, to authorize his removal. Until this is done, no presumption of slavery arises. True, it will arise, if "seized" on "claim" and taken before a judge, but not if removed without this judicial sanction. Here is the true point of the case. The law protects the owner or agent, until he proceeds to remove the slave in defiance of its prohibition. The instant he does this, the crime is committed; the penalty is incurred; the violated law demands its victim. The Constitution evidently contemplates the act of the law, and not the act of the party in the recovery of fugitive slaves; and he who with a strong hand usurps the prerogative of the law and tramples on its mandates, has no right to complain of the punishment it inflicts.

The special verdict in this case distinctly admits, that the act of the defendant is neither sanctioned nor protected by either the act of Congress or the legislature of Pennsylvania. It was therefore clear, as he believed, whatever might be the opinion of the Court upon the broad question of the power of the states to pass laws directing the mode of delivering up fugitive slaves; that the act of Pennsylvania, so far as it affected this case, or was involved in its determination, was not repugnant to the Constitu-

tion, and that accordingly the judgment of the Supreme Court of that state must be affirmed.

In conclusion, said Mr. Johnson, the Court will allow me to say, that I have argued this case on the presumption that many great rules of constitutional interpretation have been settled by its decisions; and that I have adopted and applied them so far as they appeared applicable, without consuming the time or abusing the patience of the Court, by elaborate inquiries into their justice or their authority. I have not deemed it respectful to address this Court as if I were delivering a course of elementary lectures in a law academy. I know my own duty and the character of this Court too well, to engage in such an undertaking. I feel persuaded that my deficiencies will be far more than supplied by the learning and experience of your honours. I have sought to confine my argument strictly to the case before you, and I hope within this scope no points of essential interest have escaped my attention.

I trust I shall be pardoned if I again reiterate my conviction, that the construction of the Constitution for which I have contended, is the true, rational, and just one. Whatever may be the opinion of others, it cannot and will not be plausibly alleged that this construction violates any of its provisions, or endangers any power vested in either the national or state governments. It offends no prejudices; it trenches on no rights; it sets no example to be hereafter pleaded in justification of measures which tend to augment the power of the general government, and to strip the states of their proudest attributes of sovereignty. It binds each in its proper sphere; it invests both with all requisite and proper authority to perform the functions for which they were designed, and it divests this obligation to deliver up fugitive slaves, which, to the sensitive, is harsh and odious, of almost every feature of painful repugnance to the feelings.

But let the picture be reversed.—Deny the right of the states to legislate on this subject for the preservation of their own peace and the protection of their own soil from insult and aggression; arrogate exclusive power for the general government to order and direct how, and by whom alleged fugitive slaves are to be restored to their masters or hired pursuers, and you arouse a spirit of discord and resistance, that will neither shrink nor slumber till the obligation itself be cancelled, or the Union which creates it be

3 E 2

dissolved. I do not say this in menace—God forbid I should; but in expostulating warning to those who, by demanding too much, may sacrifice even that to which they are justly entitled.

The various, diversified, and almost antagonist interests of different sections of our Union, render government here a task of no small caution, forbearance, and responsibility. Time and experience have emphatically taught us that there is but one mode, in which these interests can be effectually guarded and promoted; and that is by a strict, steady, and undeviating adherence to the spirit and letter of the national Constitution.

The events of every day, and every year, invest the Constitution with additional claims to our veneration. Its advantages seem to multiply with our necessities, and to spring out of them. It would not be difficult in the course of our history, to point out particular instances, in which different quarters of the Union, influenced by adverse interests, have sought to apply opposing constructions to the same provisions, on assumed general, strict, or latitudinarian principles; and yet, in a very brief period of time, constructions of other provisions have compelled these sectional parties to change their respective ground, and to repudiate what they had before adopted. These considerations rebuke the spirit of self-confidence and of self-interest, and admonish us, that, in the end, that construction is the only sound, rational, and safe one, which encroaches on no peculiar interest, and which sustains all alike, with even-handed justice. Let the south and the north remember, that he who lives by the sword to-day, may die by the sword to-morrow. Then, indeed, may we read the Constitution in the benign spirit of the golden rule, to do " unto others, as we would that they should do unto us."

The framers of our glorious Constitution, appear to have been little less than inspired. They not only guarded the liberties of their own age, but they looked into futurity, and provided for the liberties of ages to follow them—constitutional indemnities which must then have been established, or never established at all. The day to intrench political freedom within a written Constitution, was the day when the fresh recollection of the revolutionary contest not only taught its value, but the duty of placing it beyond the reach of invasion; and our fathers, conscious of this truth, performed the duty devolved on them, in a manner worthy of

[Prigg *v.* The Commonwealth of Pennsylvania.]

its inestimable importance. The most skeptical must trace the finger of God in this work; and acknowledge that he has sanctified it in the councils of his Providence.

It is adapted to our condition in every stage of our national advancement. From the Atlantic to the Pacific Oceans, and from the lakes to the borders of Mexico, it has stretched forth its cherishing arm over our people, and diffused its blessings on all alike. It has "grown with our growth, and strengthened with our strength;" it was the swaddling clothes of our national infancy; it is the coat of mail that envelopes the giant-limbs of our national manhood. Changed as is our condition, modified as may seem our government in various matters of policy; the Constitution of our fathers is still solid and entire, the Constitution of their descendants.

If we would preserve it, if we would perpetuate its benefits, we must, in its interpretation, adhere with inflexible tenacity to that spirit of generous and enlightened concession in which it had its origin, which now and forever must be its breath of life. It is equally endangered by straining its just powers too far, as by crippling their operation, and shrivelling up the vigorous energies which alone make it a form of government capable or worthy of popular confidence and support. To claim for it, what is withheld—exclusive authority to legislate on the delicate subject of directing the delivery up of fugitive slaves, to the entire exclusion of state interposition, seems to me the rankest usurpation. In resisting this doctrine, I verily believe I stand here more as the true friend of the south, than those who honestly, but erroneously, urge it upon the Court. In the name then of Pennsylvania, in the name of all the states—in the name of the Union itself—I protest against this dangerous encroachment on state sovereignty and state independence. The long and impatient struggle on this question, I trust is nearly over. The decision of this Court will put it at rest.

Pennsylvania will be the first to acquiesce in whatever decision may be pronounced; and deeply and anxiously as she desires to see all the rights guarantied to her by the national Constitution steadfastly maintained, she submits, with a confidence that knows no fear, these rights, which are equally dear to every

sister state as they are to her, to the judgment of this high and enlightened tribunal.

Mr. Justice STORY delivered the opinion of the Court.

This is a writ of error to the Supreme Court of Pennsylvania, brought under the 25th section of the judiciary act of 1789, ch. 20, for the purpose of revising the judgment of that Court, in a case involving the construction of the Constitution and laws of the United States.

The facts are briefly these: The plaintiff in error was indicted in the Court of Oyer and Terminer for York county, for having, with force and violence, taken and carried away from that county to the state of Maryland, a certain negro woman, named Margaret Morgan, with a design and intention of selling and disposing of, and keeping her as a slave or servant for life, contrary to a statute of Pennsylvania, passed on the 26th of March, 1826. That statute in the first section, in substance, provides, that if any person or persons shall from and after the passing of the act, by force and violence take and carry away, or cause to be taken and carried away, and shall by fraud or false pretence, seduce, or cause to be seduced, or shall attempt to take, carry away, or seduce any negro or mulatto from any part of that commonwealth, with a design and intention of selling and disposing of, or causing to be sold, or of keeping and detaining, or of causing to be kept and detained, such negro or mulatto as a slave or servant for life, or for any term whatsoever; every such person or persons, his or their aiders or abettors, shall, on conviction thereof, be deemed guilty of a felony, and shall forfeit and pay a sum not less than five hundred, nor more than one thousand dollars; and moreover, shall be sentenced to undergo a servitude for any term or terms of years, not less than seven years nor exceeding twenty-one years; and shall be confined and kept to hard labour, &c. There are many other provisions in the statute which is recited at large in the record, but to which it is in our view unnecessary to advert upon the present occasion.

The plaintiff in error pleaded not guilty to the indictment; and at the trial the jury found a special verdict, which, in substance, states, that the negro woman, Margaret Morgan, was a slave for life, and held to labour and service under and according to the

laws of Maryland, to a certain Margaret Ashmore, a citizen of Maryland; that the slave escaped and fled from Maryland into Pennsylvania in 1832; that the plaintiff in error, being legally constituted the agent and attorney of the said Margaret Ashmore, in 1837, caused the said negro woman to be taken and apprehended as a fugitive from labour by a state constable, under a warrant from a Pennsylvania magistrate; that the said negro woman was thereupon brought before the said magistrate, who refused to take further cognisance of the case; and thereupon the plaintiff in error did remove, take, and carry away the said negro woman and her children out of Pennsylvania into Maryland, and did deliver the said negro woman and her children into the custody and possession of the said Margaret Ashmore. The special verdict further finds, that one of the children was born in Pennsylvania, more than a year after the said negro woman had fled and escaped from Maryland.

Upon this special verdict, the Court of Oyer and Terminer of York county, adjudged that the plaintiff in error was guilty of the offence charged in the indictment. A writ of error was brought from that judgment to the Supreme Court of Pennsylvania, where the judgment was, pro forma, affirmed. From this latter judgment, the present writ of error has been brought to this Court.

Before proceeding to discuss the very important and interesting questions involved in this record, it is fit to say, that the cause has been conducted in the Court below, and has been brought here by the co-operation and sanction, both of the state of Maryland, and the state of Pennsylvania, in the most friendly and courteous spirit, with a view to have those questions finally disposed of by the adjudication of this Court; so that the agitations on this subject in both states, which have had a tendency to interrupt the harmony between them, may subside, and the conflict of opinion be put at rest. It should also be added, that the statute of Pennsylvania of 1826, was (as has been suggested at the bar) passed with a view of meeting the supposed wishes of Maryland on the subject of fugitive slaves; and that, although it has failed to produce the good effects intended in its practical construction, the result was unforeseen and undesigned.

1. The question arising in the case, as to the constitutionality of the statute of Pennsylvania, has been most elaborately argued at

the bar. The counsel for the plaintiff in error have contended that the statute of Pennsylvania is unconstitutional; first, because Congress has the exclusive power of legislation upon the subject-matter under the Constitution of the United States, and under the act of the 12th of February, 1793, ch. 51, (7,) which was passed in pursuance thereof; secondly, that if this power is not exclusive in Congress, still the concurrent power of the state legislatures is suspended by the actual exercise of the power by Congress; and thirdly, that if not suspended, still the statute of Pennsylvania, in all its provisions applicable to this case, is in direct collision with the act of Congress, and therefore is unconstitutional and void. The counsel for Pennsylvania maintain the negative of all these points.

Few questions which have ever come before this Court involve more delicate and important considerations; and few upon which the public at large may be presumed to feel a more profound and pervading interest. We have accordingly given them our most deliberate examination; and it has become my duty to state the result to which we have arrived, and the reasoning by which it is supported.

Before, however, we proceed to the points more immediately before us, it may be well—in order to clear the case of difficulty—to say, that in the exposition of this part of the Constitution, we shall limit ourselves to those considerations which appropriately and exclusively belong to it, without laying down any rules of interpretation of a more general nature. It will, indeed, probably, be found, when we look to the character of the Constitution itself, the objects which it seeks to attain, the powers which it confers, the duties which it enjoins, and the rights which it secures, as well as the known historical fact that many of its provisions were matters of compromise of opposing interests and opinions; that no uniform rule of interpretation can be applied to it which may not allow, even if it does not positively demand, many modifications in its actual application to particular clauses. And, perhaps, the safest rule of interpretation after all will be found to be to look to the nature and objects of the particular powers, duties, and rights, with all the lights and aids of contemporary history; and to give to the words of each just such opera-

tion and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed.

There are two clauses in the Constitution upon the subject of fugitives, which stand in juxtaposition with each other, and have been thought mutually to illustrate each other. They are both contained in the second section of the fourth article, and are in the following words: "A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime."

"No person held to service or labour in one state under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labour; but shall be delivered up, on claim of the party to whom such service or labour may be due."

The last clause is that, the true interpretation whereof is directly in judgment before us. Historically, it is well known, that the object of this clause was to secure to the citizens of the slavehold-ing states the complete right and title of ownership in their slaves, as property, in every state in the Union into which they might escape from the state where they were held in servitude. The full recognition of this right and title was indispensable to the security of this species of property in all the slaveholding states; and, indeed, was so vital to the preservation of their domestic interests and institutions, that it cannot be doubted that it consti-tuted a fundamental article, without the adoption of which the Union could not have been formed. Its true design was to guard against the doctrines and principles prevalent in the non-slave-holding states, by preventing them from intermeddling with, or obstructing, or abolishing the rights of the owners of slaves.

By the general law of nations, no nation is bound to recognise the state of slavery, as to foreign slaves found within its terri-torial dominions, when it is in opposition to its own policy and institutions, in favour of the subjects of other nations where slavery is recognised. If it does it, it is as a matter of comity, and not as a matter of international right. The state of slavery is deemed to be a mere municipal regulation, founded upon and limited to the range of the territorial laws. This was fully recognised in Somerset's

Case, Lofft's Rep. 1; S. C., 11 State Trials by Harg. 340; S. C., 20 Howell's State Trials, 79; which was decided before the American revolution. It is manifest from this consideration, that if the Constitution had not contained this clause, every non-slave-holding state in the Union would have been at liberty to have declared free all runaway slaves coming within its limits, and to have given them entire immunity and protection against the claims of their masters; a course which would have created the most bitter animosities, and engendered perpetual strife between the different states. The clause was, therefore, of the last importance to the safety and security of the southern states; and could not have been surrendered by them without endangering their whole property in slaves. The clause was accordingly adopted into the Constitution by the unanimous consent of the framers of it; a proof at once of its intrinsic and practical necessity.

How, then, are we to interpret the language of the clause? The true answer is, in such a manner, as, consistently with the words, shall fully and completely effectuate the whole objects of it. If by one mode of interpretation the right must become shadowy and unsubstantial, and without any remedial power adequate to the end; and by another mode it will attain its just end and secure its manifest purpose; it would seem, upon principles of reasoning, absolutely irresistible, that the latter ought to prevail. No Court of justice can be authorized so to construe any clause of the Constitution as to defeat its obvious ends, when another construction, equally accordant with the words and sense thereof, will enforce and protect them.

The clause manifestly contemplates the existence of a positive, unqualified right on the part of the owner of the slave, which no state law or regulation can in any way qualify, regulate, control, or restrain. The slave is not to be discharged from service or labour, in consequence of any state law or regulation. Now, certainly, without indulging in any nicety of criticism upon words, it may fairly and reasonably be said, that any state law or state regulation, which interrupts, limits, delays, or postpones the right of the owner to the immediate possession of the slave, and the immediate command of his service and labour, operates, pro tanto, a discharge of the slave therefrom. The question can never be, how much the slave is discharged from; but whether he is

discharged from any, by the natural or necessary operation of state laws or state regulations. The question is not one of quantity or degree, but of withholding, or controlling the incidents of a positive and absolute right.

We have said that the clause contains a positive and unqualified recognition of the right of the owner in the slave, unaffected by any state law or regulation whatsoever, because there is no qualification or restriction of it to be found therein; and we have no right to insert any which is not expressed, and cannot be fairly implied; especially are we estopped from so doing, when the clause puts the right to the service or labour upon the same ground and to the same extent in every other state as in the state from which the slave escaped, and in which he was held to the service or labour. If this be so, then all the incidents to that right attach also; the owner must, therefore, have the right to seize and repossess the slave, which the local laws of his own state confer upon him as property; and we all know that this right of seizure and recaption is universally acknowledged in all the slaveholding states. Indeed, this is no more than a mere affirmance of the principles of the common law applicable to this very subject. Mr. Justice Blackstone (3 Bl. Comm. 4) lays it down as unquestionable doctrine. "Recaption or reprisal (says he) is another species of remedy by the mere act of the party injured. This happens when any one hath deprived another of his property in goods or chattels personal, or wrongfully detains one's wife, child, or servant; in which case the owner of the goods, and the husband, parent, or master may lawfully claim and retake them, wherever he happens to find them, so it be not in a riotous manner, or attended with a breach of the peace." Upon this ground we have not the slightest hesitation in holding, that, under and in virtue of the Constitution, the owner of a slave is clothed with entire authority, in every state in the Union, to seize and recapture his slave, whenever he can do it without any breach of the peace, or any illegal violence. In this sense, and to this extent this clause of the Constitution may properly be said to execute itself; and to require no aid from legislation, state or national.

But the clause of the Constitution does not stop here; nor indeed, consistently with its professed objects, could it do so. Many

cases must arise in which, if the remedy of the owner were confined to the mere right of seizure and recaption, he would be utterly without any adequate redress. He may not be able to lay his hands upon the slave. He may not be able to enforce his rights against persons who either secrete or conceal, or withhold the slave. He may be restricted by local legislation as to the mode of proofs of his ownership; as to the Courts in which he shall sue, and as to the actions which he may bring; or the process he may use to compel the delivery of the slave. Nay, the local legislation may be utterly inadequate to furnish the appropriate redress, by authorizing no process in rem, or no specific mode of repossessing the slave, leaving the owner, at best, not that right which the Constitution designed to secure—a specific delivery and repossession of the slave, but a mere remedy in damages; and that perhaps against persons utterly insolvent or worthless. The state legislation may be entirely silent on the whole subject, and its ordinary remedial process framed with different views and objects; and this may be innocently as well as designedly done, since every state is perfectly competent, and has the exclusive right to prescribe the remedies in its own judicial tribunals, to limit the time as well as the mode of redress, and to deny jurisdiction over cases, which its own policy and its own institutions either prohibit or discountenance.

If, therefore, the clause of the Constitution had stopped at the mere recognition of the right, without providing or contemplating any means by which it might be established and enforced in cases where it did not execute itself, it is plain that it would have, in a great variety of cases, a delusive and empty annunciation. If it did not contemplate any action either through state or national legislation, as auxiliaries to its more perfect enforcement in the form of remedy, or of protection, then, as there would be no duty on either to aid the right, it would be left to the mere comity of the states to act as they should please; and would depend for its security upon the changing course of public opinion, the mutations of public policy, and the general adaptations of remedies for purposes strictly according to the lex fori.

And this leads us to the consideration of the other part of the clause, which implies at once a guaranty and duty. It says, "But he (the slave) shall be delivered up on claim of the party to

whom such service or labour may be due." Now, we think it exceedingly difficult, if not impracticable, to read this language and not to feel that it contemplated some farther remedial redress than that which might be administered at the hands of the owner himself. A claim is to be made. What is a claim? It is, in a just juridical sense, a demand of some matter as of right made by one person upon another, to do or to forbear to do some act or thing as a matter of duty. A more limited, but at the same time an equally expressive definition was given by Lord Dyer, as cited in Stowell *v.* Zouch, Plowden, 359; and it is equally applicable to the present case: that " a claim is a challenge by a man of the propriety or ownership of a thing, which he has not in possession, but which is wrongfully detained from him." The slave is to be delivered up on the claim. By whom to be delivered up? In what mode to be delivered up? How, if a refusal takes place, is the right of delivery to be enforced? Upon what proofs? What shall be the evidence of a rightful recaption or delivery? When and under what circumstances shall the possession of the owner, after it is obtained, be conclusive of his right, so as to preclude any further inquiry or examination into it by local tribunals or otherwise, while the slave, in possession of the owner, is in transitu to the state from which he fled?

These, and many other questions, will readily occur upon the slightest attention to the clause; and it is obvious that they can receive but one satisfactory answer. They require the aid of legislation to protect the right, to enforce the delivery, and to secure the subsequent possession of the slave. If, indeed, the Constitution guarantees the right, and if it requires the delivery upon the claim of the owner, (as cannot well be doubted,) the natural inference certainly is, that the national government is clothed with the appropriate authority and functions to enforce it. The fundamental principle applicable to all cases of this sort, would seem to be, that where the end is required, the means are given; and where the duty is enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is entrusted. The clause is found in the national Constitution, and not in that of any state. It does not point out any state functionaries, or any state action to carry its provisions into effect. The states cannot, therefore, be compelled to enforce them; and

it might well be deemed an unconstitutional exercise of the power of interpretation, to insist that the states are bound to provide means to carry into effect the duties of the national government, nowhere delegated or intrusted to them by the Constitution. On the contrary, the natural, if not the necessary conclusion is, that the national government, in the absence of all positive provisions to the contrary, is bound, through its own proper departments, legislative, judicial, or executive, as the case may require, to carry into effect all the rights and duties imposed upon it by the Constitution. The remark of Mr. Madison, in the Federalist, (No. 43,) would seem in such cases to apply with peculiar force. " A right (says he) implies a remedy; and where else would the remedy be deposited, than where it is deposited by the Constitution?" meaning, as the context shows, in the government of the United States.

It is plain, then, that where a claim is made by the owner, out of possession, for the delivery of a slave, it must be made, if at all, against some other person; and inasmuch as the right is a right of property capable of being recognised and asserted by proceedings before a Court of justice, between parties adverse to each other, it constitutes, in the strictest sense, a controversy between the parties, and a case " arising under the Constitution" of the United States; within the express delegation of judicial power given by that instrument. Congress, then, may call that power into activity for the very purpose of giving effect to that right; and if so, then it may prescribe the mode and extent in which it shall be applied, and how, and under what circumstances the proceedings shall afford a complete protection and guaranty to the right.

Congress has taken this very view of the power and duty of the national government. As early as the year 1791, the attention of Congress was drawn to it, (as we shall hereafter more fully see,) in consequence of some practical difficulties arising under the other clause, respecting fugitives from justice escaping into other states. The result of their deliberations, was the passage of the act of the 12th of February, 1793, ch. 51, (7,) which, after having, in the first and second sections, provided for the case of fugitives from justice by a demand to be made of the delivery through the executive authority of the state where they are found,

proceeds, in the third section, to provide, that when a person held to labour or service in any of the United States, shall escape into any other of the states or territories, the person to whom such labour or service may be due, his agent or attorney, is hereby empowered to seize or arrest such fugitive from labour, and take him or her before any judge of the Circuit or District Courts of the United States, residing or being within the state, or before any magistrate of a county, city, or town corporate, wherein such seizure or arrest shall be made ; and upon proof to the satisfaction of such judge or magistrate, either by oral evidence or affidavit, &c., that the person so seized or arrested, doth, under the laws of the state or territory from which he or she fled, owe service or labour to the person claiming him or her, it shall be the duty of such judge or magistrate, to give a certificate thereof to such claimant, his agent or attorney, which shall be sufficient warrant for removing the said fugitive from labour, to the state or territory from which he or she fled. The fourth section provides a penalty against any person who shall knowingly and willingly obstruct or hinder such claimant, his agent, or attorney, in so seizing or arresting such fugitive from labour, or rescue such fugitive from the claimant, or his agent, or attorney when so arrested, or who shall harbour or conceal such fugitive after notice that he is such; and it also saves to the person claiming such labour or service, his right of action for or on account of such injuries.

In a general sense, this act may be truly said to cover the whole ground of the Constitution, both as to fugitives from justice, and fugitive slaves; that is, it covers both the subjects, in its enactments; not because it exhausts the remedies which may be applied by Congress to enforce the rights, if the provisions of the act shall in practice be found not to attain the object of the Constitution; but because it points out fully all the modes of attaining those objects, which Congress, in their discretion, have as yet deemed expedient or proper to meet the exigencies of the Constitution. If this be so, then it would seem, upon just principles of construction, that the legislation of Congress, if constitutional, must supersede all state legislation upon the same subject; and by necessary implication prohibit it. For if Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot

be that the state legislatures have a right to interfere; and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject-matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it. This doctrine was fully recognised by this Court, in the case of Houston v. Moore, 5 Wheat. Rep. 1, 21, 22; where it was expressly held, that where Congress have exercised a power over a particular subject given them by the Constitution, it is not competent for state legislation to add to the provisions of Congress upon that subject; for that the will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed.

But it has been argued, that the act of Congress is unconstitutional, because it does not fall within the scope of any of the enumerated powers of legislation confided to that body; and therefore it is void. Stripped of its artificial and technical structure, the argument comes to this, that although rights are exclusively secured by, or duties are exclusively imposed upon the national government, yet, unless the power to enforce these rights, or to execute these duties can be found among the express powers of legislation enumerated in the Constitution, they remain without any means of giving them effect by any act of Congress; and they must operate solely proprio vigore, however defective may be their operation; nay, even although, in a practical sense, they may become a nullity from the want of a proper remedy to enforce them, or to provide against their violation. If this be the true interpretation of the Constitution, it must, in a great measure, fail to attain many of its avowed and positive objects as a security of rights, and a recognition of duties. Such a limited construction of the Constitution has never yet been adopted as correct, either in theory or practice. No one has ever supposed that Congress could, constitutionally, by its legislation, exercise powers, or enact laws beyond the powers delegated to it by the Constitution; but it has, on various occasions, exercised powers which were necessary and proper as means to carry into effect rights expressly

given, and duties expressly enjoined thereby. The end being required, it has been deemed a just and necessary implication, that the means to accomplish it are given also; or, in other words, that the power flows as a necessary means to accomplish the end.

Thus, for example, although the Constitution has declared that representatives shall be apportioned among the states according to their respective federal numbers; and, for this purpose, it has expressly authorized Congress, by law, to provide for an enumeration of the population every ten years; yet the power to apportion representatives after this enumeration is made, is nowhere found among the express powers given to Congress, but it has always been acted upon as irresistibly flowing from the duty positively enjoined by the Constitution. Treaties made between the United States and foreign powers, often contain special provisions, which do not execute themselves, but require the interposition of Congress to carry them into effect, and Congress has constantly, in such cases, legislated on the subject; yet, although the power is given to the executive, with the consent of the senate, to make treaties, the power is nowhere in positive terms conferred upon Congress to make laws to carry the stipulations of treaties into effect. It has been supposed to result from the duty of the national government to fulfil all the obligations of treaties. The senators and representatives in Congress are, in all cases, except treason, felony, and breach of the peace, exempted from arrest during their attendance at the sessions thereof, and in going to and returning from the same. May not Congress enforce this right by authorizing a writ of habeas corpus, to free them from an illegal arrest in violation of this clause of the Constitution? If it may not, then the specific remedy to enforce it must exclusively depend upon the local legislation of the states; and may be granted or refused according to their own varying policy, or pleasure. The Constitution also declares that the privilege of the writ of habeas corpus shall not be suspended, unless, when in cases of rebellion or invasion, the public safety may require it. No express power is given to Congress to secure this invaluable right in the non-enumerated cases, or to suspend the writ in cases of rebellion or invasion. And yet it would be difficult to say, since this great writ of liberty is usually provided for by the ordinary functions of legislation, and can be effectually

provided for only in this way, that it ought not to be deemed by necessary implication within the scope of the legislative power of Congress.

These cases are put merely by way of illustration, to show that the rule of interpretation, insisted upon at the argument, is quite too narrow to provide for the ordinary exigencies of the national government, in cases where rights are intended to be absolutely secured, and duties are positively enjoined by the Constitution.

The very act of 1793, now under consideration, affords the most conclusive proof that Congress has acted upon a very different rule of interpretation, and has supposed that the right as well as the duty of legislation on the subject of fugitives from justice, and fugitive slaves was within the scope of the constitutional authority conferred on the national legislature. In respect to fugitives from justice, the Constitution, although it expressly provides that the demand shall be made by the executive authority of the state from which the fugitive has fled, is silent as to the party upon whom the demand is to be made, and as to the mode in which it shall be made. This very silence occasioned embarrasments in enforcing the right and duty at an early period after the adoption of the Constitution; and produced a hesitation on the part of the executive authority of Virginia to deliver up a fugitive from justice, upon the demand of the executive of Pennsylvania, in the year 1791; and as we historically know from the message of President Washington and the public documents of that period, it was the immediate cause of the passing of the act of 1793; which designated the person (the state executive) upon whom the demand should be made, and the mode and proofs upon and in which it should be made. From that time down to the present hour, not a doubt has been breathed upon the constitutionality of this part of the act; and every executive in the Union has constantly acted upon and admitted its validity. Yet the right and the duty are dependent, as to their mode of execution, solely on the act of Congress; and but for that, they would remain a nominal right and passive duty; the execution of which being intrusted to and required of no one in particular, all persons might be at liberty to disregard it. This very acquiescence, under such circumstances, of the highest state functionaries, is a most decisive proof of the universality of the opinion that the

act is founded in a just construction of the Constitution; independent of the vast influence which it ought to have as a contemporaneous exposition of the provisions, by those who were its immediate framers, or intimately connected with its adoption.

The same uniformity of acquiescence in the validity of the act of 1793, upon the other part of the subject-matter, that of fugitive slaves, has prevailed throughout the whole Union until a comparatively recent period. Nay; being from its nature and character more readily susceptible of being brought into controversy, in Courts of justice, than the former, and of enlisting in opposition to it the feelings, and it may be the prejudices of some portions of the non-slaveholding states; it has naturally been brought under adjudication in several states in the Union, and particularly in Massachusetts, New York, and Pennsylvania, and on all these occasions its validity has been affirmed. The cases cited at the bar, of Wright v. Deacon, 5 Serg. and Rawle, 62; Glen v. Hodges, 9 Johns. Rep. 67; Jack v. Martin, 12 Wend. Rep. 311; S. C., 12 Wend. Rep. 507; and Com. v. Griffin, 2 Pick. Rep. 11; are directly in point. So far as the judges of the Courts of the United States have been called upon to enforce it, and to grant the certificate required by it, it is believed that it has been uniformly recognised as a binding and valid law; and as imposing a constitutional duty. Under such circumstances, if the question were one of doubtful construction, such long acquiescence in it, such contemporaneous expositions of it, and such extensive and uniform recognition of its validity, would in our judgment entitle the question to be considered at rest; unless indeed the interpretation of the Constitution is to be delivered over to interminable doubt throughout the whole progress of legislation, and of national operations. Congress, the executive, and the judiciary have, upon various occasions, acted upon this as a sound and reasonable doctrine. Especially did this Court in the cases of Stuart v. Laird, 1 Cranch Rep. 299; and Martin v. Hunter, 1 Wheat. Rep. 304; and in Cohen v. The Commonwealth of Virginia, 6 Wheat. Rep. 264; rely upon contemporaneous expositions of the Constitution, and long acquiescence in it, with great confidence, in the discussion of questions of a highly interesting and important nature.

But we do not wish to rest our present opinion upon the ground

either of contemporaneous exposition, or long acquiescence, or even practical action; neither do we mean to admit the question to be of a doubtful nature, and therefore as properly calling for the aid of such considerations. On the contrary, our judgment would be the same if the question were entirely new, and the act of Congress were of recent enactment. We hold the act to be clearly constitutional in all its leading provisions, and, indeed, with the exception of that part which confers authority upon state magistrates, to be free from reasonable doubt and difficulty upon the grounds already stated. As to the authority so conferred upon state magistrates, while a difference of opinion has existed, and may exist still on the point, in different states, whether state magistrates are bound to act under it; none is entertained by this Court that state magistrates may, if they choose, exercise that authority, unless prohibited by state legislation.

The remaining question is, whether the power of legislation upon this subject is exclusive in the national government, or concurrent in the states, until it is exercised by Congress. In our opinion it is exclusive; and we shall now proceed briefly to state our reasons for that opinion. The doctrine stated by this Court, in Sturgis v. Crowninshield, 4 Wheat. Rep. 122, 193, contains the true, although not the sole rule or consideration, which is applicable to this particular subject. "Wherever," said Mr. Chief Justice Marshall, in delivering the opinion of the Court, "the terms in which a power is granted to Congress, or the nature of the power require that it should be exercised exclusively by Congress, the subject is as completely taken from the state legislatures, as if they had been forbidden to act." The nature of the power, and the true objects to be attained by it, are then as important to be weighed, in considering the question of its exclusiveness, as the words in which it is granted.

In the first place, it is material to state, (what has been already incidentally hinted at,) that the right to seize and retake fugitive slaves, and the duty to deliver them up, in whatever state of the Union they may be found, and of course the corresponding power in Congress to use the appropriate means to enforce the right and duty, derive their whole validity and obligation exclusively from the Constitution of the United States; and are there, for the first time, recognised and established in that peculiar cha-

racter. Before the adoption of the Constitution, no state had any power whatsoever over the subject, except within its own territorial limits, and could not bind the sovereignty or the legislation of other states. Whenever the right was acknowledged or the duty enforced in any state, it was as a matter of comity and favour, and not as a matter of strict moral, political, or international obligation or duty. Under the Constitution it is recognised as an absolute, positive, right and duty, pervading the whole Union with an equal and supreme force, uncontrolled and uncontrollable by state sovereignty or state legislation. It is, therefore, in a just sense a new and positive right, independent of comity, confined to no territorial limits, and bounded by no state institutions or policy. The natural inference deducible from this consideration certainly is, in the absence of any positive delegation of power to the state legislatures, that it belongs to the legislative department of the national government, to which it owes its origin and establishment. It would be a strange anomaly, and forced construction, to suppose that the national government meant to rely for the due fulfilment of its own proper duties and the rights which it intended to secure, upon state legislation; and not upon that of the Union. A fortiori, it would be more objectionable to suppose that a power, which was to be the same throughout the Union, should be confided to state sovereignty, which could not rightfully act beyond its own territorial limits.

In the next place, the nature of the provision and the objects to be attained by it, require that it should be controlled by one and the same will, and act uniformly by the same system of regulations throughout the Union. If, then, the states have a right, in the absence of legislation by Congress, to act upon the subject, each state is at liberty to prescribe just such regulations as suit its own policy, local convenience, and local feelings. The legislation of one state may not only be different from, but utterly repugnant to and incompatible with that of another. The time, and mode, and limitation of the remedy; the proofs of the title, and all other incidents applicable thereto, may be prescribed in one state, which are rejected or disclaimed in another. One state may require the owner to sue in one mode, another in a different mode. One state may make a statute of limitations as to the remedy, in its own tribunals, short and summary; another

may prolong the period, and yet restrict the proofs: nay, some states may utterly refuse to act upon the subject at all; and others may refuse to open its Courts to any remedies in rem, because they would interfere with their own domestic policy, institutions, or habits. The right, therefore, would never, in a practical sense be the same in all the states. It would have no unity of purpose, or uniformity of operation. The duty might be enforced in some states; retarded, or limited in others; and denied, as compulsory in many, if not in all. Consequences like these must have been foreseen as very likely to occur in the non-slaveholding states; where legislation, if not silent on the subject, and purely voluntary, could scarcely be presumed to be favourable to the exercise of the rights of the owner.

It is scarcely conceivable that the slaveholding states would have been satisfied with leaving to the legislation of the non-slaveholding states, a power of regulation, in the absence of that of Congress, which would or might practically amount to a power to destroy the rights of the owner. If the argument, therefore, of a concurrent power in the states to act upon the subject-matter in the absence of legislation by Congress, be well founded; then, if Congress had never acted at all; or if the act of Congress should be repealed without providing a substitute, there would be a resulting authority in each of the states to regulate the whole subject at its pleasure; and to dole out its own remedial justice, or withhold it at its pleasure and according to its own views of policy and expediency Surely such a state of things never could have been intended, under such a solemn guarantee of right and duty. On the other hand, construe the right of legislation as exclusive in Congress, and every evil, and every danger vanishes. The right and the duty are then co-extensive and uniform in remedy and operation throughout the whole Union. The owner has the same security, and the same remedial justice, and the same exemption from state regulation and control, through however many states he may pass with his fugitive slave in his possession, in transitu, to his own domicile. But, upon the other supposition, the moment he passes the state line, he becomes amenable to the laws of another sovereignty, whose regulations may greatly embarrass or delay the exercise of his rights; and even be repugnant to those of the state where he first arrested the fugitive. Consequences like these show that

the nature and objects of the provision imperiously require, that, to make it effectual, it should be construed to be exclusive of state authority. We adopt the language of this Court in Sturgis *v.* Crowninshield, 4 Wheat. Rep. 193, and say, that "it has never been supposed that the concurrent power of legislation extended to every possible case in which its exercise by the states has not been expressly prohibited. The confusion of such a practice would be endless." And we know no case in which the confusion and public inconvenience and mischiefs thereof, could be more completely exemplified than the present.

These are some of the reasons, but by no means all, upon which we hold the power of legislation on this subject to be exclusive in Congress. To guard, however, against any possible misconstruction of our views, it is proper to state, that we are by no means to be understood in any manner whatsoever to doubt or to interfere with the police power belonging to the states in virtue of their general sovereignty. That police power extends over all subjects within the territorial limits of the states; and has never been conceded to the United States. It is wholly distinguishable from the right and duty secured by the provision now under consideration; which is exclusively derived from and secured by the Constitution of the United States, and owes its whole efficacy thereto. We entertain no doubt whatsoever, that the states, in virtue of their general police power, possess full jurisdiction to arrest and restrain runaway slaves, and remove them from their borders, and otherwise to secure themselves against their depredations and evil example, as they certainly may do in cases of idlers, vagabonds, and paupers. The rights of the owners of fugitive slaves are in no just sense interfered with, or regulated by such a course; and in many cases, the operations of this police power, although designed essentially for other purposes, for the protection, safety, and peace of the state, may essentially promote and aid the interests of the owners. But such regulations can never be permitted to interfere with or to obstruct the just rights of the owner to reclaim his slave, derived from the Constitution of the United States; or with the remedies prescribed by Congress to aid and enforce the same.

Upon these grounds, we are of opinion that the act of Pennsylvania upon which this indictment is founded, is unconstitutional

and void. It purports to punish as a public offence against that state, the very act of seizing and removing a slave by his master, which the Constitution of the United States was designed to justify and uphold. The special verdict finds this fact, and the State Courts have rendered judgment against the plaintiff in error upon that verdict. That judgment must, therefore, be reversed, and the cause remanded to the Supreme Court of Pennsylvania; with directions to carry into effect the judgment of this Court rendered upon the special verdict in favour of the plaintiff in error.

Mr. Chief Justice TANEY.

I concur in the opinion pronounced by the Court, that the law of Pennsylvania, under which the plaintiff in error was indicted, is unconstitutional and void; and that the judgment against him must be reversed. But as the questions before us arise upon the construction of the Constitution of the United States, and as I do not assent to all the principles contained in the opinion just delivered, it is proper to state the points on which I differ.

I agree entirely in all that is said in relation to the right of the master, by virtue of the third clause of the second section of the fourth article of the Constitution of the United States, to arrest his fugitive slave in any state wherein he may find him. He has a right, peaceably, to take possession of him and carry him away without any certificate or warrant from a judge of the District or Circuit Court of the United States, or from any magistrate of the state; and whoever resists or obstructs him, is a wrongdoer: and every state law which proposes directly or indirectly to authorize such resistance or obstruction is null and void, and affords no justification to the individual or the officer of the state who acts under it. This right of the master being given by the Constitution of the United States, neither Congress nor a state legislature can by any law or regulation impair it, or restrict it.

I concur also in all that is contained in the opinion concerning the power of Congress to protect the citizens of the slaveholding states, in the enjoyment of this right; and to provide by law an effectual remedy to enforce it, and to inflict penalties upon those who shall violate its provisions; and no state is authorized to pass any law, that comes in conflict in any respect with the remedy provided by Congress.

The act of February 12th, 1793, is a constitutional exercise of this power; and every state law which requires the master, against his consent, to go before any state tribunal or officer, before he can take possession of his property ; or which authorizes a state officer to interfere with him, when he is peaceably removing it from the state, is unconstitutional and void.

But, as I understand the opinion of the Court, it goes further, and decides that the power to provide a remedy for this right is vested exclusively in Congress; and that all laws upon the subject passed by a state, since the adoption of the Constitution of the United States, are null and void; even although they were intended, in good faith, to protect the owner in the exercise of his rights of property, and do not conflict in any degree with the act of Congress.

I do not consider this question as necessarily involved in the case before us; for the law of Pennsylvania, under which the plaintiff in error was prosecuted, is clearly in conflict with the Constitution of the United States, as well as with the law of 1793. But as the question is discussed in the opinion of the Court, and as I do not assent either to the doctrine or the reasoning by which it is maintained, I proceed to state very briefly my objections.

The opinion of the Court maintains that the power over this subject is so exclusively vested in Congress, that no state, since the adoption of the Constitution, can pass any law in relation to it. In other words, according to the opinion just delivered, the state authorities are prohibited from interfering for the purpose of protecting the right of the master and aiding him in the recovery of his property. I think the states are not prohibited; and that, on the contrary, it is enjoined upon them as a duty to protect and support the owner when he is endeavouring to obtain possession of his property found within their respective territories.

The language used in the Constitution does not, in my judgment, justify the construction given to it by the Court. It contains no words prohibiting the several states from passing laws to enforce this right. They are in express terms forbidden to make any regulation that shall impair it. But there the prohibition stops. And according to the settled rules of construction for all written instruments, the prohibition being confined to laws inju-

rious to the right, the power to pass laws to support and enforce it, is necessarily implied. And the words of the article which direct that the fugitive "shall be delivered up," seem evidently designed to impose it as a duty upon the people of the several states to pass laws to carry into execution, in good faith, the compact into which they thus solemnly entered with each other. The Constitution of the United States, and, every article and clause in it, is a part of the law of every state in the Union; and is the paramount law. The right of the master, therefore, to seize his fugitive slave, is the law of each state; and no state has the power to abrogate or alter it. And why may not a state protect a right of property, acknowledged by its own paramount law? Besides, the laws of the different states, in all other cases, constantly protect the citizens of other states in their rights of property, when it is found within their respective territories; and no one doubts their power to do so. And in the absence of any express prohibition, I perceive no reason for establishing, by implication, a different rule in this instance; where, by the national compact, this right of property is recognised as an existing right in every state of the Union.

I do not speak of slaves whom their masters voluntarily take into a non-slaveholding state. That case is not before us. I speak of the case provided for in the Constitution; that is to say, the case of a fugitive who has escaped from the service of his owner, and who has taken refuge and is found in another state.

Moreover, the clause of the Constitution of which we are speaking, does not purport to be a distribution of the rights of sovereignty by which certain enumerated powers of government and legislation are exclusively confided to the United States. It does not deal with that subject. It provides merely for the rights of individual citizens of different states, and places them under the protection of the general government; in order more effectually to guard them from invasion by the states. There are other clauses in the Constitution in which other individual rights are provided for and secured in like manner; and it never has been suggested that the states could not uphold and maintain them, because they were guarantied by the Constitution of the United States. On the contrary, it has always been held to be the duty

of the states to enforce them; and the action of the general government has never been deemed necessary except to resist and prevent their violation.

Thus, for example, the Constitution provides that no state shall pass any law impairing the obligation of contracts. This, like the right in question, is an individual right, placed under the protection of the general government. And in order to secure it, Congress have passed a law authorizing a writ of error to the Supreme Court, whenever the right thus secured to the individual is drawn in question, and denied to him in a State Court. And all state laws impairing this right are admitted to be void. Yet no one has ever doubted that a state may pass laws to enforce the obligation of a contract, and may give to the individual the full benefit of the right so guarantied to him by the Constitution, without waiting for legislation on the part of Congress.

Why may not the same thing be done in relation to the individual right now under consideration?

Again. The Constitution of the United States declares that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states. And although these privileges and immunities, for greater safety, are placed under the guardianship of the general government; still the states may by their laws and in their tribunals protect and enforce them. They have not only the power, but it is a duty enjoined upon them by this provision in the Constitution.

The individual right now in question, stands on the same grounds, and is given by similar words, and ought to be governed by the same principles. The obligation to protect rights of this description is imposed upon the several states as a duty which they are bound to perform; and the prohibition extends to those laws only which violate the right intended to be secured.

I cannot understand the rule of construction by which a positive and express stipulation for the security of certain individual rights of property in the several states, is held to imply a prohibition to the states to pass any laws to guard and protect them.

The course pursued by the general government after the adoption of the Constitution, confirms my opinion as to its true construction.

No law was passed by Congress to give a remedy for this right,

until nearly four years after the Constitution went into operation. Yet, during that period of time, the master was undoubtedly entitled to take possession of his property wherever he might find it; and the protection of this right was left altogether to the state authorities. In attempting to exercise it, he was continually liable to be resisted by superior force; or the fugitive might be harboured in the house of some one who would refuse to deliver him. And if a state could not authorize its officers, upon the master's application, to come to his aid, the guarranty contained in the Constitution was of very little practical value. It is true he might have sued for damages. But as he would, most commonly, be a stranger in the place where the fugitive was found, he might not be able to learn even the names of the wrongdoers; and if he succeeded in discovering them, they might prove to be unable to pay damages. At all events, he would be compelled to encounter the costs and expenses of a suit, prosecuted at a distance from his own home; and to sacrifice perhaps the value of his property in endeavouring to obtain compensation.

This is not the mode in which the Constitution intended to guard this important right; nor is this the kind of remedy it intended to give. The delivery of the property itself—its prompt and immediate delivery—is plainly required, and was intended to be secured.

Indeed, if the state authorities are absolved from all obligation to protect this right, and may stand by and see it violated without an effort to defend it, the act of Congress of 1793 scarcely deserves the name of a remedy. The state officers mentioned in the law are not bound to execute the duties imposed upon them by Congress, unless they choose to do so, or are required to do so by a law of the state; and the state legislature has the power, if it thinks proper, to prohibit them. The act of 1793, therefore, must depend altogether for its execution upon the officers of the United States named in it. And the master must take the fugitive, after he has seized him, before a judge of the District or Circuit Court, residing in the state, and exhibit his proofs, and procure from the judge his certificate of ownership, in order to obtain the protection in removing his property which this act of Congress professes to give.

Now, in many of the states there is but one district judge, and

there are only nine states which have judges of the Supreme Court residing within them.    The fugitive will frequently be found by his owner in a place very distant from the residence of either of these judges; and would certainly be removed beyond his reach, before a warrant could be procured from the judge to arrest him, even if the act of Congress authorized such a warrant. But it does not authorize the judge to issue a warrant to arrest the fugitive; but evidently relied on the state authorities to protect the owner in making the seizure.    And it is only when the fugitive is arrested and brought before the judge that he is directed to take the proof, and give the certificate of ownership. It is only necessary to state the provisions of this law in order to show how ineffectual and delusive is the remedy provided by Congress, if state authority is forbidden to come to its aid.

But it is manifest from the face of the law, that an effectual remedy was intended to be given by the act of 1793.    It never designed to compel the master to encounter the hazard and expense of taking the fugitive in all cases, to the distant residence of one of the judges of the Courts of the United States; for it authorized him, also, to go before any magistrate of the county, city, or town corporate wherein the seizure should be made. And Congress evidently supposed that it had provided a tribunal at the place of the arrest, capable of furnishing the master with the evidence of ownership to protect him more effectually from unlawful interruption.    So far from regarding the state authorities as prohibited from interfering in cases of this description, the Congress of that day must have counted upon their cordial co-operation.    They legislated with express reference to state support. And it will be remembered, that when this law was passed, the government of the United States was administered by the men who had but recently taken a leading part in the formation of the Constitution.    And the reliance obviously placed upon state authority for the purpose of executing this law, proves that the con struction now given to the Constitution by the Court had not entered into their minds.    Certainly, it is not the construction which it received in the states most interested in its faithful execution.    Maryland, for example, which is substantially one of the parties to this case, has continually passed laws, ever since the adoption of the Constitution of the United States, for the arrest

of fugitive slaves from other states as well as her own. Her officers are by law required to arrest them when found within her territory; and her magistrates are required to commit them to the public prison, in order to keep them safely until the master has an opportunity of reclaiming them. And if the owner is not known, measures are directed to be taken by advertisement to apprize him of the arrest; and if known, personal notice to be given. And as fugitives from the more southern states, when endeavouring to escape into Canada, very frequently pass through her territory, these laws have been almost daily in the course of execution in some part of the state. But if the states are forbidden to legislate on this subject, and the power is exclusively in Congress, then these state laws are unconstitutional and void; and the fugitive can only be arrested, according to the provisions of the act of Congress. By that law the power to seize is given to no one but the owner, his agent, or attorney. And if the officers of the state are not justified in acting under the state laws, and cannot arrest the fugitive, and detain him in prison without having first received an authority from the owner; the territory of the state must soon become an open pathway for the fugitives escaping from other states. For they are often in the act of passing through it by the time that the owner first discovers that they have absconded; and in almost every instance, they would be beyond its borders (if they were allowed to pass through without interruption) before the master would be able to learn the road they had taken.

I am aware that my brethren of the majority do not contemplate these consequences; and do not suppose that the opinion they have given will lead to them. And it seems to be supposed that laws nearly similar to those I have mentioned, might be passed by the state in the exercise of her powers over her internal police, and by virtue of her right to remove from her territory disorderly and evil-disposed persons, or those who, from the nature of her institutions, are dangerous to her peace and tranquillity. But it would be difficult perhaps to bring all the laws I have mentioned within the legitimate scope of the internal powers of police. The fugitive is not always arrested in order to prevent a dangerous or evil-disposed person from remaining in her territory. He is himself most commonly anxious to escape

from it; and it often happens that he is seized near the borders of the state when he is endeavouring to leave it, and is brought back and detained until he can be delivered to his owner. He may sometimes be found travelling peaceably along the public highway on his road to another state, in company with and under the protection of a white man who is abetting his escape. And it could hardly be maintained that the arrest and confinement of the fugitive in the public prison, under such circumstances, until he could be delivered to his owner, was necessary for the internal peace of the state; and therefore a justifiable exercise of its powers of police.

It has not heretofore been supposed necessary, in order to justify these laws, to refer them to such questionable powers of internal and local police. They were believed to stand upon surer and firmer grounds. They were passed, not with reference merely to the safety and protection of the state itself; but in order to secure the delivery of the fugitive slave to his lawful owner. They were passed by the state in the performance of a duty believed to be enjoined upon it by the Constitution of the United States.

It is true that Maryland as well as every other slaveholding state, has a deep interest in the faithful execution of the clause in question. But the obligation of the compact is not confined to them. It is equally binding upon the faith of every state in the Union; and has heretofore, in my judgment, been justly regarded as obligatory upon all.

I dissent therefore, upon these grounds, from that part of the opinion of the Court which denies the obligation and the right of the state authorities to protect the master, when he is endeavouring to seize a fugitive from his service, in pursuance of the right given to him by the Constitution of the United States;—provided the state law is not in conflict with the remedy provided by Congress.

Mr. Justice THOMPSON.

I concur in the judgment given by the Court in this case. But not being able to yield my assent to all the doctrines embraced in the opinion, I will very briefly state the grounds on which my judgment is placed.

The provision in the Constitution upon which the present question arises is as follows: " No- person held to service or labour in one state, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labour, but shall be delivered up on claim of the party to whom such service or labour may be due." Art. 4. sec. 2.    We know, historically, that this provision was the result of a compromise between the slaveholding and non-slaveholding states; and it is the indispensable duty of all to carry it faithfully into execution according to its real object and intention.

This provision naturally divides itself into two distinct considerations.    First, the right affirmed; and secondly, the mode and manner in which that right is to be asserted and carried into execution.

The right is secured by the Constitution, and requires no law to fortify or strengthen it.    It affirms, in the most unequivocal manner, the right of the master to the service of his slave, according to the laws of the state under which he is so held.    And it prohibits the states from discharging the slave from such service by any law or regulation therein.

The second branch of the provision, in my judgment, requires legislative regulations pointing out the mode and manner in which the right is to be asserted.    It contemplates the delivery of the person of the slave to the owner; and does not leave the owner to his ordinary remedy at law, to recover damages on a refusal to deliver up the property of the owner.    Legislative provision, in this respect, is essential for the purpose of preserving peace and good order in the community.    Such cases, in some parts of our country, are calculated to excite feelings which, if not restrained by law, might lead to riots and breaches of the peace.    This legislation, I think, belongs more appropriately to Congress than to the states, for the purpose of having the regulation uniform throughout the United States, as the transportation of the slave may be through several states; but there is nothing in the subject-matter that renders state legislation unfit. It is no objection to the right of the states to pass laws on the subject, that there is no power anywhere given to compel them to do it.    Neither is there to compel Congress to pass any law

[Prigg *v.* The Commonwealth of Pennsylvania.]

on the subject. The legislation must be voluntary in both; and governed by a sense of duty. But I cannot concur in that part of the opinion of the Court, which asserts that the power of legislation by Congress is exclusive; and that no state can pass any law to carry into effect the constitutional provision on this subject; although Congress had passed no law in relation to it. Congress, by the act of 1793, has legislated on the subject; and any state law in conflict with that, would be void, according to the provisions of the Constitution, which declares, that the laws of the United States, which shall be made in pursuance of the Constitution, shall be the supreme law of the land, any thing in the laws of any state to the contrary notwithstanding. This provision meets the case of a conflict between congressional and state legislation; and implies that such cases may exist, growing out of the concurrent powers of the two governments. The provision in the Constitution under consideration, is one under which such conflicting legislation may arise; and harmony is produced by making the state law yield to that of the United States. But to assert that the states cannot legislate on the subject at all, in the absence of all legislation by Congress, is, in my judgment, not warranted by any fair and reasonable construction of the provision. There is certainly nothing in the terms used in this article, or in the nature of the power to surrender the slave, that makes legislation by Congress exclusive. And if, as seems to be admitted, legislation is necessary to carry into effect the object of the Constitution, what becomes of the right where there is no law on the subject? Should Congress repeal the law of 1793, and pass no other law on the subject, I can entertain no doubt that state legislation, for the purpose of restoring the slave to his master, and faithfully to carry into execution the provision of the Constitution, would be valid. I can see nothing in the provision itself, or discover any principle of sound public policy, upon which such a law would be declared unconstitutional and void. The Constitution protects the master in the right to the possession and service of his slave, and of course makes void all state legislation impairing that right; but does not make void state legislation in affirmance of the right. I forbear enlarging upon this question, but have barely stated the general grounds upon which my opinion rests; and principally to guard against the conclusion, that,

by my silence, I assent to the doctrine that all legislation on this subject is vested exclusively in Congress; and that all state legislation, in the absence of any law of Congress, is unconstitutional and void.

Mr. Justice BALDWIN,

Concurred with the Court in reversing the judgment of the Supreme Court of Pennsylvania, on the ground that the act of the legislature was unconstitutional; inasmuch as the slavery of the person removed was admitted, the removal could not be kidnapping. . But he dissented from the principles laid down by the Court as the grounds of their opinion.

Mr. Justice WAYNE.

I concur altogether in the opinion of the Court, as it has been given by my brother Story.

In that opinion it is decided:

1. That the provision in the second section of the fourth article of the Constitution, relative to fugitives from service or labour, confers upon the owner of a fugitive slave the right, by himself or his agent, to seize and arrest, without committing a breach of the peace, his fugitive slave, as property, in any state of the Union; and that no state law is constitutional which interferes with such right.

2. That the provision authorizes and requires legislation by Congress to guard that right of seizure and arrest against all state and other interference, to make the delivery of fugitive slaves more effectual when the claims of owners are contested; and to insure to owners the unmolested transportation of fugitive slaves, through any of the states, to the state from which they may have fled. .

3. That the legislation by Congress upon the provision, as the supreme law of the land, excludes all state legislation upon the same subject; and that no state can pass any law or regulation, or interpose such as may have been a law or regulation when the Constitution of the United States was ratified, to superadd to, control, qualify, or impede a remedy, enacted by Congress, for the delivery of fugitive slaves to the parties to whom their service or labour is due.

4. That the power of legislation by Congress upon the provision is exclusive; and that no state can pass any law as a remedy upon the subject, whether Congress had or had not legislated upon it.

5. That the act of Congress of the 12th February, 1793, entitled "An act, respecting fugitives from justice, and persons escaping from the service of their masters," gives a remedy; but does not exhaust the remedies, which Congress may legislate upon the subject.

6. That the points so decided are not intended to interfere in any way, nor do they interfere in any manner, with the police power in the states, to arrest and imprison fugitive slaves, to guard against their misconduct and depredations; or to punish them for offences and crimes committed in the states to which they may have fled.

7. These points being so decided and applied to the case before the Court, it follows that the law of Pennsylvania, upon which the plaintiff is indicted is unconstitutional; and that the judgment given by the Supreme Court of Pennsylvania against the plaintiff must be reversed.

All of the judges of the Court concur in the opinion that the law under which the plaintiff in error was indicted is unconstitutional. All of them concur, also, in the declaration; that the provision in the Constitution was a compromise between the slaveholding, and the non-slaveholding states, to secure to the former fugitive slaves as property. All of the members of the Court, too, except my brother Baldwin, concur in the opinion that legislation by Congress, to carry the provision into execution, is constitutional; and he contends that the provision gives to the owners of fugitive slaves all the rights of seizure and removal which legislation could give; but he concurs in the opinion, if legislation by Congress be necessary, that the right to legislate is exclusively in Congress.

There is no difference, then, among the judges as to the reversal of the judgment; none in respect to the origin and object of the provision, or the obligation to exercise it. But differences do exist as to the mode of execution. Three of the judges have expressed the opinion, that the states may legislate upon the provision, in aid of the object it was intended to secure; and that

such legislation is constitutional, when it does not conflict with the remedy which Congress may enact.

I believe that the power to legislate upon the provision is exclusively in Congress.

The provision is, that "No person held to service or labour in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labour, but shall be delivered up on claim of the party to whom such service or labour is due."

The clause contains four substantive declarations; or two conditions, a prohibition, and a direction.

First, The fugitive must owe service or labour under the law of the state from which he has escaped; second, he must have fled from it. The prohibition is, that he cannot be discharged from service, in consequence of any law or regulation of the state in which he may be; and the direction is affirmative of an obligation upon the states, and declarative of a right in the party to whom the service or labour of a fugitive is due.

My object, and the only object which I have in view, in what I am about to say, is, to establish the position that Congress has the exclusive right to legislate upon this provision of the Constitution. I shall endeavour to prove it by the condition of the states when the Constitution was formed; by references to the provision itself; and to the Constitution generally.

Let it be remembered, that the conventioners who formed the Constitution, were the representatives of equal sovereignties. That they were assembled to form a more perfect union than then existed between the states under the confederacy. That they co-operated to the same end; but that they were divided into two parties, having antagonist interests in respect to slavery.

One of these parties, consisting of several states, required as a condition, upon which any constitution should be presented to the states for ratification, a full and perfect security for their slaves as property, when they fled into any of the states of the Union. The fact is not more plainly stated by me than it was put in the convention. The representatives from the non-slaveholding states assented to the condition. The provision under review was proposed and adopted by the unanimous vote of the convention It, with an allowance of a certain portion of slaves with

the whites, for representative population in Congress, and the importation of slaves from abroad, for a number of years; were the great obstacles in the way of forming a constitution. Each of them was, equally insisted upon by the representatives from the slaveholding states; and without all of them being provided for, it was well understood, that the convention would have been dissolved, without a constitution being formed. I mention the facts as they were. They cannot be denied. I have nothing to do, judicially, with what a part of the world may think of the attitude of the different parties upon this interesting topic. I am satisfied with what was done; and revere the men and their motives for insisting, politically, upon what was done. When the three points relating to slaves had been accomplished, every impediment in the way of forming a constitution was removed. The agreement concerning them was called, in the convention, a compromise. The provision in respect to fugitives from service or labour, was called a guarantee of a right of property in fugitive slaves, wherever they might be found in the Union. The Constitution was p esented to the states for adoption, with the understanding that the provisions in it relating to slaves were a compromise and guarantee ; and with such an understanding in every state, it was adopted by all of them. Not a guarantee merely in the professional acceptation of the word, but a great national engagement, in which the states surrendered a sovereign right, making it a part of that instrument, which was intended to make them one nation, within the sphere of its action. The provision, then, must be interpreted by those rules of construction assented to by all civilized nations, as obligatory in ascertaining the rights growing out of these agreements. We shall see, directly, how these rules bear upon the question of the power of legislation upon this subject being exclusively in Congress; and why the states are excluded from legislating upon it.

The prohibition upon the states to discharge fugitive slaves is absolute.

The provision, however, does not contain, in detail, the manner of asserting the right it was meant to secure. Nor is there in it any expressed power of legislation ; nor any expressed prohibition of state legislation. But it does provid , that delivery of a fugitive shall be made on the claim of the owner—that the fugi-

tive slave owing service and labour in the state from which he fled, and escaping therefrom, shall be decisive of the owner's right to a delivery.　It does not, however, provide the mode of proving that service and labour is due in a contested case, nor for any such evidence of the right, when it has been established, as will insure to an owner the unmolested transportation of the fugitive, through other states, to the state from which he fled.　But the right to convey is the necessary consequence of a right to delivery.　The latter would be good for nothing without the former. Proof of ownership gives both, if it gives either or any thing ; and yet the right might be in the larger number of instances unavailing, if it were not certified by some official document, that the right had been established.　A certificate from an officer authorized to inquire into the facts, is the easiest way to secure the right to its contemplated intent. ˙ It was foreseen that claims would be made, which would be contested.　Some tribunal was necessary to decide them, and to authenticate the fact that a claim had been established. ˳ Without such authentication, the contest might be renewed in other tribunals of the state in which the fact had been established ; and in those of the other states through which the fugitive might be carried on his way to the state from which he fled.　Such a certificate too, being required, protects persons who are not fugitives from being seized and transported. It has the effect of securing the benefit of a lawful claim ; and of preventing the accomplishment of one that is false.　Such a certificate, to give a right to transport a fugitive slave through another state, a state cannot give.　Its operation would be confined to its own boundaries ; and would be useless to assert the right in another sovereignty.　This analysis of the provision is given to show that legislation was contemplated to carry it fully into effect, in many of the cases that might occur ; and to prevent its abuse when attempts might be made to apply it to those who were not fugitives.　And it brings me to the point I have asserted, that Congress has the exclusive right to legislate upon the provision.

˙　Those who contend that the states may legislate in aid of the object of the provision, admit that Congress can legislate to the full extent to carry it into execution.　There is, then, no necessity for the states to legislate.　This is a good reason why they should not

legislate ; and that it was intended that they should not do so. For legislation by Congress makes the mode of asserting the right uniform throughout the Union ; and legislation by the states would be as various as the separate legislative will and policy of the different states might choose to make it. Certainly such an interest as the Constitution was intended to secure, we may well think the framers of the Constitution intended to provide for by a uniform law. I admit, however, that such considerations do not necessarily exclude the right of the states to legislate. The argument in favour of the right, is, that the states are not in express terms prohibited from legislating, and that the exclusion is not necessarily implied. I further admit, if it be not necessarily implied, that the right exists. Such is the rule, in respect to the right of legislation by the states, in all cases under the Constitution when the question of a right to legislate is merely such.

My first remark is, and I wish it to be particularly observed, that the question is not one only of the right of the states to legislate in aid of this provision, unconnected with other considerations bearing directly upon the question. The true question in the case is, by what rules shall the compromise or guarantee be construed ; so that the obligations and rights of the states under the provision may be ascertained and secured.

It is admitted, that the provision raises what is properly termed a perfect obligation upon all of the states to abstain from doing any thing which may interfere with the rights secured. Will this be so, if any part of what may be necessary to discharge the obligation is reserved by each state, to be done as each may think proper ? The obligation is common to all of them, to the same extent. Its object is to secure the property of some of the states, and the individual rights of their citizens in that property. Shall, then, each state be permitted to legislate in its own way, according to its own judgment, and their separate notions, in what manner the obligation shall be discharged to those states to which it is due ? To permit some of the states to say to the others, how the property included in the provision was to be secured by legislation, without the assent of the latter, would certainly be, to destroy the equality and force of the guarantee, and the equality of the states by which it was made. That was

3 H 2                    81

not anticipated by the representatives of the slaveholding states in the convention, nor could it have been intended by the framers of the Constitution.

Is it not more reasonable to infer, as the states were forming a government for themselves, to the extent of the powers conceded in the Constitution, to which legislative power was given to make all laws necessary and proper to carry into execution all powers vested in it—that they meant that the right for which some of the states stipulated, and to which all acceded, should, from the peculiar nature of the property in which only some of the states were interested—be carried into execution by that department of the general government in which they were all to be represented, the Congress of the United States.

But is not this power of legislation by the states, upon this provision, a claim for each to use its discretion in interpreting the manner in which the guarantee shall be fulfilled?

Are there no rules of interpretation, founded upon reason and nature, to settle this question, and to secure the rights given by the provision, better than the discretion of the parties to the obligation? Has not experience shown that those rules must be applied to conventions between nations, in order that justice may be done? All civilized nations have consented to be bound by them; and they are a part of the laws of nations. Is not one of those rules, the maxim that neither one or the other of the interested or contracting powers has a right to interpret his act or treaty at his pleasure? Such is the rule in respect to the treaties and conventions of nations foreign to each other. It applies with equal necessity and force to states united in one general government. Especially to states making a provision in respect to property peculiar to some of them, which has become so interwoven with their institutions and their representation in the general government of all of them, that the right to such property must be maintained and guarded, in order to preserve their separate existence, and to keep up their constitutional representation in Congress. Such cannot be the case, unless there is uniformity in the law for asserting the right to fugitive slaves; and if the states can legislate, as each of them may think it should be done, a remedy, by which the right of property in fugitive slaves is to be ascertained and finally concluded. Nor does it matter, that the

rule to which I have adverted as being exclusive of the right of the states to legislate upon the provision, does not appear in it. It is exactly to such cases that the rule applies, and it must be so applied, unless the contrary has been expressly provided. The mode of its application is as authoritative as the rule. The rule, too, applies to the provision without any conflict with the other rule that the states may legislate in all cases, when they are not expressly or impliedly prohibited by the Constitution. The latter rule is in no way trenched upon by excluding the states from legislating in this case. This provision is the only one in the Constitution in which a security for a particular kind of property is provided; provided, too, expressly against the interference by the states in their sovereign character. The surrender of a sovereign right carries with it all its incidents. It differs from yielding a participation to another government, in a sovereign right. In the latter, both may have jurisdiction. The state yielding the right, retaining jurisdiction to the extent of doing nothing repugnant to the exercise of the right by the government to which it has been yielded.

But it is said, all that is contended for, is, that the states may legislate to aid the object, and that such legislation will be constitutional if it does not conflict with the remedies which Congress may enact. This is a cautious way of asserting the right in the states, and it seems to impose a limitation which makes it unobjectionable. But the reply to it is, that the right to legislate a remedy, implies so much indefinite power over the subject, and such protracted continuance, as to the mode of finally determining whether a fugitive owes service and labour, that the requirements of the remedy, without being actually in conflict with the provision or the enactments of Congress might be oppressive to those most interested in the provision, by interposing delays and expenses more costly than the value of the fugitive sought to be reclaimed. Ordinarily, and when rightly understood, it is true that the abuse of a thing is no argument against its correctness or its use; but that suggestion can only be correctly made in cases in support of a right or power abstractly and positively right, and which has been abused under the pretence of using it; or where the proper use has been mistaken. In matters of government, however, a power liable to be abused is always a good reason

for withholding it. It is the reason why the powers of the United States, under the Constitution, are so cautiously given—why the express prohibitions upon the states not to legislate in certain cases were expressed—why the limitation upon the former, that the powers not granted are reserved to the states, as it is expressed in the amendments to the Constitution. But in truth, any additional legislation in this case by a state, acting as a remedy, in aid of the remedy given by the Constitution and by Congress, would be, in practice, in conflict with the latter, if it be a process differing from it; though it might make the mode of recovering a fugitive easier than the former, and much more so, when it made it more difficult. The right to legislate a remedy implies the ability to do either; and it is because it does so, and may be the latter, that I deny all right in the states to legislate upon this subject; unless it be to aid, by mere ministerial acts, the protection of an owner's right to a fugitive slave—the prevention of all interference with it by the officers of a state, or its citizens, or an authority to its magistrates to execute the law of Congress—and such legislation over fugitives as may be strictly of a police character.

Admit the states to legislate remedies in this case, besides such as are given by Congress, and there will be no security for the delivery of fugitive slaves in half of the states of the Union. Such was the case when the Constitution was adopted. The states might legislate in good faith, according to their notions how such a right of property should be tried. They have already done so, and the act of Pennsylvania, now under consideration, shows, that the assertion of a right to a fugitive slave is burdened by provisions entailing expenses disproportioned to his value; and that it is only to be asserted, by arraying against the claim all of those popular prejudices which, under other circumstances, would be proper feelings against slavery.

But the propriety of the rule of interpretation, which I have invoked to exclude the states from legislating upon this provision of the Constitution, becomes more obvious, when it is remembered that the provision was not intended only to secure the property of individuals, but that through their rights, that the institutions of the states should be preserved, so long as any one of the states chose to continue slavery as a part of its policy.

The subject has usually been argued as if the rights of individuals only were intended to be secured, and as if the legislation by the states would only act upon such rights.

The framers of the Constitution did not act upon such narrow grounds. They were engaged in forming a government for all of the states; by concessions of sovereign rights from all, without impairing the actual sovereignty of any one, except within the sphere of what was conceded. One great object was, that all kinds of property, as well that which was common in all of the states, as that which was peculiar to any of them, should be protected in all of the states, as well from any interference with it by the United States, as by the states. Experience had shown that under the confederacy, the reclamation of fugitive slaves was embarrassed and uncertain, and that they were yielded to by the states only from comity. It was intended that it should be no longer so. The policy of the different states. some of them contiguous, had already become marked and decided upon the subject of slavery. There was no doubt it would become more so. It was foreseen, unless the delivery of fugitive slaves was made a part of the Constitution, and that the right of the states to discharge them from service was taken away, that some of the states would become the refuge of runaways; and, of course, that in proportion to the facility and certainty of any state being a refuge, so would the right of individuals, and the institutions of the slaveholding states, be impaired. The latter were bound, when forming a general government with the other states, under which there was to be a community of rights and privileges for all citizens in the several states, to protect that property of their citizens which was essential to the preservation of their state constitutions. If this had not been done, all of the property of the citizens would have been protected in every state, except that which was the most valuable in a number of them. In such a case, the states would have become members of the Union upon unequal terms. Besides, the property of an individual is not the less his, because it is in another state than that in which he lives. It continues to be his, and forms a part of the wealth of his state. The provision, then, in respect to fugitive slaves, only comprehended within the general rule a species of property not within it before. By doing so, the right of individuals, and that of the

states in which slavery was continued, were preserved. It remained in the states as a part of that wealth, from which contributions were to be raised by taxes laid with the consent of the owners to meet the wants of the state as a body politic. If this be so, upon what principle shall the states act by their legislation upon property, which is national as well as individual; and direct the mode when it is within their jurisdiction, without the consent of the owners, and without the fault of the states where the owners reside, how the right of property should be ascertained and determined. The case of a fugitive slave is not like that of a contest for other property, to be determined between two claimants by the remedy given by the tribunals of the state where the property may be. It is not a controversy between two persons claiming the right to a thing, but the assertion by one person of a right of property in another, to be determined upon principles peculiar to such relation. If the provision had not been introduced into the Constitution, the states might have adjudged the right in the way it pleased; but having surrendered the right to discharge, they are not now to be allowed to assume a right to legislate, to try the obligation of a fugitive to servitude, in any other way than in conformity to the principles peculiar to the relation of master and slave. Their legislation, then, in the way of remedy, would bear upon state as well as individual rights; and I am sure, when the Constitution was formed, the states never intended to give any such right to each other. If it has such an effect, I think I may rightly conclude that legislation in the case before us is forbidden to the states.

But I have a further reason for the conclusion to which I have come upon this point; to which I cannot see that an answer can be given.

The provision contemplates, besides the right of seizure by the owner, that a claim may be made, when a seizure has not been effected, or afterwards, if his right shall be contested. That the claim shall be good, upon the showing by the claimant that the person charged as a fugitive owes service or labour, under the laws of the state from which he fled.

The prohibition in the provision, is, that he shall not be "discharged, in consequence of any law or regulation of a state" where he may be. If then, in a controverted case, a person

[Prigg *v.* The Commonwealth of Pennsylvania.]

charged as a fugitive, shall be discharged under a remedy legis--
lated by a state to try the fact of his owing service or labour, is
he not discharged under a law or regulation of a state? It is no
answer to this question, to say, that the discharge was not made
in virtue of any law discharging the fugitive from servitude; and
that the discharge occurred only from the mode of trial to ascer-
tain if he owed service and labour.   For that is to assume, that
the provision only prevented discharges from being made by the
states, by enactment or law, declaring that fugitive slaves might
be discharged.   The provision will not admit of such an interpre-
tation.   Nor is it any answer to say, that state regulations to
ascertain whether a fugitive owes service or labour, are distin-
guishable from such as directly or by construction would lead
to his discharge; for if a discharge be made under one or the
other—whether the discharge be right or wrong, it is a discharge
under the regulation of a state.

   I understand the provision to mean; and when its object and the
surrender by the states of the right to discharge are kept in mind,
its obvious meaning to every one must be, that the states are not
only prohibited from discharging a fugitive from service by a law,
but that they shall not make or apply regulations to try the ques-
tion of the fugitive owing service.   The language of the provision,
is, "No person, &c., shall in consequence of any law or regulation
therein," be discharged from such service or labour.   The words
"in consequence," meaning the effect of a cause—certainly em-
brace regulations to try the right of property, as well as laws,
directly discharging a fugitive from service,

   If this be not so, the states may regulate the mode of an owner's
seizing a fugitive slave, prohibiting it from being done except by
warrant, and by an officer; thus denying to an owner the right to
use a casual opportunity to repossess himself of this kind of pro-
perty, which there is a right to do, in respect to all other kinds of
property, where not in the possession of some one else.   It may
regulate the quantity and quality of the proof to establish the
right of an owner to a fugitive, and give compensatory and
punitory damages against a claimant, if his right be not established
according to such proof.   It might limit the trial to particular
times and Courts; give appeals from one to other Courts; and
protract the ultimate decision, until the value in controversy

was exceeded by the cost of establishing it. Such rights of legislation in the states to try a right of property in a fugitive slave, are surely inconsistent with that security which Judge Iredell told the people of North Carolina, in the convention, that the Constitution gave to them for their slaves when they fled into other states. Speaking of this clause of the Constitution, he says, " In some of the northern states, they have emancipated all of their slaves. If any one of our slaves go there, and remain there a certain time, they would, by the present laws, be entitled to their freedom, so that their masters could not get them again. This would be extremely prejudicial to the inhabitants of the southern states; and, to prevent it, this clause is inserted in the Constitution." To the same purpose, and with more positiveness, Charles Cotesworth Pinckney said to the people of South Carolina, in the convention of that state, "We have obtained a right to recover our slaves in whatever part of America they may take refuge; which is a right we had not before."

But further, does not the language of this provision in the precise terms used, " shall not be discharged from such service or labour," show, that the states surrendering the right to discharge, meant to exclude themselves from legislating a mode of trial, which, from the time it would take, would be a qualified or temporary discharge to the injury of the owner? Would not a postponement of the trial of a fugitive owing service or labour, for one month, be a loss to the owner of his service, equivalent to a discharge for that time. And if a state can postpone by legislation the trial for one month, may it not do so for a longer time? And whether it be for a longer or a shorter time, is it not a discharge from service, for whatever time it may be? It is no answer to this argument, to say, that time is necessarily involved in the prosecution of all rights. The question here is not as to a time being more or less necessary—but as to the right of a state by regulations to try the obligation of a fugitive to service or labour, to fix in its discretion the time it may take.

The subject might be further discussed and illustrated by arguments equally cogent with those already given. But I forbear. For the foregoing reasons, in addition to those given in the opinion of the Court, I am constrained to come to the conclusion, that the right of legislating upon that clause in the Con-

stitution, preventing the states from discharging fugitive slaves, is exclusively in the Congress of the United States. I am as little inclined as any one can be, to deny, in a doubtful case, a right of legislation in the states; but I cannot concede that it exists under the Constitution in a case relating to the property of some of the states in which the others have no interest; and whose legislators, from the nature of the subject, and the human mind in relation to it, cannot be supposed to be best fitted to secure the right guarantied by the Constitution.

I had intended to give an account of the beginning and progress of the legislation of the states upon this subject; but my remarks are already so much extended, that I must decline doing so. It would have shown, perhaps, as much as any other instance, how a mistaken, doubtful, and hesitating exercise of power in the commencement, becomes, by use, a conviction of its correctness. It would also have shown that the legislation of the states in respect to fugitive slaves, and particularly that which has most embarrassed the recovery of fugitive slaves, has been in opposition to an unbroken current of decisions in the Courts of the states, and those of the United States. Not a point has been decided in the cause now before this Court, which has not been ruled in the Courts of Massachusetts, New York, and Pennsylvania, and in other State Courts. Judges have differed as to some of them, but the Courts of the states have announced all of them, with the consideration and solemnity of judicial conclusion. In cases too, in which the decisions were appropriate, because the points were raised by the record.

I consider the point I have been maintaining, more important than any other in the opinion of the Court. It removes those causes which have contributed more than any other to disturb that harmony which is essential to the continuance of the Union. The framers of the Constitution knew it to be so, and inserted the provision in it. Hereafter they cannot occur, if the judgment of this Court in this cause shall meet with the same patriotic acquiescence which the tribunals of the states and the people of the states have heretofore accorded to its decisions. The recovery of fugitive slaves will hereafter be exclusively regulated by the Constitution of the United States, and the acts of Congress.

Apart from the position that the states may legislate in all cases, where they are not expressly prohibited, or by necessary implication; the claim for the states to legislate is mainly advocated upon the ground that they are bound to protect free blacks and persons of colour residing in them from being carried into slavery by any summary process. The answer to this is, that legislation may be confined to that end, and be made effectual, without making such a remedy applicable to fugitive slaves. There is no propriety in making a remedy to protect those who are free the probable means of freeing those who are not so. It is also said, the states may aid by remedies the acts of Congress, when they are not in conflict with them. I reply, Congress has full power to enact all that such aid could give; and if experience shows any deficiency in its enactments, Congress will no doubt supply it. If there are not now agencies enough to make the assertion of the right to fugitives convenient to their owners, Congress can multiply them. But if it should not be done, better is it that the inconvenience should be borne, than that the states should be brought into collision upon this subject as they have been; and that they should attempt to supply deficiencies, upon their separate views of what the remedies should be to recover fugitive slaves within their jurisdictions.

I have heard it suggested, also, as a reason why the states should legislate upon this subject, that Congress may repeal the remedy it has given, and leave the provision unaided by legislation; and that then the states might carry it into execution. Be it so; but the latter is not needed, for though legislation by Congress supports the rights intended to be secured, there is energy enough in the Constitution without legislation upon this subject, to protect and enforce what it gives.

Mr. Justice DANIEL.

Concurring entirely as I do with the majority of the Court, in the conclusions they have reached relative to the effect and validity of the statute of Pennsylvania now under review, it is with unfeigned regret that I am constrained to dissent from some of the principles and reasonings which that majority in passing to our common conclusions, have believed themselves called on to affirm.

In judicial proceedings generally, that has been deemed a safe and prudent rule of action, which involves no rights, nor questions not necessary to be considered; but leaves these for adjudication where, and when, only, they shall be presented directly and unavoidably, and when surrounded with every circumstance which can best illustrate their character. If, in ordinary questions of private interest, this rule is recommended by considerations of prudence, and accuracy, and justice; it is surely much more to be observed, when the subject to which it is applicable is the great fundamental law of the confederacy: every clause and article of which affects the polity and the acts of states.

Guided by the rule just mentioned, it seems to me that the regular action of the Court in this case is limited to an examination of the Pennsylvania statute, to a comparison of its provisions with the third clause of the fourth article of the Constitution, and with the act of Congress of 1793, with which the law of Pennsylvania is alleged to be in conflict; and that to accomplish these purposes, a general definition or contrast of the powers of the state and federal governments, was neither requisite nor proper. The majority of my brethren, in the conscientious discharge of their duty, have thought themselves bound to pursue a different course; and it is in their definition and distribution of state and federal powers, and in the modes and times they have assigned for the exercising those powers, that I find myself compelled to differ with them.

That portion of the Constitution which provides for the recovery of fugitive slaves, is the third clause of the second section of the fourth article; and is in these words: "No person held to service or labour in one state under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labour; but shall be delivered up on claim of the party to whom such service or labour may be due." The paramount authority of this clause in the Constitution to guaranty to the owner the right of property in his slave, and the absolute nullity of any state power directly or indirectly, openly or covertly, aimed to impair that right, or to obstruct its enjoyment; I admit, nay, insist upon to the fullest extent. I contend, moreover, that the act of 1793, made in aid of this clause of the Constitution and for its enforcement, so far as it conforms to the Constitution is the supreme law to the states; and cannot

be contravened by them without a violation of the Constitution. But the majority of my brethren proceeding beyond these positions, assume the ground that the clause of the Constitution above quoted, as an affirmative power granted by the Constitution, is essentially an exclusive power in the federal government; and consequently that any and every exercise of authority by the states at any time, though undeniably in aid of the guarantee thereby given, is absolutely null and void.

: Whilst I am free to admit the powers which are exclusive in the federal government, some of them became so denominated by the express terms of the Constitution; some because they are prohibited to the states; and others because their existence, and much more their practical exertion by the two governments, would be repugnant, and would neutralize if they did not conflict with and destroy each other : I cannot regard the third clause of the fourth article as falling either within the definition or meaning of an exclusive power. Such a power, I consider as originally and absolutely, and at all times incompatible with partition or association. It excludes every thing but itself.

There is a class of powers originally vested in the states, which by the theory of the federal government have been transferred to the latter; powers which the Constitution of itself does not execute, and which Congress may or may not enforce either in whole or in part, according to its views of policy or necessity; or as it may find them for the time beneficially executed or otherwise under the state authorities. These are not properly concurrent, but may be denominated dormant powers in the federal government; they may at any time be awakened into efficient action by Congress, and from that time so far as they are called into activity, will of course displace the powers of the states. But should they again be withdrawn or rendered dormant, or should their primitive exercise by the states never be interfered with by Congress; could it be properly said that because they potentially existed in Congress they were therefore denied to the states? The prosperity, the necessities of the country, and the soundest rules of constitutional construction, appear to me to present a decided negative to this inquiry. Nay, I am prepared to affirm, that even in instances wherein Congress may have legislated, legislation by a state which is strictly ancillary, would not be unconstitutional or improper.

The interpretation for which I contend cannot be deemed a novelty in this Court; but rests upon more than one of its decisions. upon the constitutional action of state authorities. In the case of Sturgis *v.* Crowninshield, which brought in question the right of the states to pass insolvent or bankrupt laws, Chief Justice Marshall holds the following doctrine, 4 Wheat. 192, 193 : "The counsel for the plaintiff contend that the grant of this power to Congress without limitation, takes it entirely from the states. In support of this proposition, they argue, that every power given to Congress is necessarily supreme; and if from its nature, or from the words of the grant, it is apparently intended to be exclusive, it is as much so as if they were expressly forbidden to exercise it. These propositions have been enforced and illustrated by many arguments drawn from different parts of the Constitution. That the power is both unlimited and supreme, is not questioned. That it is exclusive, is denied by the counsel for the defendant. In considering this question, it must be recollected that previous to the formation of the new Constitution, we were divided into independent states, united for some purposes, but in most respects sovereign. These states could exercise almost every legislative power; and amongst others, that of passing bankrupt laws. When the American people created a national legislature with certain enumerated powers, it was neither necessary nor proper to define the powers retained by the states. These powers remain as they were before the adoption of the Constitution, except so far as they may be abridged by that instrument. In some instances, as in making treaties, we find an express prohibition; and this shows the sense of the convention to have been that the mere grant of a power to Congress did not imply a prohibition on the states to the exercise of the same power." Again, p. 198, "It does not appear to be a violent construction of the Constitution, and is certainly a convenient one, to consider the powers of the states as existing over such cases as the laws of the Union do not reach. Be this as it may, the power of Congress may be exercised or declined, as the wisdom of that body shall decide. It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states. It has been said that Congress has exercised this power; and by doing so, has extinguished the power of the states, which cannot

be revived by repealing the law of Congress. We do not think so. If the right of the states is not taken away by the mere grant of that power to Congress, it cannot be extinguished; it can only be suspended by enacting a general bankrupt law. The repeal of that, cannot, it is true, confer the power on the states; but it removes a disability to its exercise, which was created by the act of Congress."

In the case of Houston v. Moore, 6 Wheat. 48, the following doctrine, was held by Mr. Justice Story, and in accordance with the opinion of the Court, in that case. "The Constitution containing a grant of powers, in many instances similar to those already existing in the state governments, and some of these being of vital importance also to state authority, and state legislation, it is not to be admitted that a mere grant of powers, in affirmative terms, to Congress, does, per se, transfer an exclusive sovereignty in such subjects to the latter; on the contrary, a reasonable interpretation of that instrument necessarily leads to the conclusion that the powers so granted are never exclusive of similar powers existing in the states; except where the Constitution has, in express terms, given an exclusive power to Congress, or the exercise of a like power is prohibited to the states. The example of the first class is to be found in the exclusive legislation delegated to Congress over places purchased by the consent of the legislature of the state in which the same shall be, for forts, arsenals, dock-yards, &c. :—of the second class, the prohibition of a state to coin money or emit bills of credit :—of the third class, as this Court have already held, is the power to establish an uniform rule of naturalization; and the delegation of admiralty and maritime jurisdiction. In all other cases not falling within the classes already mentioned, it seems unquestionable that the states retain concurrent authority with Congress, not only under the eleventh amendment of the Constitution, but upon the soundest principles of general reasoning. There is this reserve, however, that in cases of concurrent authority, where the laws of the states and of the Union are in direct and manifest collision on the same subject, those of the Union being the supreme law of the land, are of paramount authority; and the state laws, so far, and so far only, as such incompatibility exists, must necessarily yield. Such are the general principles by which my judgment is guided, in

every investigation of constitutional points. They commend themselves by their intrinsic equity; and have been amply justified by the great men under whose guidance the Constitution was framed, as well as by the practice of the government of the Union. To desert them, would be to deliver ourselves over to endless doubts and difficulties; and probably to hazard the existence of the Constitution itself."

In the case of the City of New York v. Miln, 11 Peters, 102, Mr. Justice Barbour, in delivering the opinion of the Court, lays down the following position, (p. 137,) as directly deducible from the decisions in Gibbons and Ogden, 7 Wheat. 204, and Brown and the State of Maryland, 12 Wheat. 419: "Whilst a state is acting within the legitimate scope of its power, as to the end to be attained, it may use whatever means being appropriate to that end, it may think fit; although they be the same, or so nearly the same as scarcely to be distinguished from those adopted by Congress acting under a different power; subject only to this limitation, that in the event of collision, the law of the state must yield to the law of Congress. The Court must be understood, of course, as meaning that the law of Congress is passed upon a subject within the sphere of its power." In the same case, the following language is held by Mr. Justice Thompson, p. 145: "In the leading cases upon this question, where the state law has been held to be constitutional, there has been an actual conflict between the legislation of Congress and that of the states, upon the right drawn in question. And in all such cases, the law of Congress is supreme. But in the case now before the Court, no such conflict arises; Congress has not legislated on this subject in any manner to affect the question." And again, p. 146, it is said by the same judge; "It is not necessary in this case to fix any limits upon the legislation of Congress and of the states on this subject; or to say how far Congress may, under the power to regulate commerce, control state legislation in this respect. It is enough to say, that whatever the power of Congress may be, it has not been exercised so as in any manner to conflict with the state law; and if the mere grant of the power to Congress does not necessarily imply a prohibition of the states to exercise the power until Congress assumes the power to exercise it, no objection on that ground can arise to this law."

Here then are recognitions, repeated and explicit, of the propriety, utility, and regularity of state action, in reference to powers confessedly vested in the general government, so long as the latter remains passive, or shall embrace within its own action only a portion of its powers, and that portion not comprised in the proceedings of a state government; and so long as the states shall neither conflict with the measures of the federal government, nor contravene its policy. From these recognitions, it must follow by necessary consequence, that powers vested in the federal government which are compatible with the modes of execution just adverted to, cannot be essentially and originally, nor practically, exclusive powers; for whatever is exclusive, utterly forbids, as has been previously observed, all partition or association. I hold then that the states can establish proceedings which are in their nature calculated to secure the rights of the slaveholder guarantied to him by the Constitution; as I shall attempt to show, that those rights can never be so perfectly secured, as when the states shall, in good faith, exert their authority to assist in effectuating the guarantee given by the Constitution. Fugitives from service, in attempting to flee either to the non-slaveholding states, or into the Canadas, must, in many instances, pass the intermediate states, before they can attain to the point they aim at.

If there is a power in the states to authorize and order their arrest and detention for delivery to their owners, not only will the probabilities of recovery be increased by the performance of duties enjoined by law upon the citizens of those states, as well private persons as those who are officers of the law; but the incitements of interest, under the hope of reward, will in a certain class of persons powerfully co-operate to the same ends. But let it be declared that the rights of arrest and detention, with a view of restoration to the owner, belong solely to the federal government, exclusive of the individual right of the owner to seize his property, and what are to be the consequences? In the first place, whenever the master, attempting to enforce his right of seizure under the Constitution, shall meet with resistance, the inconsiderable number of federal officers in a state, and their frequent remoteness from the theatre of action, must, in numerous instances, at once defeat his right of property, and deprive him

also of personal protection and security. By the removal of every incentive of interest in state officers, or individuals, and by the inculcation of a belief that any co-operation with the master becomes a violation of law, the most active and efficient auxiliary which he could possibly call to his aid is entirely neutralized. Again, suppose that a fugitive from service should have fled to a state where slavery does not exist, and in which the prevalent feeling is hostile to that institution; there might, nevertheless, in such a community, be a disposition to yield something to an acknowledged constitutional right—something to national comity too, in the preservation of that right; but let it once be proclaimed from this tribunal, that any concession by the states towards the maintenance of such a right, is a positive offence, the violation of a solemn duty, and I ask what pretext more plausible could be offered to those who are disposed to protect the fugitive, or to defeat the rights of the master? The Constitution and the act of Congress would thus be converted into instruments for the destruction of that which they were designed especially to protect. But it is said that if the states can legislate at all upon the subject of fugitives from service, they may, under the guise of regulations for securing the master' right, enact laws which, in reality, impair or destroy them. This, like every other argument drawn from the possible abuse of power, is deemed neither fair nor logical. It is equ ly applicable to the exercise of power by the federal as by the state governments; and might be used in opposition to all power and all government, as it is undeniable, that there is no power and no government which is not susceptible of great abuses. But those who argue from such possible or probable abuses against all regulations by the states touching this matter, should dismiss their apprehensions, under the recollection that should those abuses be attempted, the corrective may be found, as it is now about to be applied to some extent, in the controlling constitutional authority of this Court.

It has been said that the states in the exercise of their police powers may arrest and imprison vagrants or fugitives who may endanger the peace and good order of society; and by that means contribute to the recovery by the master of his fugitive slave. It should be recollected, however, that the police power of a state has no natural affinity with her exterior relations, nor wi h those

83

which she sustains to her sister states; but is confined to matters strictly belonging to her internal order and quiet. The arrest or confinement, or restoration of a fugitive, merely because he is such, falls not regularly within the objects of police regulations; for such a person may be obnoxious to no charge of violence or disorder; he may be merely passing through the state peaceably and quietly; or he may be under the care and countenance of some person affecting ownership over him, with the very view of facilitating his escape. Under such circumstances he would not be a proper subject for the exertion of the police power; and if not to be challenged under a different power in the state, his escape would be inevitable, however strong might be the evidences of his being a fugitive. But let it be supposed that either on account of some offence actually committed, or threatened; or from some internal regulation forbidding the presence of such persons within a state, they may be deemed subjects for the exertion of the police power proper, to what end would the exercise of that power naturally lead? Fugitives might be arrested for punishment, or they might be expelled or deported from the state. Nothing beyond these could be legally accomplished; and thus the invocation of this police power, so far from securing the rights of the master, would be made an engine to insure the deprivation of his property. Such are a portion of the consequences which, in my opinion, must flow from the doctrines affirmed by the majority of the Court: doctrines in my view not warranted by the Constitution, nor by the interpretation heretofore given of that instrument; and the assertion whereof seemed not to have been necessarily involved in the adjudication of this cause. With the convictions predominatory in my mind as to the nature and tendencies of these doctrines; whilst I cherish the profoundest respect for the wisdom and purity of those who maintain them; it would be a dereliction of duty in me to yield to them a direct or a tacit acquiescence; I therefore declare my dissent from them.

Mr. Justice M'LEAN.

As this case involves questions deeply interesting, if not vital, to the permanency of the union of these states; and as I differ on one point from the opinion of the Court, I deem it proper to state my own views on the subject.

The plaintiff, Edward Prigg, was indicted under the first section of an act of Pennsylvania, entitled "An act to give effect to the provisions of the Constitution of the United States, relative to fugitives from labour, for the protection of free people of colour, and to prevent kidnapping."

It provides, "If any person or persons shall, from and after the passing of this act, by force and violence, take and carry away, or cause to be taken or carried away, and shall by fraud or false pretence, seduce, or cause to be seduced, or shall attempt to take, carry away, or seduce any negro or mulatto from any part or parts of this commonwealth, to any other place or places whatsoever, out of this commonwealth, with a design and intention of selling and disposing of, or of causing to be sold, or of keeping and detaining, or of causing to be kept and detained, such negro or mulatto as a slave or servant for life, or for any term whatsoever; every such person or persons, his or their aiders or abettors shall, on conviction thereof, be deemed guilty of felony, and shall be fined in a sum not less than five hundred nor more than one thousand dollars, and shall be sentenced to imprisonment and hard labour not less than seven nor more than twenty-one years."

The plaintiff being a citizen of Maryland, with others, took Margaret Morgan, a coloured woman, and a slave, by force and violence, without the certificate required by the act of Congress, from the state of Pennsylvania, and brought her to the state of Maryland. By an amicable arrangement between the two states, judgment was entered against the defendant, in the Court where the indictment was found; and on the cause being removed to the Supreme Court of the state, that judgment, pro forma, was affirmed. And the case is now here for our examination and decision.

The last clause of the second section of the fourth article of the Constitution of the United States, declares that, "No person held to service or labour in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labour; but shall be delivered up on claim of the party to whom such service or labour may be due."

This clause of the Constitution is now, for the first time, brought before this Court for consideration.

That the Constitution was adopted in a spirit of compromise, is matter of history. And all experience shows that to attain the great objects of this fundamental law, it must be construed and enforced in a spirit of enlightened forbearance and justice. Without adverting to other conflicting views and interests of the states represented in the general convention, the subject of slavery was then, as it is now, a most delicate and absorbing consideration. In some of the states, it was considered an evil, and a strong opposition to it, in all its forms, was felt and expressed. In others it was viewed as a cherished right, incorporated into the social compact, and sacredly guarded by law.

Opinions so conflicting, and which so deeply pervaded the elements of society, could be brought to a reconciled action only by an exercise of exalted patriotism. Fortunately for the country, this patriotism was not wanting in the convention and in the states. The danger of discord and ruin was seen, and felt, and acknowledged; and this led to the formation of the confederacy. The Constitution, as it is, cannot be said to have imbodied in all its parts, the peculiar views of any great section of the Union; but it was adopted by a wise and far-reaching conviction, that it was the best which, under the circumstances, could be devised; and that its imperfections would be lost sight of, if not forgotten, in the national prosperity and glory which it would secure.

A law is better understood by a knowledge of the evils which led to its adoption. And this applies most strongly to a fundamental law.

At an early period of our history, slavery existed in all the colonies; and fugitives from labour were claimed and delivered up under a spirit of comity or conventional law among the colonies. The articles of confederation contained no provision on the subject, and there can be no doubt that the provision introduced into the Constitution was the result of experience and manifest necessity. A matter so delicate, important, and exciting, was very properly introduced into the organic law.

Does the provision, in regard to the reclamation of fugitive slaves, vest the power exclusively in the federal government?

This must be determined from the language of the Constitution, and the nature of the power.

The language of the provision is general. It covers the whole

ground, not in detail, but in principle. The states are inhibited from passing "any law or regulation which shall discharge a fugitive slave from the service of his master;" and a positive duty is enjoined on them to deliver him up, "on claim of the party to whom his service may be due."

The nature of the power shows that it must be exclusive.

It was designed to protect the rights of the master, and against whom? Not against the state, nor the people of the state in which he resides; but against the people and the legislative action of other states where the fugitive from labour might be found. Under the confederation, the master had no legal means of enforcing his rights in a state opposed to slavery. A disregard of rights thus asserted was deeply felt in the south. It produced great excitement, and would have led to results destructive of the Union. To avoid this, the constitutional guarantee was essential.

The necessity for this provision was found in the views and feelings of the people of the states opposed to slavery; and who, under such an influence, could not be expected favourably to regard the rights of the master. Now, by whom is this paramount law to be executed?

It is contended that the power to execute it rests with the states. The law was designed to protect the rights of the slaveholder against the states opposed to those rights; and yet, by this argument, the effective power is in the hands of those on whom it is to operate.

This would produce a strange anomaly in the history of legislation. It would show an inexperience and folly in the venerable framers of the Constitution, from which, of all public bodies that ever assembled, they were, perhaps, most exempt.

The clause of the Constitution under consideration declares that no fugitive from labour shall be discharged from such labour, by any law or regulation of the state into which he may have fled. Is the state to judge of this? Is it left for the state to determine what effect shall be given to this and other parts of the provision?

This power is not susceptible of division. It is a part of the fundamental law, and pervades the Union. The rule of action which it prescribes was intended to be the same in all the states. This is essential to the attainment of the objects of the

law. If the effect of it depended, in any degree, upon the construction of a state by legislation or otherwise, its spirit, if not its letter, would be disregarded. This would not proceed from any settled determination in any state to violate the fundamental rule, but from habits and modes of reasoning on the subject. Such is the diversity of human judgment, that opposite conclusions equally honest, are often drawn from the same premises. It is, therefore, essential to the uniform efficacy of this constitutional provision that it should be considered, exclusively, a federal power. It is in its nature as much so as the power to regulate commerce, or that of foreign intercourse.

To give full effect to this provision, was legislation necessary? Congress, by the passage of the act of 1793, legislated on the subject, and this shows how this provision was construed shortly after its adoption: and the reasons which were deliberately considered, and which led to the passage of the act, show clearly that it was necessary. These reasons will be more particularly referred to under another head of the argument. But looking only at the Constitution, the propriety, if not the necessity of legislation is seen.

The Constitution provides that the fugitive from labour shall be delivered up, on claim being made by the person entitled to such labour; but it is silent as to how and on whom this claim shall be made. The act of Congress provides for this defect and uncertainty, by establishing the mode of procedure.

It is contended, that the power to legislate on this subject is concurrently in the states and federal government. That the acts of the latter are paramount, but that the acts of the former must be regarded as of authority, until abrogated by the federal power. How a power exercised by one sovereignty can be called concurrent, which may be abrogated by another, I cannot comprehend. A concurrent power, from its nature, I had supposed must be equal. If the federal government by legislating on the subject annuls all state legislation on the same subject, it must follow that the power is in the federal government and not in the state.

Taxation is a power common to a state and the general government, and it is exercised by each independently of the other And this must be the character of all concurrent powers.

It is said that a power may be vested in the federal govern-

ment which remains dormant, and that in such case a state may legislate on the subject. In the case supposed, whence does the legislature derive its power? Is it derived from the constitution of the state, or the Constitution of the United States?

If the power is given by the state constitution, it must follow that it may be exercised independently of the federal power; for it is presumed no one will sanction the doctrine that Congress, by legislation, may abridge the constitutional power of a state.

How can the power of the state be derived from the federal Constitution? Is it assumed on the ground that Congress having the power have failed to exercise it? Where is such an assumption to end? May it not be applied with equal force and propriety to the whole ground of federal legislation; excepting only the powers inhibited to the states? Congress have not legislated upon a certain subject, but this does not show that they may not have duly considered it. Or, they may have acted without exhausting the power. Now, in my judgment, it is illogical and unconstitutional to hold that in either of these cases a state may legislate.

Is this a vagrant power of the state, like a floating land warrant to be located on the first vacant spot that shall be found? May a state occupy a fragment of federal power which has not been exercised, and like a tenant at will, continue to occupy it until it shall have notice to quit?

No such power is derived by implication from the federal Constitution. It defines the powers of the general government, and imposes certain restrictions and duties on the states. But beyond this it in no degree affects the powers of the states. The powers which belong to a state are exercised independently. In its sphere of sovereignty it stands on an equality with the federal government, and is not subject to its control. It would be as dangerous as humiliating to the rights of a state, to hold that it legislative powers were exercised to any extent and under any circumstances, subject to the paramount action of Congress. Such a doctrine would lead to serious and dangerous conflicts of power.

The act of 1793 seems to cover the whole constitutional ground. The third section provides, "That when a person held to labour in any state or territory of the United States, under the laws

thereof, shall escape into any other of the said states or territories, the person to whom such labour or service may be due, his agent or attorney, is empowered to seize or arrest such fugitive from labour, and to take him or her before any judge of the Circuit or District Courts of the United States residing or being within the state, or before any magistrate of a county, city, or town corporate, wherein such seizure or arrest shall be made, and upon proof, to the satisfaction of such judge or magistrate, either by oral testimony or affidavit, &c., that the person so seized or arrested, doth, under the laws of the state or territory from which he or she fled, owe service or labour to the person claiming him or her; it shall be the duty of such judge or magistrate to give a certificate thereof to such claimant, his agent, or attorney, which shall be sufficient warrant for removing said fugitive to the state from which he or she fled "

The fourth section imposes a penalty on any person who shall obstruct or hinder such claimant, his agent, or attorney, &c., or shall rescue such fugitive, when so arrested, &c.

It seems to be taken as a conceded point in the argument, that Congress had no power to impose duties on state officers, as provided in the above act. As a general principle this is true; but does not the case under consideration form an exception? Congress can no more regulate the jurisdiction of the state tribunals, than a state can define the judicial power of the Union. The officers of each government are responsible only to the respective authorities under which they are commissioned. But do not the clauses in the Constitution in regard to fugitives from labour, and from justice, give Congress a power over state officers, on these subjects? The power in both the cases is admitted or proved to be exclusively in the federal government.

The clause in the Constitution preceding the one in relation to fugitives from labour, declares that, "A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime."

In the first section of the act of 1793, Congress have provided that on demand being made as above, "it shall be the duty of

the executive authority to cause the person demanded to be arrested, &c.

The constitutionality of this law, it is believed, has never been questioned. It has been obeyed by the governors of states, who have uniformly acknowledged its obligation. To some demands surrenders have not been made; but the refusals have, in no instance, been on the ground that the Constitution and act of Congress were of no binding force. Other reasons have been assigned.

Now, if Congress may by legislation require this duty to be performed by the highest state officer, may they not on the same principle require appropriate duties in regard to the surrender of fugitives from labour, by other state officers. Over these subjects the constitutional power is the same.

In both cases the act of 1793 defines on what evidence the delivery shall be made. This was necessary, as the Constitution is silent on the subject. The act provides that on claim being made of a fugitive from labour, "it shall be the duty of such judge or magistrate to give a certificate that the person claimed owes services to the claimant."

The Constitution requires "that such person shall be delivered up, on claim of the party to whom the service is due." Here is a positive duty imposed; and Congress have said in what mode this duty shall be performed. Had they not power to do so? If the Constitution was designed, in this respect, to require, not a negative but a positive duty on the state and the people of the state where the fugitive from labour may be found; of which, it would seem, there can be no doubt; it must be equally clear that Congress may prescribe in what manner the claim and surrender shall be made. I am therefore brought to the conclusion that, although, as a general principle, Congress cannot impose duties on state officers, yet in the cases of fugitives from labour and from justice, they have the power to do so.

In the case of Martin's Lessee v. Hunter, 1 Wheat. Rep. 304, this Court say, "The language of the Constitution is imperative on the states as to the performance of many duties. It is imperative on the state legislatures to make laws prescribing the time, place, and manner of holding elections for senators and representatives, and for electors of President and Vice President. And in these as

well as in other cases, Congress have a right to revise, amend, or supersede the laws which may be passed by the state legislatures."

Now, I do not insist on the exercise of the federal power to the extent as here laid down. I go no farther than to say, that where the Constitution imposes a positive duty on a state or its officers to surrender fugitives, that Congress may prescribe the mode of proof, and the duty of the state officers.

This power may be resisted by a state, and there is no means of coercing it. In this view the power may be considered an important one. So the Supreme Court of a state may refuse to certify its record on a writ of error to the Supreme Court of the Union, under the twenty-fifth section of the judiciary act. But resistance to a constitutional authority by any of the state functionaries, should not be anticipated; and if made, the federal government may rely upon its own agency in giving effect to the laws.

I come now to a most delicate and important inquiry in this case, and that is, whether the claimant of a fugitive from labour may seize and remove him by force out of the state in which he may be found, in defiance of its laws. I refer not to laws which are in conflict with the Constitution, or the act of 1793. Such state laws, I have already said, are void. But I have reference to those laws which regulate the police of the state, maintain the peace of its citizens, and preserve its territory and jurisdiction from acts of violence.

About the time of the adoption of the Constitution, a coloured man was seized by several persons in the state of Pennsylvania, and forcibly removed out of it, with the intent, as charged, to enslave him. This act was then, as it is now, a criminal offence by the law of Pennsylvania. Certain persons were indicted for this offence, and in the year 1791, the Governor of Pennsylvania demanded of the Governor of Virginia, the persons indicted, as fugitives from justice.

The Governor of Virginia submitted the case to the attorney-general of that state, who decided, that the offence charged in the indictment was not, such a crime as under the Constitution required a surrender. He also held, "that control over the persons charged ought not to be acquired by any force not specified and delegated by positive law." The Governor of Virginia refused

to arrest the defendants, and deliver them to the authorities of Pennsylvania. The correspondence between the governors and the opinion of the attorney-general of Virginia, with other papers relating to the case, were transmitted to the President of the United States, who laid them before Congress. And there can be no doubt that this correspondence, and the forcible removal of the coloured person, which gave rise to it, led to the passage of the act of 1793.

It is not unworthy of remark, that a controversy on this subject should first have arisen after the adoption of the Constitution, in Pennsylvania; and that after a lapse of more than half a century, a controversy involving a similar act of violence should be brought before this Court, for the first time, from the same state

Both the Constitution and the act of 1793, require the fugitive from labour to be delivered up on claim being made, by the party or his agent, to whom the service is due. Not that a suit should be regularly instituted. The proceeding authorized by the law is summary and informal. The fugitive is seized by the claimant, and taken before a judge or magistrate within the state, and on proof, parol or written, that he owes labour to the claimant, it is made the duty of the judge or magistrate to give the certificate, which authorizes the removal of the fugitive to the state from whence he absconded.

The counsel inquire of whom the claim shall be made. And they represent that the fugitive, being at large in the state, is in the custody of no one, nor under the protection of the state; so that the claim cannot be made, and consequently that the claimant may seize the fugitive and remove him out of the state.

A perusal of the act of Congress obviates this difficulty, and the consequence which is represented as growing out of it.

The act is framed to meet the supposed case. The fugitive is presumed to be at large, for the claimant is authorized to seize him. After seizure, he is in custody; before it, he was not. And the claimant is required to take him before a judicial officer of the state; and it is before such officer his claim is to be made.

To suppose that the claim is not to be made, and indeed cannot be unless the fugitive be in the custody or possession of some public officer or individual, is to disregard the letter and spirit of the act of 1793. There is no act in the statute book more pre-

cise in its language ; and, as it would seem, less liable to misconstruction. In my judgment, there is not the least foundation in the act for the right asserted in the argument, to take the fugitive by force and remove him out of the state.

Such a proceeding can receive no sanction under the act, for it is in express violation of it. The claimant having seized the fugitive, is required by the act to take him before a federal judge within the state, or a state magistrate within the county, city, or town corporate, within which the seizure was made. Now, can there be any pretence that after the seizure under the statute, the claimant may disregard the other express provision of it, by taking the fugitive without claim out of the state. But it is said, the master may seize his slave wherever he finds him, if by doing so he does not violate the public peace ; that the relation of master and slave is not affected by the laws of the state, to which the slave may have fled, and where he is found.

If the master has a right to seize and remove the slave without claim, he can commit no breach of the peace by using all the force necessary to accomplish his object.

It is admitted that the rights of the master, so far as regards the services of the slave, are not impaired by this change ; but the mode of asserting them, in my opinion, is essentially modified. In the state where the service is due, the master needs no other law than the law of force to control the action of the slave. But can this law be applied by the master in a state which makes the act unlawful?

Can the master seize his slave and remove him out of the state in disregard of its laws, as he might take his horse which is running at large? This ground is taken in the argument. Is there no difference in principle in these cases?

The slave, as a sensible and human being, is subject to the local authority into whatsoe er jurisdiction he may go. He is answerable under the laws for his acts, and he may claim their protection. The state may protect him against all the world except the claim of his master. Should any one commit lawless violence on the slave, the offender may unquestionably be punished ; and should the slave commit murder, he may be detained and punished for it by the state, in disregard of the claim of the

master. Being within the jurisdiction of a state, a slave bears a very different relation to it from that of mere property.

In a state where slavery is allowed, every coloured person is presumed to be a slave ; and on the same principle, in a non-slaveholding state, every person is presumed to be free without regard to colour. On this principle, the states, both slaveholding and non-slaveholding, legislate. The latter may prohibit, as Pennsylvania has done under a certain penalty, the forcible removal of a coloured person out of the state. Is such law in conflict with the act of 1793?

The act of 1793 authorizes a forcible seizure of the slave by the master, not to take him out of the state, but to take him before some judicial officer within it. The act of Pennsylvania punishes a forcible removal of a coloured person out of the state. Now, here is no conflict between the law of the state and the law of Congress. The execution of neither law can, by any just interpretation, in my opinion, interfere with the execution of the other. The laws in this respect stand in harmony with each other.

It is very clear that no power to seize and forcibly remove the slave without claim is given by the act of Congress. Can it be exercised under the Constitution? Congress have legislated on the constitutional power, and have directed the mode in which it shall be executed. The act, it is admitted, covers the whole ground ; and that it is constitutional there seems to be no reason to doubt. Now, under such circumstances, can the provisions of the act be disregarded, and an assumed power set up under the Constitution? This is believed to be wholly inadmissible by any known rule of construction.

The terms of the Constitution are general, and like many other powers in that instrument require legislation. In the language of this Court in Martin v. Hunter, 1 Wheat. Rep. 304, "the powers of the Constitution are expressed in general terms, leaving to the legislature, from time to time, to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers, as its own wisdom and the public interests should require."

This, Congress have done by the act of 1793. It gives a summary and effectual mode of redress to the master, and is he not

bound to pursue it? It is the legislative construction of the Constitution; and is it not a most authoritative construction? I was not prepared to hear the counsel contend that, notwithstanding this exposition of the Constitution, and ample remedy provided in the act, the master might disregard the act and set up his right under the Constitution. And having taken this step, it was easy to take another, and say, that this right may be asserted by a forcible seizure and removal of the fugitive.

This would be a most singular constitutional provision. It would extend the remedy by recaption into another sovereignty, which is sanctioned neither by the common law nor the law of nations. If the master may lawfully seize and remove the fugitive out of the state where he may be found, without an exhibition of his claim, he may lawfully resist any force, physical or legal, which the state, or the citizens of the state, may interpose.

To hold that he must exhibit his claim in case of resistance, is to abandon the ground assumed. He is engaged, it is said, in the lawful prosecution of a constitutional right. All resistance then, by whomsoever made, or in whatsoever form, must be illegal. Under such circumstances the master needs no proof of his claim, though he might stand in need of additional physical power. Having appealed to this power, he has only to collect a sufficient force to put down all resistance and attain his object. Having done this, he not only stands acquitted and justified; but he has recourse for any injury he may have received in overcoming the resistance.

If this be a constitutional remedy, it may not always be a peaceful one. But if it be a rightful remedy, that it may be carried to this extent, no one can deny. And if it may be exercised without claim of right, why may it not be resorted to after the unfavourable decision of the judge or magistrate? This would limit the necessity of the exhibition of proof by the master to the single case where the slave was in the actual custody of some public officer. How can this be the true construction of the Constitution? That such a procedure is not sanctioned by the act of 1793 has been shown. That act was passed expressly to guard against acts of force and violence.

I cannot perceive how any one can doubt that the remedy

given in the Constitution, if indeed it give any remedy without legislation, was designed to be a peaceful one ; a remedy sanctioned by judicial authority ; a remedy guarded by the forms of law. But the inquiry is reiterated, is not the master entitled to his property? I answer that he is. His right is guarantied by the Constitution, and the most summary means for its enforcement is found in the act of Congress. And neither the state nor its citizens can obstruct the prosecution of this right.

The slave is found in a state where every man, black or white, is presumed to be free; and this state, to preserve the peace of its citizens, and its soil and jurisdiction from acts of violence, has prohibited the forcible abduction of persons of colour. Does this law conflict with the Constitution? It clearly does not, in its terms.

The conflict is supposed to arise out of the prohibition against the forcible removal of persons of colour generally, which may include fugitive slaves. Primâ facie it does not include slaves, as every man within the state is presumed to be free, and there is no provision in the act which embraces slaves. Its language clearly shows, that it was designed to protect free persons of colour within the state. But it is admitted, there is no exception as to the forcible removal of slaves. And here the important and most delicate question arises between the power of the state, and the assumed but not sanctioned power of the federal government.

No conflict can arise between the act of Congress and this state law. The conflict can only arise between the forcible acts of the master and the law of the state. The master exhibits no proof of right to the services of the slave, but seizes him, and is about to remove him by force. I speak only of the force exerted on the slave. The law of the state presumes him to be free, and prohibits his removal. Now, which shall give ay, the master or the state? The law of the state does, in no case, discharge, in the language of the Constitution, the slave from the service of his master.

It is a most important police regulation. And if the master violate it, is he not amenable? The offence consists in the abduction of a person of colour. And this is attempted to be justified upon the simple ground that the slave is property. That a

slave is property must be admitted. The state law is not violated by the seizure of the slave by the master, for this is authorized by the act of Congress; but by removing him out of the state by force, and without proof of right, which the act does not authorize. Now, is not this an act which a state may prohibit? The presumption in a non-slaveholding state is against the right of the master, and in favour of the freedom of the person he claims. This presumption may be rebutted, but until it is rebutted by the proof required in the act of 1793, and also, in my judgment, by the Constitution, must not the law of the state be respected and obeyed?

The seizure which the master has a right to make under the act of Congress is for the purpose of taking the slave before an officer. His possession of the slave within the state, under this seizure, is qualified and limited to the subject for which it was made.

The certificate of right to the service of the slave is undoubtedly for the protection of the master; but it authorizes the removal of the slave out of the state where he was found, to the state from whence he fled. And under the Constitution this authority is valid in all the states.

The important point is, shall the presumption of right set up by the master, unsustained by any proof, or the presumption which arises from the laws and institutions of the state, prevail. This is the true issue. The sovereignty of the state is on one side, and the asserted interest of the master on the other. That interest is protected by the paramount law, and a special, a summary, and an effectual mode of redress is given. But this mode is not pursued, and the remedy is taken into his own hands by the master.

The presumption of the state that the coloured person is free may be erroneous in fact; and if so, there can be no difficulty in proving it. But may not the assertion of the master be erroneous also; and if so, how is his act of force to be remedied? The coloured person is taken, and forcibly conveyed beyond the jurisdiction of the state. This force, not being authorized by the act of Congress nor by the Constitution, may be prohibited by the state. As the act covers the whole power in the Constitution, and carries out, by special enactments, its provisions, we are, in my judgment,

[Prigg *v.* The Commonwealth of Pennsylvania.]

bound by the act. We can no more, under such circumstances, administer a remedy under the Constitution, in disregard of the act, than we can exercise a commercial or other power in disregard of an act of Congress on the same subject.

This view respects the rights of the master and the rights of the state. It neither jeopards nor retards the reclamation of the slave. It removes all state action prejudicial to the rights of the master; and recognises in the state a power to guard and protect its own jurisdiction, and the peace of its citizens.

It appears, in the case under consideration, that the state magistrate before whom the fugitive was brought refused to act. In my judgment he was bound to perform the duty required of him by a law paramount to any act, on the same subject, in his own state. But this refusal does not justify the subsequent action of the claimant. He should have taken the fugitive before a judge of the United States, two of whom resided within the state.

It may be doubted whether the first section of the act of Pennsylvania under which the defendant was indicted, by a fair construction applies to the case under consideration. The decision of the Supreme Court of that state was pro forma, and, of course, without examination. Indeed, I suppose, the case has been made up merely to bring the question before this Court. My opinion, therefore, does not rest so much upon the particular law of Pennsylvania, as upon the inherent and sovereign power of a state, to protect its jurisdiction and the peace of its citizens, in any and every mode which its discretion shall dictate, which shall not conflict with a defined power of the federal government.

This cause came on to be heard on the transcript of the record from the Supreme Court of Pennsylvania, and was argued by counsel; on consideration whereof, It is the opinion of this Court, that the act of the Commonwealth of Pennsylvania, upon which the indictment in this case is founded, is repugnant to the Constitution and laws of the United States, and, therefore, void; and that the judgment of the Supreme Court of Pennsylvania upon the special verdict found in the case, ought to have been that the said Edward Prigg was not guilty. It is, therefore, ordered and adjudged by this Court, that the judgment of the said Supreme Court of Pennsylvania be, and the same is, hereby, re-

[Prigg *v.* The Commonwealth of Pennsylvania.]

versed. And this Court, proceeding to render such judgment in the premises as the said Supreme Court of Pennsylvania ought to have rendered, do hereby order and adjudge that judgment upon the special verdict aforesaid be here entered, that the said Edward Prigg is not guilty in manner and form as is charged against him in the said indictment, and that he go thereof quit without day; and that this cause be remanded to the Supreme Court of Pennsylvania with directions accordingly, so that such other proceeding may be had therein as to law and justice shall appertain.